834

```
1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF NEW YORK
2
    - - - - - - - - - - - -     X
3
    UNITED STATES OF AMERICA,    :   24-CR-146(KAM)
4
         -against-               :   United States Courthouse
5                                    Brooklyn, New York
    JOEL DAVID FORNEY,           :
6                                    August 15, 2025
              Defendant.         :   9:00 a.m.
7
    - - - - - - - - - - - -     X
8
            TRANSCRIPT OF CRIMINAL CAUSE FOR SENTENCING
9          BEFORE THE HONORABLE KIYO A. MATSUMOTO
            UNITED STATES DISTRICT JUDGE, and a jury.
10
    APPEARANCES:
11
    For the Government:          JOSEPH NOCELLA, JR.
12                               INTERIM UNITED STATES ATTORNEY
                                 BY: ANTOINETTE N. RANGEL
13                                   LAUREN A. BOWMAN
                                 Assistant United States Attorneys
14                               271 Cadman Plaza East
                                 Brooklyn, New York
15
                                 U.S. DEPARTMENT OF JUSTICE
16                               HUMAN PROSECUTION UNIT
                                 BY:  LEAH BRANCH
17                               150 M Street, NE
                                 Washington, DC  20002
18
    For the Defendant:           MURRAY SINGER, ESQ.
19                               14 Vanderventer Avenue, Suite 147
                                 Port Washington, New York
20
                                 NICHOLAS HINE, ESQ.
21                               P.O. Box 170096
                                 Brooklyn, New York
22
    Court Reporter:              Andronikh M. Barna
23                               225 Cadman Plaza East
                                 Brooklyn, New York
24                               (718) 613-2178

25  Proceedings recorded by mechanical stenography, transcript
    produced by computer-aided transcription.
```

Proceedings                                              835

1              (in open court; all parties present.)

2              (Jury not present.)

3              THE COURT:  I just ask if we can go on the record.

4              This concerns an e-mail request which, again, is not

5    appropriate in my view.  Everything should be on the docket.

6    This e-mail was sent this morning at 8:44.

7              Did you see it, Mr. Singer or Mr. Hine?

8              MR. SINGER:  Yes.

9              THE COURT:  All right.  I'm prepared to discuss it,

10   but we can wait until Mr. Forney is here if you prefer.  It

11   concerns the charges.

12             And I will order the Government to file it on the

13   docket as a letter.  We don't --

14             MR. SINGER:  Mr. Forney had consented to do the

15   charge conference without him being present.

16             THE COURT:  Yes.  Correct.

17             MR. SINGER:  I think this would simply be a

18   continuation.

19             THE COURT:  All right.

20             So, what I don't have is Mr. Mr. Singer and

21   Mr. Hine's response to this.

22             We did make one other change and we wanted to clear

23   this with everybody.

24             If you look at page 31, number 3, approximate dates,

25   rather than state that "charges in the offenses alleged in

Proceedings                                          836

1   Counts One and Two," it should say "One through Five."

2              (Ms. Rangel enters.)

3              MS. RANGEL:  Hello, Your Honor.

4              MR. SINGER:  That's fine.

5              THE COURT:  Good morning.

6              That's fine?  Okay, good.

7              So the other change is a request to amend the

8   instruction on Count Two.

9              U.S. MARSHAL:  Good morning, Your Honor.

10             THE COURT:  Hi.  Thank you.  Good morning.

11             U.S. MARSHAL:  Good morning, Judge.

12             THE COURT:  Mr. Forney is welcome to join us.

13             (Defendant enters.)

14             THE COURT:  All right.  Mr. Forney is here now.

15  Thank you.

16             Mr. Forney, we were reviewing the charges that we

17  were talking about last night and making some last-minute

18  tweaks.

19             THE DEFENDANT:  Good morning.

20             THE COURT:  These are the legal instructions.  Okay,

21  sir?

22             So the Government, this morning, e-mailed my law

23  clerk -- again, not appropriate, but they will file a letter

24  on the public docket -- requesting that the following language

25  be inserted into Count Two:  "Whether or not Jonnica C.

Proceedings                                               837

1    consented to travel in interstate commerce for the purpose of

2    prostitution is irrelevant, so long as the Government proves

3    that the Defendant knowingly and intentionally transported

4    Jonnica C. in interstate commerce with the intent that she

5    engage in prostitution."

6              This is already in Count Three.

7              And I'm happy to hear from Mr. Singer or Mr. Hine

8    about their views on this request.

9              MR. SINGER:  Judge, we oppose it as simply being too

10   late.  We've been through this charge, we've read the charge

11   as I have -- as we've been trying the case and as I was

12   preparing to sum up today, and I think it's not appropriate at

13   this point to add further legal instruction at the last moment

14   like this.  It's simply inappropriate.  They've had ample

15   opportunity, they've got a team of people to work on this, and

16   it should have been raised earlier.  So, we would oppose the

17   change.

18             The changes that both sides had proposed last

19   evening were merely technical ones having to do with a date or

20   some of that type of language, technical language.  This is a

21   substantive change that the Government is asking for and I

22   don't think it's appropriate at this time.

23             THE COURT:  Do you want to be heard, ma'am?

24             MS. BRANCH:  Well, Your Honor, we do appreciate that

25   this was sent this morning, and we will file a letter on the

Proceedings                                           838

1   docket per the Court's order.  However, regardless of when

2   something is submitted, the purpose of the jury instructions

3   is to ensure that the jury fully understands the law, and this

4   instruction is important to do just that.  It's important to

5   explain to the jury, in a case where we expect there to be

6   significant argument about what Ms. C may have consented to

7   and not consented to, that they understand the confines of the

8   law and how they can use that alleged consent, should they

9   find it, in order to evaluate the evidence and the charges,

10  which is why we are making this request.

11              THE COURT:  All right.

12              Mr. Singer, I think that the language is correct as

13  a matter of law.  It appears elsewhere with regard to

14  Charge 3 -- no.

15              Is it in Charge 3?  I'm sorry.

16              MS. BRANCH:  It is, Your Honor.

17              THE COURT:  Charge 3.

18              Count Two is the Mann Act transportation.

19              And I think I've tried to make clear my displeasure

20  with this last-minute request.  I agree with you, Mr. Singer,

21  that the Government has a team of three very experienced

22  prosecutors and should have brought this to our attention

23  during the charging conference.

24              My concern is that if the jurors see this in

25  Count Three but not in Count Two, it may be confusing to them.

Andronikh M. Barna, Official Court Reporter, RPR, CRR

Proceedings                                                839

1   And I think that in terms of your summation regarding each of

2   the counts, the parties can make a fairly seamless pivot if

3   this is part of what you were going to be arguing.

4          I don't think that adding this to Count Two would be

5   prejudicial.  It is a correct statement of the law, as I said,

6   and it would help the jury understand, if arguments are made

7   about consent, how to apply that concept in the context of the

8   evidence before the trial jury.

9          So, I would like to add this to Count Two.  It

10  should --

11         MR. SINGER:  Judge.

12         THE COURT:  I'm sorry, go ahead.

13         MR. SINGER:  I'm sorry.

14         Would you use the same language that you used in

15  Count Three?  Because what the Government is proposing is not

16  what exists in Count Three.

17         THE COURT:  Ms. Branch, is there a reason not to?

18         MS. BRANCH:  Your Honor, it mirrors the instruction.

19  But because the elements are different, there's a difference

20  in the language.

21         So, the language to Count Three is "whether or not

22  she consented is irrelevant, so long as the Government proves

23  the Defendant" and then the --

24         THE COURT:  Is irrelevant, yes.

25         MS. BRANCH:  This proposed instruction is the same,

Proceedings                                          840

1    except for it says "so long as the Government proves the

2    Defendant knowingly and intentionally transported her."  So

3    the only difference is because of the elements of the statute

4    itself.

5              MR. SINGER:  But the language -- I mean, I

6    understand it's not identical language because it's a

7    different element, but the structure of the sentence should be

8    the same.

9              Count Three is "I instruct you that if you

10   unanimously find that the Defendant did the necessary act,

11   whether or not she consented to travel is irrelevant."  So I

12   think that the same formulation should be used if you're going

13   to be adding.

14             MS. BRANCH:  Perhaps I'm not understanding

15   Mr. Singer, but I believe that is what is requested, "whether

16   or not Jonnica C. consented to travel in interstate commerce

17   for the purposes of prostitution is irrelevant, so long as the

18   Government proves that the Defendant knowingly and

19   intentionally transported Jonnica C. in interstate commerce

20   with the intent that she engage in prostitution."

21             THE COURT:  Well, I think what he's asking is that

22   the sentence that appears on page 49 under A, first element,

23   that that language be duplicated in Count Two, but it would

24   instead say, for Count Two, "I instruct you that if you

25   unanimously find that the Defendant knowingly transported

Proceedings                                                    841

1    Jonnica C. in interstate commerce for the purpose of

2    prostitution, then" -- and the rest of it would follow.

3              MS. BRANCH:  That's fine with the Government,

4    Your Honor.

5              THE COURT:  Is that what you were getting at,

6    Mr. Singer?

7              MR. SINGER:  Yes.

8              THE COURT:  Okay.

9              It should say "I instruct you that if you

10   unanimously find that the Defendant knowingly transported or

11   caused the transportation of Jonnica C. in interstate commerce

12   for the purpose of prostitution, whether or not Jonnica C.

13   consented to travel in interstate commerce for the purpose of

14   prostitution is irrelevant."

15             I mean, it basically will capture everything that is

16   in the proposal by the Government.

17             All right.  So what we did was we used that

18   language, but formatted in the way that Mr. Singer suggested.

19             "I instruct you that if you unanimously find that

20   the Defendant knowingly and intentionally transported or

21   caused the transportation of Jonnica C in interstate commerce

22   with the intent that she engage in prostitution, whether or

23   not Jonnica C. consented to travel in interstate commerce for

24   the purpose of prostitution is irrelevant."

25             Is that language acceptable to the Government and

Proceedings                                                842

1    Mr. Singer?

2              MS. BRANCH:  Yes, Your Honor.

3              MR. SINGER:  Yes.

4              THE COURT:  All right, we will insert that.  And I

5    suggest that that will be inserted on what is page 46 under

6    the -- at the end of the first paragraph there which ends "I

7    have already instructed you as to what it means to act

8    knowingly and intentionally, and you should apply those

9    instructions here."  We will add it there.  It's on page 46.

10             All right.  Are we ready to proceed with closing

11   arguments now?

12             MS. BRANCH:  One more very brief issue, Your Honor,

13   with the Government's apologies.

14             Yesterday, during the direct of Jessica F, I

15   misspoke.  I asked that Government's 533 be shown to the

16   witness, thinking it was already in evidence.  It was not.

17   What was in evidence was Government's 532, which was not shown

18   to Ms. F.  Counsel and the Government conferred this morning,

19   and given the fact that 533 and 532 are almost identical

20   photographs of the same location, Counsel, my understanding,

21   is not objecting to admitting 533 into evidence so the record

22   is corrected and complete.

23             MR. SINGER:  That is correct, Your Honor.

24             THE COURT:  All right.

25             So in terms of the transcript --

Andronikh M. Barna, Official Court Reporter, RPR, CRR

Proceedings                                    843

1              MS. BRANCH:  Yes, Your Honor.

2              THE COURT:  -- it will still use the exhibit

3    designation that you spoke about yesterday?

4              MS. BRANCH:  Yes, Your Honor.

5              THE COURT:  But we will admit the exhibit.

6              MS. BRANCH:  Yes, Your Honor.

7              (Government Exhibit 533 received in evidence.)

8              THE COURT:  Okay.

9              And it's added to your compilation?

10             MS. BRANCH:  Yes, it will be, Your Honor.

11             THE COURT:  All right.

12             And did the Defense give you their exhibits to add?

13             MS. BRANCH:  They did, Your Honor.

14             THE COURT:  All right.

15             And did you check it against Ms. Jackson's exhibit

16   list?

17             MS. BRANCH:  We have not at this point, Your Honor.

18             THE COURT:  All right.  You'll have to do that just

19   to make sure.

20             Both Mr. Singer and the Government should check and

21   make sure that there's nothing on that list that is missing or

22   shouldn't be there.

23             MS. BRANCH:  Understood, Your Honor.

24             May we have a copy of the master list?

25             THE COURT:  Yes.

Andronikh M. Barna, Official Court Reporter, RPR, CRR

                          Proceedings                    844

1              MS. BRANCH:  Thank you.

2              THE COURT:  Is there anything else?

3              MS. BRANCH:  Not from the Government, Your Honor.

4              MR. SINGER:  No, Your Honor.

5              Judge, could we have -- before we bring the jury in,

6    could we have a moment to speak with Mr. Forney?  We were not

7    able to speak with him this morning and I understand that

8    there is an issue that he would like to raise.

9              THE COURT:  All right.  Hopefully a moment.  Okay?

10             MR. SINGER:  It will be brief.

11             THE COURT:  Sure.

12             (Recess taken.)

13             (In open court; all parties present.)

14             THE COURT:  We can bring the jury in.

15             Is everybody ready?

16             MR. SINGER:  You're not asking for this right now?

17             THE COURT:  No.  Before we send the exhibits back to

18   the jury, you will have a chance to review, confer and make

19   sure that everything is in order on the exhibits.  Okay?

20             MR. SINGER:  All right.  That's fine.  Because I

21   just want to be focusing on this.

22             THE COURT:  Yes.

23             Could you give me a brief estimate as to how long

24   your respective summations will take?

25             MS. RANGEL:  I would say about an hour, an hour and

Proceedings                                                 845

1    15 fifteen minutes.

2           THE COURT:  All right.

3           What about you, Mr. Singer?

4           MR. SINGER:  45.  It's really a guess.

5           THE COURT:  And will you be doing a rebuttal

6    summation as well?

7           MS. RANGEL:  Ms. Bowman will, yes.

8           THE COURT:  Okay.

9           MS. RANGEL:  And if we can just remind the jurors;

10   we are going to do a PowerPoint presentation, so just to bring

11   up their monitors.

12          THE COURT:  All right.

13          THE LAW CLERK:  I can bring them up.

14          MS. RANGEL:  And we also have some sealed exhibits

15   that we're going to be showing, and so I will indicate that it

16   should only be shown to the parties and the jury.

17          THE COURT:  I will remind Sandy and --

18          MS. RANGEL:  We reminded her.

19          THE COURT:  Okay.

20          MR. SINGER:  I will need to remind her as well

21   because I will be doing the same.

22          THE COURT:  All right.  So just remember to say

23   "sealed," both of you.

24          MS. RANGEL:  Yes.

25          THE COURT:  Okay.  Thank you.

Summation - Ms. Rangel                    846

1          (Pause in proceedings.)

2          (Jury enters.)

3          THE COURT:  All right.  Good morning, Members of the

4     Jury.

5          All are present.

6          Please have a seat.

7          As I told you yesterday, at this time both of the

8     parties will have an opportunity to sum up the evidence for

9     you.  I remind you that their summations are not evidence;

10    rather, they are arguments and they are going to be asking you

11    to interpret the evidence in the case that has been admitted

12    and will argue that certain conclusions should be reached

13    based on the evidence.  But do bear in mind that their

14    arguments are not evidence.

15         With that, is Ms. Rangel ready to proceed?

16         MS. RANGEL:  Yes, Your Honor.

17         THE COURT:  All right.  Please do so.

18         MS. RANGEL:  Jonnica, Shyya, Mellisa.  The person

19    these three women have in common is the Defendant.  The

20    Defendant preyed on their vulnerabilities.  He lured in these

21    victims.  He offered to help Jonnica with her financial

22    struggles.  He offered Shyya housing because she was living on

23    the streets.  He told Mellisa she was beautiful and he gave

24    her the attention she was lacking.  And then, once he trapped

25    them, he used them however he saw fit.

Summation - Ms. Rangel                    847

1        You heard during this trial how the Defendant abused

2   them.  He hit Shyya and Jonnica, he threatened them, he

3   created a climate of fear to coerce them.  And he did it all

4   for one reason and one reason only:  Money.  He forced these

5   women to engage in prostitution 7 days a week for 10 to

6   12 hours a day to make him thousands of dollars while he gave

7   them barely any money for food and a place to stay.

8        On the stand, the Defendant tried to sell you a

9   story.  He was a gentleman pimp.  He told you his pimp name

10  was The Reverend Sirbar.  It was his testimony under oath that

11  he never laid hands on a woman working in prostitution, but

12  you know from the evidence that's not the truth.  The

13  Defendant is a violent sex trafficker.  He smacked or beat up

14  Jonnica, Shyya, Foxy, and Jessica.  He told you he told them

15  that he was a real pimp.  And what do real pimps do?  Real

16  pimps keep all the money from the women in their stable.

17       You know from this trial that these women aren't the

18  only ones the Defendant abused.  He also abused Mellisa.  The

19  evidence shows that the Defendant brought her to his basement

20  when she was no more than 15 years old and he had sex with

21  her.

22       The Defendant did not just terrorize these women, he

23  broke the law.

24       And this morning I will summarize the evidence for

25  you.  I won't be able to mention everything, but what I will

1    do is highlight the key evidence that proves the Defendant's

2    guilt beyond a reasonable doubt.

3              Let's start with the law.

4              Now, Judge Matsumoto will instruct you on the law

5    later.  And, of course, what Judge Matsumoto says controls.

6    And if I say something inconsistent with what Judge Matsumoto

7    tells you, please follow her instructions.

8              The Defendant is charged with five counts:

9    Count One, the sex trafficking of Jonnica; Count Two,

10   transportation of Jonnica; Count Three, interstate

11   prostitution of Jonnica; Count Four, sex trafficking of Shyya;

12   and Count Five, coercion and enticement of Mellisa.

13             Now, we're going to go through how the evidence

14   establishes each element for the crimes, but before we do I

15   want to start by briefly noting that for Count One, sex

16   trafficking of Jonnica, the Defendant is charged both with

17   committing this crime himself and with aiding and abetting in

18   the commission of these acts.  As Judge Matsumoto will explain

19   more fully in her instructions on the law, this means that if

20   you find beyond a reasonable doubt that either the Defendant

21   himself committed the acts that make up the element of the

22   charged crimes or if he aided and abetted in the commission of

23   these acts, you must find him guilty.  The law treats them the

24   same.

25             Now, let's first review the evidence of Counts One

1   and Four, the sex trafficking of Jonnica and Shyya.

2          Judge Matsumoto will instruct you that to prove that

3   the Defendant is guilty of sex trafficking, the Government

4   must establish four elements:

5          First, that the Defendant knowingly transported,

6   recruited, enticed or maintained a person by any means; or

7   that the Defendant knowingly benefited financially or by

8   receiving something of value from participating in a venture

9   that recruited, enticed, transported or maintained a person;

10          Second, that the Defendant knew or acted in reckless

11   disregard of the fact that force, fraud or coercion, or a

12   combination of these tactics, would be used to cause such

13   person to engage in a commercial sex act;

14          Third, that the Defendant knew that such person

15   would be engaged in a commercial sex act;

16          And fourth, that the Defendant's conduct was in or

17   affecting interstate commerce.

18          And as you've seen, the third element is not in

19   dispute here.  The Defendant told you he's a pimp and that

20   Jonnica and Shyya worked in prostitution for him.  That's at

21   transcript pages 572 and 573.  So the third element, that the

22   Defendant knew these women would be engaging in commercial

23   sex, is satisfied.

24          The fourth element is also not in dispute.

25   Judge Matsumoto will instruct you that the fourth element

1    simply requires that the Defendant's conduct affected

2    interstate commerce in any way, no matter how minimal.  And

3    there are many ways that the Defendant's conduct impacted

4    interstate commerce, so let's go through them.

5          The Defendant communicated on cellular phones

6    through calls and texts with Jonnica and Shyya about dates, be

7    it the hotel room or on the Penn Track, which, as you learned,

8    is an area in Brooklyn where women walk the streets, approach

9    cars to sell sex.  That's at transcript pages 88, 293, and

10   305.

11         Judge Matsumoto will instruct you that the

12   Government must only prove that the Defendant's conduct

13   impacted interstate commerce in any way, no matter how

14   minimal.  These calls and texts with Jonnica and Shyya and the

15   Defendant that were part of their work as prostitutes for him

16   are enough to satisfy the interstate commerce element for both

17   Count One and Count Four.

18         Just these calls and texts, this element is

19   satisfied, but I'll briefly review some of the other evidence

20   that proves the interstate commerce element.

21         In addition to these calls and text, you know that

22   the Defendant arranged Jonnica's travel from Wisconsin to

23   New York through the purchase of her Amtrak ticket, which is

24   Government Exhibit 904, which also satisfies the interstate

25   commerce element.

Summation - Ms. Rangel                               851

1          The interstate commerce element is also satisfied by

2   the Defendant transporting Jonnica from state to state,

3   including from Wisconsin to New York, New York to Connecticut,

4   New Jersey, Pennsylvania, and many other states that she

5   testified about.  That's at transcript pages 126 and 132.

6          There were also dozens of Backpage ads that the FBI

7   examiner reviewed with you.

8          And for this slide, I would ask that it only be

9   displayed to the jury and the parties.

10          The FBI examiner told you that these were Backpage

11   ads that were posted on the internet.  That's Government

12   Exhibit 1003.

13          And the Defendant testified that he posted these

14   ads.  That's at transcript 592.

15          The Defendant's use of the internet to post these

16   Backpage ads also satisfies the interstate commerce element.

17          These are the other ways that the interstate

18   commerce element is satisfied.

19          So, let's turn to the second element of sex

20   trafficking.  There are two ways this element can be

21   satisfied.  The first way is that the Defendant knowingly

22   transported, recruited, enticed or maintained these victims by

23   any means; or the second way to satisfy this element is that

24   the Defendant knowingly benefited financially from

25   participating in a venture that recruited, enticed,

1    transported or maintained a person.

2          Now let's turn to the first way this element is

3    satisfied, that the Defendant knowingly transported,

4    recruited, enticed or maintained the victims by any means.

5    That's a long list of words, but they have simple meanings.

6    You know what it means to transport someone.  In your everyday

7    life, you have seen what it means to recruit or entice

8    someone.  And it's a long list with many options.  If you find

9    that the Defendant did any one of the things on that list,

10   took any of those actions as to Jonnica or Shyya, you will

11   have found proof for the first element of sex trafficking for

12   that victim.

13         So, let's walk through the evidence that the

14   Defendant transported, recruited, enticed or maintained

15   Jonnica and Shyya.

16         Transportation.

17         The Defendant transported Jonnica first by arranging

18   her travel and purchasing her Amtrak ticket from Wisconsin to

19   New York and then by driving her from New York to Connecticut

20   and also from hotel to hotel, not only in Connecticut, but as

21   she testified, New Jersey, Pennsylvania, Maine, Massachusetts,

22   Virginia, and Washington, D.C.  This was the Defendant

23   repeatedly transporting Jonnica across state lines either by

24   arranging for her travel through the purchase of the Amtrak

25   ticket or driving him herself across states throughout the

1  Northeast to engage in prostitution.

2          You also heard about the other ways in which the

3  Defendant transported both Jonnica and Shyya.  The Defendant

4  picked them up in his car and drove them to various places so

5  that they could have sex with men for money.

6          The Defendant drove Jonnica to other states, as we

7  just discussed -- that's at transcript pages 125 -- and drove

8  Shyya to and from the Penn Track daily, sometimes in his

9  Jaguar, and that's at transcript page 309.  This is the

10  Defendant transporting both victims.

11          Recruitment and enticement.

12          The Defendant lured Jonnica with false promises of a

13  life of luxury.  Jonnica told you that the Defendant painted

14  her a picture of what her life would be like in New York.  He

15  told her that she would be living a very luxurious, very fancy

16  life, strutting around in nice heels and nice outfits just

17  living the life.  That's at transcript page 165.  She told you

18  before she got to New York that based on her conversations

19  with the Defendant, that she believed she'd find herself on a

20  yacht somewhere drinking martinis.  That's at transcript

21  page 237.  The Defendant told Jonnica that she would make a

22  substantial amount of money and that she would be free to keep

23  it, go here, fly there, and the Defendant told her that she

24  would be able to keep the money that she made.  That's all at

25  transcript page 41.  Jonnica's life was in shambles.  She was

Summation - Ms. Rangel                    854

1   broke.  The Defendant recruited and enticed her to engage in

2   prostitution by selling her a fantasy.

3            And you know from the Defendant's own words, in the

4   video of Government Exhibit 822, that he sells fantasies to

5   women that he's trying to recruit in prostitution.

6            The Defendant recruited Shyya by offering her

7   shelter.  At the time Shyya met the Defendant, she had been

8   sleeping on the subway.  And most recently, she was living in

9   a house that was infested with mice.  That's at transcript

10  page 289.  Without stable housing, the Defendant recruited and

11  enticed her by offering her a place to stay.

12           This is the Defendant recruiting and enticing

13  Jonnica and Shyya to work for him, by offering them an

14  opportunity to improve their circumstances by coming to work

15  for him in prostitution.

16           Now, once Jonnica and Shyya worked for him, the

17  Defendant provided them with shelter, food, clothing, condoms,

18  and basic necessities.  This is the Defendant maintaining

19  these victims.  You can find this element is satisfied based

20  on any of this conduct, but the Defendant gave you plenty of

21  options.

22           All this evidence I went through proves how the

23  Defendant knowingly transported, recruited, enticed or

24  maintained these victims by numerous means.

25           Now, let's review the second way this first element

Summation - Ms. Rangel                                    855

1    is satisfied, that the Defendant benefited financially from

2    participating in a venture that recruited, enticed,

3    transported or maintained a person.  If you believe that

4    Kelsie is the one who recruited Jonnica, and Kelsie is the one

5    who defrauded Jonnica, and Kelsie coerced Jonnica to work with

6    threats, then the Defendant is still guilty because he was in

7    a business venture with Kelsie and he was making money off

8    that venture, and that venture being prostitution.  And he

9    knew exactly what Kelsie was doing because he was the one

10   managing her and telling her what to do.  Kelsie worked for

11   the Defendant and he's on the hook for her actions done at his

12   bidding and with his knowledge.  This is also why aiding and

13   abetting is important.  If you find that Kelsie was

14   trafficking Jonnica and the Defendant was aiding her in the

15   commission of that crime, he's also guilty.

16        You know that the Defendant gained a financial

17   benefit from his work as a pimp because the victims told you

18   that they gave him his -- their money after their dates, be it

19   on the Penn Track or in hotels.

20        Jonnica and Shyya testified that when they received

21   the money from engaging in commercial sex, they gave it all to

22   the Defendant.  That's transcript pages 28, 304 and -5, and

23   307.

24        Jonnica and Shyya told you that the Defendant set a

25   daily quota for them, $2,000 for Jonnica and $600 for Shyya.

1   That's at transcript pages 94 and 304.

2          The Defendant also told you that he financially

3   benefited from commercial sex that Jonnica and Shyya engaged

4   in, when he testified.  That's at transcript pages 597 and 598

5   and 610 and 611.  The second element of sex trafficking is

6   satisfied because the Defendant profited thousands of dollars

7   in this venture from Jonnica and Shyya engaging in commercial

8   sex.

9          Now let's talk about the second element, how the

10  Defendant used force, the threat of force, fraud or coercion,

11  or a combination of these tactics, against Jonnica and Shyya

12  to cause them to engage in commercial sex.

13         Now, as I talk about these elements, please keep in

14  mind that like the first element, the second element is proven

15  if you believe that the Defendant used any of these tactics

16  with respect to Jonnica and Shyya.  The law does not require

17  that the Defendant use all of them -- force, the threat of

18  force, fraud and coercion -- against Jonnica to find him

19  guilty of sex trafficking.  It simply requires that any one of

20  these tactics, at any time, or any combination of them,

21  against Jonnica and Shyya.  But I submit that the evidence

22  will show that the Defendant used each and every one of them

23  to compel Jonnica and Shyya.

24         And that brings us to the second element of

25  Counts One and Four, whether the Defendant used force, fraud,

1  or coercion to cause Jonnica or Shyya to engage in commercial

2  sex.

3          But before we talk about this element, I want to

4  pause and focus on a very important aspect of this case, and

5  that is that Jonnica and Shyya told you that the Defendant

6  used merely identical tactics to compel them to engage in

7  prostitution.  This is important because the fact that two

8  women who worked for the Defendant at different times, who

9  come from different places and do not know each other, took

10 the stand and told you the same thing.

11         So, let's talk about the ways Jonnica and Shyya's

12 testimony is consistent.

13         Jonnica and Shyya both told you the Defendant hit

14 them when they broke his rules or when they disobeyed him.

15 More specifically, they both told you that he backhanded them

16 in the face on at least one occasion.

17         Jonnica and Shyya both told you that the Defendant

18 would recruit them by using a very specific phrase.  He called

19 himself a real pimp.

20         Jonnica and Shyya both told you that the Defendant

21 compelled them to work on the Penn Track.  For Shyya, all

22 night long.  And for Jonnica, as punishment when she did not

23 make enough on hotel dates.

24         Jonnica and Shyya both told you that the Defendant

25 had rules they had to follow.  Shyya said that she had to look

1    down and not look at pimps in the eye.  And both of them said

2    that they had to give all their money to the Defendant, except

3    for a meager sum for food each day.

4            Jonnica and Shyya both told you that the Defendant

5    gave them a quota or an amount of money that they had to make

6    each night and that he made them keep working until they made

7    it.

8            Jonnica and Shyya both told you that the Defendant

9    had them work seven days a week, even if they were tired, even

10   if they were on their periods.

11           And Jonnica and Shyya both told you that because of

12   the Defendant's conduct, they were terrified.  They didn't

13   want to make him mad, so they both kept having sex with men

14   for money, even when they didn't want to, to keep him from

15   hitting them or threatening them.

16           And Members of the Jury, you don't just have the

17   testimony of Jonnica and Shyya.  You also have the testimony

18   of Jessica, who doesn't know Shyya and Jonnica.  And the

19   testimony from all these women is consistent.

20           Like Jonnica and Shyya, Jessica told you that the

21   Defendant beat her on the Penn Track.  And you saw the

22   photographs of the injury it caused her.

23           Jessica and Shyya also both told you that they saw

24   the Defendant beat a woman named Foxy on the Penn Track.

25           Like Jonnica and Shyya, Jessica told you that the

Summation - Ms. Rangel                859

1    Defendant tried to recruit her using the very same, specific
2    phrase, telling her that he was a real pimp.  And Jessica and
3    Shyya also both told you that this phrase has a specific
4    meaning, that the Defendant doesn't split money with his
5    prostitutes.  Or, as Shyya put it, he doesn't do half and
6    half.
7              Jessica's testimony supports what Jonnica and Shyya
8    told you that life was like on the Penn Track.
9              Jessica testified that there were rules on the
10   track; that women working in commercial sex can't look pimps
11   in the eye; that women have to walk the streets, as the
12   sidewalk is reserved for pimps; that pimps impose quotas on
13   the women working for them; and that pimps on the track
14   enforce these rules with violence, like the Defendant did.
15             Members of the Jury, the testimony of these women is
16   consistent with one another.  And I submit to you that this
17   evidence, you should credit their testimony because it's
18   consistent.
19             Now, with that in mind, let's talk about how the
20   Defendant used force, fraud, threats of force and coercion to
21   cause Jonnica and Shyya to engage in commercial sex starting
22   with physical force.
23             Force.
24             Force is any form of power, violence, or physical
25   pressure directed at another person.  The Defendant used force

Summation - Ms. Rangel                860

1    against Jonnica and Shyya to cause them to engage in

2    commercial sex.  And you heard from both of them that the

3    Defendant used this force to keep them in line, to keep them

4    working and making money for him.

5            Jonnica told you about that force, the physical

6    violence the Defendant subjected her to.  The Defendant

7    smacked her with the back of his hand and the next thing she

8    knew he was having sex with her.  That's at page 107 of the

9    transcript.  Jonnica said she got an attitude with the

10   Defendant.  This was the Defendant's response, to backhand her

11   and have sex with her.

12           And what did the Defendant say next?  After he hit

13   her, after he forced her to have sex, he said:  Get back to

14   work.

15           Jonnica said that after the Defendant hit her, she

16   didn't leave him, out of fear.  That's transcript page 108.

17   Instead, Jonnica continued to engage in commercial sex for the

18   Defendant.

19           This is the Defendant using physical force, both by

20   hitting Jonnica and then having sex with her, to ensure that

21   she would continue to engage in commercial sex for his

22   benefit.

23           The Defendant also subjected Shyya to force.  The

24   Defendant put his hands on Shyya on at least three separate

25   occasions.

1      The first time, the Defendant smacked her across the

2   face.  She said she was scared.  That's at transcript page

3   311.

4      The second time the Defendant was angry with Shyya,

5   because she violated his rules.  The Defendant punished Shyya

6   because she met a man who was willing to pay $700 for the

7   whole night and Shyya wanted to stay with him so she didn't

8   have to return to the Track, but the Defendant told her she

9   couldn't stay, even though she wanted to.  And Shyya told you

10  that because she disobeyed him, he beat her.  In other words,

11  he beat her to cause her to continue to engage in commercial

12  sex where he wanted and when he wanted so that he could make

13  more money.

14     The Defendant took off all his clothes because Shyya

15  thought he didn't want to get blood on his fancy clothing from

16  beating her.  Shyya covered her face while the Defendant

17  slapped and punched her.  After the beating, Shyya suffered

18  headaches for two weeks.  Shyya was scared.  She said she just

19  wanted it to be over.  The beating was so bad that Shyya left

20  working for the Defendant because she said she didn't want it

21  to ever happen again.  That's transcript pages 315 and 316.

22     But what happened next?  The Defendant used more

23  force.  Shyya left the Defendant.  He found her on the

24  Penn Track and he smacked her on the mouth and busted her lip.

25  The Defendant smacked Shyya across the face and he busted her

Summation - Ms. Rangel                         862

1    lip.  And that's at transcript page 326.

2            And I submit that the Defendant hit her because he

3    didn't want her to leave.  He wanted her to continue making

4    him $600 a day.  And so when she attempted to leave, he found

5    her and used force.

6            The Defendant used force on these occasions to

7    create a climate of fear for Jonnica and Shyya.  And he

8    created that climate of fear to ensure that they would obey

9    him and follow his rules to engage in commercial sex where and

10   how he wanted and give him the money.  In other words, the

11   Defendant taught them, through his show of physical force,

12   that if they did not do as he said, they would bear the

13   physical consequences.  And both of them actually did.

14           You also heard from Jessica.  Like Jonnica and

15   Shyya, she told you that the Defendant beat her and Foxy.

16   Jessica described how the Defendant drove up to her and Foxy

17   while they were working on the Penn Track and violently

18   punched and kicked Foxy while calling her a bitch.  She told

19   you how the Defendant then did the same to her, punching and

20   kicking her when she tried to walk away.  And you saw the

21   injuries the Defendant caused.  That's Government Exhibit 804.

22           Threats of force.

23           A threat is a warning, a statement indicating that

24   you're going to do harm.  A threat to do harm to cause someone

25   to engage in a commercial sex act is the second element of the

1    sex trafficking -- is the way the second element is satisfied.

2             Jonnica testified about the Defendant's threat of

3    force.  The Defendant showed her a picture of a black woman's

4    dismembered body.  The Defendant showed her that picture and

5    said, in no uncertain terms:  This is what happens if you

6    don't obey your pimp.

7             This was the ultimate threat of force.  Jonnica

8    described the Defendant's words as a very serious threat to

9    her life.  That's at transcript page 100.

10            And, in turn, Jonnica stayed and she continued to

11   work for him and give him money.

12            That was the whole point:  Don't leave, don't take

13   money, don't stop having sex, don't do anything other than

14   what I tell you or something very bad will happen to you.

15            Jonnica told you that's why she kept working for the

16   Defendant, because she was trying to protect herself.  That's

17   at transcript page 131.

18            Jonnica said she kept playing along so the Defendant

19   didn't threaten her with violence.  That's at transcript page

20   98.

21            Shyya also experienced a threat of force.  Shyya saw

22   the Defendant beat another one of the women, who worked for

23   the Defendant, on the Penn Track.  Shyya saw the Defendant

24   beat Foxy.  Foxy was on the floor, on her knees, while the

25   Defendant beat her.  Shyya said that after seeing Foxy be

Summation - Ms. Rangel                              864

1   beaten by the Defendant, she was terrified.  Foxy (sic) told

2   you that after watching that beating, she thought:  If I did

3   something wrong, then I would get my ass beat like that.

4              THE COURT:  You mean Shyya.  I think you misspoke.

5              MS. RANGEL:  I apologize.

6              Shyya told you that after the beating, she thought:

7   If I did something wrong, then I would get my ass beat.

8              Thank you, Your Honor.

9              Think about that, Ladies and Gentlemen.  The

10  Defendant beat Foxy to the ground in front of Shyya.  Why?

11  Because Shyya was an example, a living threat of force, to

12  show Shyya what would happen if she broke the Defendant's

13  rules and she stopped engaging in commercial sex when and how

14  the Defendant demanded.

15             Fraud.

16             Another way the second element can be satisfied is

17  that the Defendant used fraud to get Jonnica or Shyya to

18  perform commercial sex acts.  A fraud is a misstatement of

19  material facts.  Fraud means lies, a lie about a material

20  fact, which is a fact that someone would rely on when making a

21  decision.

22             And you know the Defendant and Kelsie, who were in a

23  venture together, lied to Jonnica.  We talked about it earlier

24  when I discussed enticement.  The Defendant painted a

25  completely different picture of what Jonnica's life would be

1  like in New York City.  But you know that was a lie.  Jonnica

2  wasn't rolling in money.  She never set foot on a yacht.  She

3  never went out to fancy dinners or wore fancy clothes, as the

4  Defendant sent man after man to her room so she could engage

5  in commercial sex for him.  The life the Defendant painted to

6  Jonnica got her to move to New York City.  All lies.  That's

7  fraud.

8          And these lies, this fraud, all designed to get

9  Jonnica to work for the Defendant, that's sufficient to

10  satisfy the second element for sex trafficking.

11          You heard a lot about Jonnica's communications with

12  the Defendant before she left Wisconsin about what she agreed

13  to and whether she sent the Defendant nude pictures.  And you

14  will evaluate her credibility just like you will for all the

15  witnesses.  But Members of the Jury, no matter what Jonnica

16  did before she arrived in New York, the Defendant is guilty.

17          Listen as Judge Matsumoto instructs you on the law.

18  She will tell you that even if a woman initially agrees to

19  work in prostitution for the Defendant, she can later be

20  coerced if the Defendant used force, threats of force, fraud

21  or coercion, or a combination, to compel her to continue to

22  work in prostitution.  What that means is, even if you find

23  Jonnica willingly agreed to come to New York to work in

24  prostitution, the Defendant still trafficked her if he

25  compelled her to continue working when she wanted to stop.

1          The moment the Defendant warned Jonnica there would

2     be consequences if she fell asleep before working, he's

3     guilty.

4          The moment he threatened to put her in the hospital

5     to scare her into having sex with men for money, he's guilty.

6          The moment he showed her the picture of the

7     dismembered woman's body and warned her that that's what

8     happens to whores who disobey their pimps, he's guilty.

9          The moment he painted the fantasies of a glamorous

10    lifestyle in New York City to get her to travel here to engage

11    in prostitution, and that was all made up, he's guilty.

12         The moment he barged into her hotel room and slapped

13    her for having an attitude and then told her to get back to

14    work, he's guilty.

15         Even if she initially agreed to work in

16    prostitution.

17         And Members of the Jury, that makes sense.  Just

18    because a person consents to something does not mean they

19    surrender their right to change their mind, especially when

20    the conditions are entirely different than what they were

21    told.  And that's the -- and the law of sex trafficking

22    recognizes that.

23         In sum, Jonnica had the right to stop engaging in

24    prostitution if she wanted to.  And because the Defendant used

25    force, threats of force, fraud and coercion, or some

Summation - Ms. Rangel                    867

1   combination of those tactics, to compel her to keep working,

2   he's guilty.

3            Now, turning back to the second element of sex

4   trafficking, let's discuss coercion.  The last way the second

5   element can be satisfied is if the Defendant used coercion to

6   get Jonnica and Shyya to engage in commercial sex.

7            Coercion is important here.  Coercion is a threat of

8   serious harm or physical restraint.  And I expect that

9   Judge Matsumoto will instruct that this harm includes both

10  physical and nonphysical types of harm, including

11  psychological, financial, or reputational harm.  That is

12  sufficient under all of the surrounding circumstances to

13  compel a reasonable person in the same circumstances to

14  perform or continue to perform commercial sex in order to

15  avoid harm.

16           I also expect that Judge Matsumoto will instruct you

17  that coercion can mean that the Defendant engaged in a course

18  of behavior that was intended to cause these victims to

19  believe that if they did not engage in prostitution as

20  directed by the Defendant, that they would suffer harm.

21           Judge Matsumoto will also tell you, when you

22  consider whether there was a serious threat of harm to a

23  particular victim, you can take into account their

24  circumstances in life, age, experience, intelligence, mental

25  condition.

1          Take these victims and their circumstances into

2    account.

3          Jonnica had no money.  Her life was in shambles.

4    She had a bad relationship with her family, no friends and

5    lost custody of her daughter.

6          And Shyya, she was in and out of a foster care

7    system throughout her life.  Like Jonnica, she had not a

8    dollar to her name and no place to live when she came to

9    New York City.

10         Both of these women were teen moms who came to a

11   foreign city with nothing with the hope of a better life.

12   They did not have endless opportunities when they came to work

13   for the Defendant.  He was the option at the time.

14         When you assess whether his actions were intended to

15   and did cause Jonnica and Shyya to fear for their lives and,

16   as a result, followed his rules, abide by his direction, go

17   where he wanted them to go, do sex dates and get the money,

18   you should take into account who they were and what their life

19   was like at the time.  In other words, when you evaluate

20   whether Jonnica and Shyya were coerced, you're assessing how

21   someone in their situation would feel and act under those

22   circumstances.

23         And I submit to you that when you do, you'll

24   conclude that in light of the fact that they were seriously

25   struggling personally and financially and that once they

Summation - Ms. Rangel                        869

1    worked for the Defendant, he was their sole source of money,

2    food, housing, they both had a deep fear of violence or of

3    living on the street, and that drove them to continue to

4    engage in prostitution as and when the Defendant directed

5    them.

6            Shyya even told you that she thought if she

7    contacted the authorities when she was working for the

8    Defendant, it would put her life in jeopardy.  That's at

9    transcript page 329.

10           And this fear, which the Defendant cultivated, was

11   not only a physical harm but also financial harm.  Indeed, it

12   was exactly these vulnerabilities that caused the Defendant to

13   prey on them.  He knew they were susceptible to his control

14   because they were struggling, because they were out of

15   options, and because they had nowhere else to go and no one to

16   save them.  And he capitalized on these vulnerabilities

17   because he's a pimp and he wanted more money.

18           But there were other forms of coercion.  The

19   Defendant created rules that were coercive.  You heard from

20   Shyya about those rules.  When you meet a man, ask if he is a

21   pimp or police.  If you're approached by a pimp, keep your

22   head down.  No speaking to other women on the Penn Track.  No

23   walking on the sidewalk or walk -- only walk on the street.

24   Wear lingerie or see-through clothing.  Use vulgar language to

25   catch dates.  Text the Defendant immediately once you're with

1    a date.  After the date, give him all the money.  Meet the

2    $600 a night quota.  Work from sundown to sunrise.  Work no

3    matter what.  Sick, tired, on your period, you couldn't leave

4    the track until you made quota.  Those are transcript pages

5    292 to 293 and 304 to 306.

6            Shyya was afraid to break the rules.  She said she

7    didn't want to find out what could happen if she didn't follow

8    the Defendant's rules.  That's at transcript page 293.

9            She learned the hard way when she didn't follow what

10   the Defendant said.  He beat her.

11           And when Foxy didn't follow what he said, he beat

12   her.

13           So Shyya, who could not work on the Track with other

14   pimps for fear of what might happen to her and no source of

15   income, kept following the Defendant's rules.  She kept

16   working, engaging in commercial sex for the Defendant day in

17   and day out, seven days a week for five months.

18           Think about Shyya's testimony when you evaluate her

19   credibility.  Remember her frank, very matter-of-factly

20   account of her life on the Penn Track, working for the

21   Defendant.  Think about how she told you, in federal court,

22   about the things the Defendant told her to say to attract men

23   in passing cars, things designed to, in her words, get a man's

24   dick hard, or telling you she had sex with seven to ten men in

25   cars each night.  She brought you inside of what it felt like

1    to be in the center of a pimp circle with seven or eight

2    men -- seven or eight pimps surrounding her.  She felt dizzy.

3    She wasn't sure what was going to happen to her.

4            When she described the photographs of the Penn

5    Track, she made sure to point out to you where the

6    White Castle was, essentially her workplace bathroom, as if it

7    was the most normal thing.  And I don't say this to pass any

8    judgment on Shyya whatsoever.  I say that because Shyya's

9    story helps you understand why she's desensitized to the fact

10   that instead of tolerating the mice where she was living, she

11   called another pimp in hopes that her fate might be better

12   with him.  And you know from her testimony that it wasn't.

13           The Defendant's own words, and in his own voice, in

14   the recording Sir Bar-Down, Government Exhibits 206-1 and 812,

15   are also consistent with the coercive environment that Shyya

16   experienced when working for the Defendant on the Penn Track,

17   that the Defendant bragged about.  Also, based on the report

18   from the Defendant's phone, the rap was accessed in July 14,

19   2016, during the time period Jonnica worked for the Defendant

20   on the Penn Track and only a year before Shyya did.  When the

21   Defendant rapped about life on the Penn Track, he was rapping

22   about women like Shyya who worked for him.

23           Now, let's do a comparison of what the Defendant

24   rapped about in Sir Bar-Down and what Shyya told you the

25   Defendant did to her.            (Continued on the next page.)

1          MS. RANGEL:  (Continuing) Lyric:  "Selling pussy."

2    Shyya:  Selling pussy.

3          Lyric:  "Real pimp."

4          When referring to the defendant, Shyya testified

5    he said he was a real pimp, he don't do no half-and-half.

6          Lyric:  "30 bitches in my stable."

7          Shyya:  Stable is who you're with.  So a stable

8    would be, I'm with a pimp and we have four other girls in

9    our stable.

10          Lyric:  "Talking to the bitch, she looked down."

11          Shyya:  If you approached by a pimp, you keep your

12    head down.

13          Lyric:  "Multi, that's my Co-P."

14          Shyya identified Multi as Tyshawn Higgins, another

15    pimp on the Track.  She defined Co-P as co-pimp which are

16    pimps who associate or know one another.

17          Lyric:  "When I get you out, straight to the

18    Track."

19          Shyya testified that no matter the circumstances:

20    Sick, tired, or on your period, it was straight to the

21    Track.

22          As you evaluate Shyya's credibility, the

23    consistency between her testimony and the defendant's own

24    description of the coercive environment that he created when

25    she worked for him on the Penn Track is more evidence for

1   you to credit her testimony.

2          The defendant's actions led Jonnica and Shyya to

3   believe they had no other choice but to obey him.  Jonnica

4   explained her fear of the defendant, that she was scared of

5   what he might do to her if she left.  She believed that

6   continuing to work for him would be the only way to avoid

7   the option of serious harm.  The defendant even threatened

8   to put her in the hospital.  That's at transcript Page 99.

9   That's why she stayed with him for eight months until she

10  jumped at the opportunity to escape when he was late to pick

11  her up because of an injury.

12         Similarly, the defendant also made Shyya feel like

13  leaving him wasn't an option.  When asked why she didn't

14  leave the defendant, she called it crazy.  She said she

15  would probably would get smacked for doing so.  That's

16  transcript Page 319.  She called leaving crazy because the

17  defendant had successfully made her fear that if she did not

18  do what he wanted, stayed and continued to sell her body,

19  she'd suffer physical consequences.

20         Let's list some of the other things that the

21  defendant caused Jonnica and Shyya to fear beyond physical

22  harm.  They feared being alone, broke, and on the street

23  because prostitution was the only way they were making a

24  living in New York City.  They both had no money and they

25  were not from here.  They feared having nowhere to live and

1    no roof on their heads.  The food was cheap, they wore

2    exposing clothing and lingerie on the streets of the

3    Penn Track.  And they stayed in hotels that were the kind

4    that turned a blind eye to prostitution.  But they stayed

5    because they feared losing even this basic level of

6    existence.

7         The defendant also coerced Jonnica and Shyya by

8    isolating them from their family and friends.  He took away

9    their smartphones and purchased them flip phones.  That's at

10   transcript Pages 89 to 90 and 311.  He did so so he could

11   control who they communicated with and limited their access

12   to social media and the internet.  The defendant even told

13   Shyya that he was her only family.  That's at transcript

14   Pages 311.

15        The defendant created an environment where Jonnica

16   and Shyya were entirely reliant on him, so they had no

17   choice but to do as he told.  This overwhelming, constant

18   fear of really bad things happening to them if they didn't

19   keep working for the defendant, that's what he used to cause

20   his victims to engage in commercial sex and that is

21   coercion.  And it took months for them to break free from

22   this fear and escape because the defendant used threats.

23        Because the defendant used force, because he used

24   threats of force, and because he used coercion or a

25   combination of these tactics because he was an expert at

1    using them.  He got what he wanted.

2           Jonnica and Shyya did what he said for months.

3    The two of them had sex with hundreds of men and the

4    defendant profited off their bodies.

5           Before we move on, I want to make it clear again.

6    You can find this second element has been proven beyond a

7    reasonable doubt if you believe the evidence shows the

8    defendant used any these tactics or a combination to cause

9    Shyya and Jonnica to engage in commercial sex.  If you

10   believed he used threats of force with Jonnica, that's

11   enough.  If you believe he used force with Shyya, that's

12   enough.

13          But I submit that the defendant used a combination

14   of these tactics with both Jonnica and Shyya and there was

15   only one reason to:  To get them to work for him as

16   prostitutes so he could make money.

17          Now, let me say this:  The victims are not on

18   trial for working in prostitution and neither is the

19   defendant.  The defendant told you prostitution was a

20   business.  He portrays himself as a businessman.  And that

21   may be true, but the defendant is a pimp, a real pimp.  This

22   is his business.  And his business was not mutually

23   beneficial for the victims.  It wasn't their business and he

24   wasn't someone that was trying to help them.  He was making

25   money off them and he was trafficking them.  They did not

1   sign up for business physically abused when they wanted to

2   take a break, stop for the night, or rest.  They did not

3   sign up for having sex with men on their period.  They did

4   not sign up for being isolated from their family friends.

5   They did not sign up for living on $20 a day for food while

6   the defendant made hundreds for the defendant each night.

7   Shyya did not sign up for being put on the Penn Track for

8   10, 12 hours a day, seven days a week, whether she was sick

9   or not.  When they pushed back on things they didn't sign up

10  for or disobeyed the defendant, they were met with force and

11  threats of force even being shown a photograph of a

12  chopped-up woman's body and being told, This is what happens

13  if you don't obey your pimp.

14          I expect the defense will argue these victims were

15  willing participants.  In what?  What exactly did they get

16  from this relationship?  For Shyya, $20 a day and a place to

17  stay?  For Jonnica, constant trips across the Northeast to

18  have sex with strangers?  Sex with hundreds of strangers and

19  paid not a dime?  Use your common sense.  This was not an

20  agreed-upon partnership or a mutually successful venture.

21  The defendant kept all the money.  These two women had sex

22  with countless men during the months they worked for the

23  defendant.  They were working on the Penn Track in cars, in

24  hotels, performing sex acts for the defendant's exclusive

25  gain.  This was sex trafficking and it has been proven

1    beyond a reasonable doubt.

2            And members of the jury, you know that those

3    aren't the only charges that the defendant is charged with.

4    So now let's turn to Counts Two and Three.

5            Count Two is the actual transportation of Jonnica

6    from Wisconsin to New York and from New York to Connecticut.

7    And Count Three is the interstate prostitution charge which

8    I'll discuss a bit more later.

9            But what's important to note is the second element

10   for both these counts is that the defendant do so with the

11   intent for these women to engage in prostitution.  These

12   counts are not in dispute.

13           But before we dive into these charges, I want to

14   note that for Counts Two and Three that I expect

15   Judge Matsumoto will instruct you that consent to travel in

16   interstate commerce for the purpose of prostitution is

17   irrelevant as the consent or voluntary participation of an

18   individual is not a defense.

19           Now, let's discuss Count Two.

20           To find the defendant guilty of Count Two, which

21   is the transportation of Jonnica to engage in prostitution,

22   you can find him guilty of this count based on either the

23   Wisconsin-to-New York trip or the New York-to-Connecticut

24   trip or both.

25           To start, Jonnica's testimony proves Count Two.

1  She testified that the defendant drove her from New York to

2  Connecticut and that the reason he took her there was to

3  engage in prostitution.  That's at transcript Pages 132 and

4  133.

5           But beyond Jonnica's testimony, you have even more

6  evidence of this trip.  In Government Exhibit 402, you can

7  see a chart that contains numerous Backpage ads that the

8  defendant posted of Jonnica throughout Connecticut.  And the

9  ads themselves posted from these locations; for example, and

10  these should be displayed to the jury and parties only,

11  Government's Exhibits 400-51S and 400-71S.  Both ads were

12  posted of Jonnica in Connecticut.

13          But on top of Jonnica's testimony and the Backpage

14  ads, there's so much additional evidence of the Connecticut

15  trip that is on the defendant's phone.  Orbitz e-mail

16  confirmation sent to the defendant for their stay in

17  Connecticut, Government's Exhibits 212-1.  The Ramada Inn

18  records in Government's Exhibit 907 that showed he and

19  Kelsie had rooms there from July 4th to July 15, 2016.

20          The calendar entries for their hotel stay in

21  Government Exhibit 211, the text from the defendant tell

22  telling a friend that he was in Connecticut, Government

23  Exhibit 200.  But you have even more evidence than Jonnica's

24  testimony, the Backpage ads, the travel records from the

25  Connecticut trip.  You also have the testimony from the

1    Connecticut law enforcement officer who arrested Jonnica.

2          The officer and her team conducted an undercover

3    operation which revealed that Jonnica and Kelsie were

4    engaged in prostitution in Connecticut which had led to

5    their arrests.  That same officer also testified that she

6    saw Jonnica with the defendant near the Ramada Inn the next

7    day.

8          And as Jonnica explained, the defendant had driven

9    the three of them to Connecticut.  And you know what the

10   defendant, Jonnica, and Kelsie were in Connecticut for.  You

11   know from her arrest that she was engaging in prostitution.

12   And you know from the Backpage ads that were posted of her

13   and you also know because she told you that's why the

14   defendant brought her there.

15         So there's Jonnica and the law enforcement

16   officer's testimony, the Backpage ads, and the travel

17   records, but there's even more.

18         The defendant himself told you that he transported

19   Jonnica from New York to Connecticut and that's at

20   transcript page 624:

21         "QUESTION:  You took her to Connecticut?"

22         "ANSWER:  Yes."

23         And the defendant also told you that Jonnica

24   traveled to Connecticut to have sex with men for his

25   financial benefit.  That's the same page of the transcript,

1   Page 624, when asked that question he said:

2            "QUESTION:  What about Connecticut?"

3            "ANSWER:  Yes."

4            The defendant himself took the stand and admitted

5   to both elements of this crime.  By his own testimony, he's

6   guilty of this offense.

7            Based on the testimony from the defendant,

8   Jonnica, the Connecticut law enforcement officer, along with

9   numerous Backpage ads for Jonnica in Connecticut and all of

10  the other evidence including hotel records, e-mails, booking

11  confirmations, calendar entries from the defendant's phone

12  confirms that this trip happened, you could find the

13  defendant guilty of Count Two.

14           But you can also find the defendant guilty of

15  Count Two based on Jonnica's trip from Wisconsin to

16  New York.  Look at the Amtrak records from Jonnica's

17  district from Wisconsin to New York.  Using the defendant's

18  e-mail address and his home address as the billing address

19  in Government Exhibit 904.  You also know that this trip

20  happened, and that it was for the purpose for Jonnica to

21  engage in commercial sex, because Jonnica testified as much.

22  And she told you that she did, in fact, travel from New York

23  to Wisconsin.  That's at transcript page 44 to 45.

24           THE COURT:  From Wisconsin to New York.

25           MS. RANGEL:  Wisconsin to New York.

1           And you know that's exactly what happened.

2           Jonnica described traveling from Wisconsin and

3    being picked up from the train station in Manhattan and

4    brought to a hotel on Long Island where the defendant had

5    sex with her, took pictures, used those pictures to post

6    Backpage ads for her and then Jonnica's nightmare unfolded

7    from then until she left.  Man after man came to her room

8    and paid her for sex and she gave the defendant all that

9    money.

10          Upon Jonnica's arrival, the evidence shows that

11   the defendant wasted no time.  As soon as he got to the

12   hotel room, he broke her down by having sex with her and

13   directed her to start working for him.  That's at transcript

14   Pages 58 to 59.

15          That same night, he took photographs of Jonnica.

16          This exhibit should also only be displayed to the

17   parties and the jury and this is Government Exhibit 215-2S.

18   Naked and in that hotel room, the defendant turned around

19   and posted her on Backpage.

20          That image --

21          THE COURT:  I don't think the images are keeping

22   pace with your summary.

23          MS. RANGEL:  Okay.  I'll take a pause.

24          THE COURT:  We're trying to keep up with the

25   various categories and how they're being shown but we're not

1    seeing images.

2          This is for the jury and the parties only, not for

3    the public display.

4          MS. RANGEL:  I'll just move on, your Honor, I'll

5    just direct them to that exhibit.

6          THE COURT:  All right.

7          MS. RANGEL:  That image that the defendant used in

8    Backpage ads was found on his phone.  That's Government

9    Exhibit 205-1S.  Look at the timestamp from when he took

10   that picture on his phone.  10:10 p.m., June 10, 2015.

11   Which she posted the day Jonnica arrived in New York and

12   then posted her first Backpage ad that same night, 10:36

13   p.m. in Government Exhibit 400-92S.

14          You also saw the text that you know that the

15   defendant sent because Jonnica said he texted from her phone

16   that that first night.  That's Government's Exhibits 307,

17   308, 311, 313 to 315, 317, and 318.  And the two Johns that

18   visited her in that room, one that masturbated to her and

19   the other that had violent sex with her.  That's at

20   transcript pages 68 to 70.

21          And even though you have all this evidence of the

22   Wisconsin trip, you can also find the defendant guilty of

23   Count Two based again on his testimony alone.  That's at

24   transcript pages 682 and 591.

25          The defendant admitted that he purchased Jonnica's

1   Amtrak ticket from Wisconsin to New York and that she came

2   to work for the defendant to engage in prostitution and that

3   he put her to work that very night.  The defendant's

4   testimony about this trip is at transcripts Pages 682 to

5   683.  This trip alone is sufficient to find him guilty of

6   Count Two.

7         All this evidence profits defendant is guilty of

8   Count Two for his transportation of Jonnica from Wisconsin

9   to New York to engage in prostitution.  You can find the

10  defendant guilty on either of these trips or both of these

11  trips.

12        Now, let's turn to Count Three.

13        To find the defendant guilty of Count Three, you

14  must find that the defendant knowingly persuaded, enticed,

15  or coerced Jonnica to travel in interstate commerce.  And

16  that she traveled in interstate commerce and that the

17  defendant intended that she would engage in prostitution.

18        Just like Count Two, you can find the defendant

19  guilty of this count based on either the

20  Wisconsin-to-New York trip or the New York-to-Connecticut

21  trip or both.

22        As I've already discussed with you, the second

23  element of this crime that Jonnica traveled across state

24  lines for both trips is established.  Jonnica told you she

25  traveled from Wisconsin to New York and New York to

1   Connecticut.  The defendant admitted to facilitating these

2   trips by buying her the Amtrak ticket or driving her in his

3   car.  You also have testimony of the law enforcement officer

4   in Connecticut, the Amtrak, hotel records, the Backpage ads,

5   showing Jonnica's movement between states.  Based on this

6   evidence, this element is satisfied beyond a reasonable

7   doubt.

8           And the third element that the defendant engage in

9   prostitution when she crossed those state lines is

10  established for all the reasons we talked about in Count

11  Two.  Jonnica told you that the purpose of her interstate

12  travel was to work in commercial sex and to make money.  And

13  the defendant himself told you he's a pimp and that Jonnica

14  traveled from Wisconsin to New York and New York to

15  Connecticut to engage in commercial sex for his financial

16  benefit.  They crossed state lines and the defendant

17  intended for Jonnica to sell her body, then this element is

18  proven.

19          That leaves the first element that the defendant

20  persuaded, induced, enticed, or coerced Jonnica to travel in

21  interstate commerce.

22          As we've already discussed, the defendant enticed

23  Jonnica to come from Wisconsin to New York with promises of

24  a life of luxury.  This is the evidence of the defendant

25  enticing her in violation of this element.  And you don't

1    just have Jonnica's words.  The defendant himself testified

2    this was all an agreement between the two of them.  That

3    Jonnica wanted to work with him and wanted to travel because

4    they both understood that they would make money.  By

5    agreeing to help her travel between states so she could make

6    money, the defendant by his own words enticed her.

7              Members of the jury, this evidence, including the

8    defendant's testimony also establishes Count Three.

9              So, finally, let's turn to Count Five.

10             This is the coercion and enticement of Mellisa,

11   the minor with who the defendant had sex with miss his

12   payment.

13             Mellisa told you that she met the defendant when

14   she was walking home from the park.  Judge Matsumoto will

15   instruct that you the Government must prove four things:

16             First, that the defendant used a facility of

17   interstate commerce.

18             Second, that the defendant knowingly persuaded or

19   induced or enticed or coerced Mellisa to engage in sexual

20   activity.

21             Third, that this sexual activity would violate

22   New York criminal law.

23             And fourth, that Mellisa was less than 17 years

24   old at the time of the sexual activity.

25             As to the first element, the Government has proven

1  that the defendant used a facility of interstate commerce to

2  coerce and entice Mellisa.  The defendant used the internet,

3  specifically, Google Hangouts to engage in sexual activity

4  with Mellisa.  You saw the Google Hangout messages for

5  yourself, from Mellisa's phone and also from the he

6  defendant's phone in Government's Exhibits 202 and 800.

7          If you find that the defendant used Google Hangout

8  messages to meet Mellisa, that's enough to satisfy the use

9  of a facility of interstate commerce.

10          I'm going to go through the second, third, and

11  fourth elements together as they require the defendant to

12  prove that the defendant knowingly persuaded or induced or

13  enticed Mellisa to engage in sexual activity, and that

14  sexual activity was illegal because she was under 17 years

15  old.

16          Because the defendant sexually abused Mellisa in

17  New York, we look to New York law.  I anticipate that

18  Judge Matsumoto will instruct that you under New York law, a

19  person is guilty of rape in the third degree when being 21

20  years old or more, he engaged in sexual intercourse with

21  another person less than 17 years old.

22          Under New York law, sexual intercourse means any

23  penetration, however slight, of the penis in the vaginal

24  opening.  Under New York law, a person is deemed incapable

25  of consenting to sexual intercourse when she is less than 17

1    years old.  Thus, New York law deems sexual intercourse with

2    someone less than 17 years old to be without consent even if

3    that person did not object to sexual intercourse.

4           So let me be clear:  Even if you were to find that

5    Mellisa had sex with the defendant voluntarily, it's still

6    against the law.

7           So let's begin with the evidence of Mellisa's age.

8           First, you know that she and the defendant

9    exchanged messages in the summer of 2014 to the winter of

10   2014.  From June 4, 2014, to December 9, 2014, that's in

11   Government Exhibit 800.  You know that Mellisa was 14 years

12   old when she met the defendant that summer because her

13   birthday is on June 17, 2014.  Sorry, June -- I apologize, I

14   misspoke.  Her birthday is on June 17, 1999.  And that she

15   met him on June 4, 2014.  And she turned 15 years old a

16   couple weeks after she met the defendant.  Her date of birth

17   is in Government Exhibits 802 and 803.  This evidence

18   establishes that Mellisa was under 17 years old when she was

19   communicating with the defendant.  You also saw defendant's

20   age in his New York State drivers -- DMV -- record, his

21   Department of Motor vehicle record in Government Exhibit

22   908.  Based on his date of birth, May 22, 1983, the

23   defendant was 31 at the time he had sex with Mellisa.

24          You know what happened in the defendant's

25   basement.  Mellisa told you she had vaginal sex with the

*Summation - Ms. Rangel*                    888

1   defendant.  That's transcript Page 443.  And that

2   penetration constitutes sexual intercourse under New York

3   law.

4           Now, let's turn to how the defendant knowingly

5   persuaded or induced other enticed or coerced Mellisa to

6   engage in sexual activity.  But before we turn to the

7   evidence on this element, let's take a moment to discuss the

8   defendant's testimony about Mellisa.

9           Now, the defendant has no obligation to testify.

10  He does not carry the burden of proof.  The Government has

11  the burden always and the Government welcomes that.

12          But the defendant chose to testify and that is his

13  right.  And because he chose to testify, you're allowed to

14  scrutinize high school testimony and evaluate whether you

15  believe that it was credible.  And I submit to you that it

16  was not credible.

17          The defendant told you that prior to her

18  testifying, the defendant had never been in the same room

19  with her.  He said she never came to his home.  He stated

20  that he never had sex with her.  That was the defendant's

21  only option to spin a narrative, to tell you he's never met

22  Mellisa in person.  To be clear, throughout this trial, the

23  defendant has no burden and it rests entirely with the

24  Government.  But you have to scrutinize his testimony, and

25  when you look at the messages that we're about to go

1    through, his narrative falls apart.

2              So let's start with how the defendant met Mellisa.

3              Mellisa told you about her initial conversation

4    with the defendant.  He called her beautiful and told her he

5    liked how she dressed.  He made her feel good.  An innocent,

6    young, and shy 14-year-old, Mellisa was curious and lonely

7    and the defendant saw that and he capitalized on that even

8    though she was only in the 8th grade.

9              But the compliments did not stop after their

10   initial in-person conversation.  Instead, they just moved to

11   a different platform, to Google Hangouts, which is

12   Government's Exhibit 800.  These messages are between the

13   defendant and Mellisa.

14             Now, let's review them.

15             These are the first messages the defendant

16   exchanged with Mellisa.  After she sent a selfie,

17   defendant's response:  "Looking sexy."  Then he sends a

18   selfie to a 14-year-old.  Then the flirting continues.  The

19   defendant stated:  "Damn, baby, looking real good in that

20   pic."  And Mellisa sent the defendant a picture.  His

21   response:  "Yeah, I may have to have you."  This message is

22   not the defendant asking to just hangout with Mellisa, it

23   reads like a message for sex.  "Yeah, I may have to have

24   you."  To a minor.

25             His next message:  "Hell, yeah, that one made

1    people wake the hell up."  I submit this is the defendant

2    telling a minor that her photo is turning him on.  Then

3    Mellisa tells defendant she wants to kiss him and he

4    responded:  "Me, too."

5              After she sent him more photos of her 14-year-old

6    self, and eventually that night, the defendant signs off

7    messaging her, "Good night sexy."

8              But the compliments and flirtation do not stop; it

9    keeps going.  All of these messages from the defendant:

10   "Good night, baby"; "Miss you, how was your day?"  He

11   continues to escalate the conversation.  When Mellisa tells

12   him again she wants to kiss him, the defendant responds:

13   "Yeah, that's a good thing."

14             Later in their messages, Mellisa said, "Oh, my God

15   I'm dying to see you."  The defendant's response:  "Yeah.

16   Me, too."  Mellisa then sends another picture and the

17   defendant doubles down.  "Nice baby, I got to see you."  And

18   a couple messages later, "I miss you."

19             I submit these messages are all a stream of

20   messages designed to entice Mellisa to ultimately have sex

21   with the defendant.  At one point, Mellisa says she is

22   falling with love with the defendant and she can't stop

23   thinking about him.  And instead of waiving off a minor,

24   this 8th grader, the defendant again doubles down and

25   encourages her.  That's a good thing.  There are more I miss

1    yous from the defendant, more instances of him calling her

2    sexy, and I submit the defendant used these messages to lure

3    her in.

4              But the enticement doesn't stop.  In another

5    message after calling Mellisa sexy, the defendant asks, "Can

6    I have you?"  And then one of Mellisa's responses, she sent

7    the defendant a picture of her with a stuffed animal.  I

8    submit that this is the defendant asking if he can have

9    Mellisa's body.  And then soon after the defendant sent a

10   picture of himself, shirt off, in his underwear, in his

11   bedroom to Mellisa.  I submit that sending that picture

12   communicates the defendant's intention to have sex with

13   Mellisa.

14             These compliments and flirtatious messages, the

15   exchange of pictures you see throughout Government

16   Exhibit 800, this was all to entice and induce Mellisa to

17   meet the defendant and ultimately have sex with him.  The

18   defendant spoke to her in a way to try to get her to his

19   house.  And you know why he wanted her to come there and

20   what he wanted to do to her there.  Because she got up on

21   that stand, and under oath, she told you that they had sex.

22             Now, think about Mellisa's testimony as you

23   evaluate her credibility.  She sat up there on that witness

24   stand visibly ashamed and emotional describing that the

25   defendant had sex with her in his basement.  You saw that it

1   was hard for her to talk about what happened.  And even

2   though happened over a decade ago, she still walked into

3   that courtroom and swore an oath to tell the truth.  What is

4   her incentive to lie?  And also, think about it, why would

5   she be so oddly specific about the way the defendant took

6   her to his house?  The defendant instructed her to walk

7   behind him and that on the bus, on the way to his house,

8   they sat on opposite ends.  Mellisa's testimony and the

9   Google messages speak for themselves.  They're powerful

10  evidence that the defendant coerced and enticed Mellisa to

11  engage in sexual intercourse when she was under the age of

12  17 and it proves Count Five beyond a reasonable doubt.

13          Now, it's time to hold the defendant accountable.

14  On the Penn Track and in hotels, the defendant had the

15  power.  He had the control over these women.  He had the

16  last word and he used that power to use and abuse Jonnica

17  and Shyya.  To use force, threats of force, fraud, and

18  coercion to compel them to have sex with multiple men a

19  night month after month and he had that last word with

20  Mellisa, too.  When he told her to relax and that he sex

21  with her when she was only 14 years old.

22          But later today, Judge Matsumoto is going to

23  instruct you on the law and the power will be in your hands.

24  You will have the control.  You will have the last word.

25  And the last word in this case is the only verdict that is

1    supported by the evidence that the defendant is guilty on

2    all counts.

3              THE COURT:  Would you like to be heard Mr. Singer?

4    Before we to that, may I go to sidebar with the parties.

5              (Continued on the next page.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
                          Sidebar                        894

1          (Sidebar held outside the presence of the jury.)
2          THE COURT:  You showed Government Exhibit 802
3   which was the birth certificate of Mellisa.  We don't have
4   any record of that being admitted.
5          MS. RANGEL:  I believe it was admitted.  We can
6   double check the transcript.  I only had admitted exhibits
7   in my summation.
8          THE COURT:  All right.  Maybe it wasn't displayed
9   during the trial.
10         MS. PICARD:  We have a record of the passport
11  being admitted, 803.
12         THE COURT:  We admitted the passport but I don't
13  think the birth certificate was.
14         MS. BOWMAN:  I think that's correct, actually.
15  We'll check the transcript.
16         MS. RANGEL:  Okay.  I thought it was admitted but
17  we will double check it.
18         THE COURT:  All right.  That's all I wanted to
19  say.
20         If you have, pardon me, if you check and that is
21  correct that you did not admit the birth certificate and
22  that you only admitted the passport to establish age, then
23  we'll have to deal with that.
24         MS. RANGEL:  Okay.
25         MR. HINE:  I just pulled the list that we got from
```

*Sidebar*                                                               895

1    the Government that I double checked and I'm not seeing 802

2    on there, just 803 which is the passport.

3                THE COURT:  Okay.  Thank you.  That's what we have

4    as well.  We have the passport.

5                MS. RANGEL:  Okay.

6                THE COURT:  Thank you.

7                MR. SINGER:  Can I ask for a five-minute break

8    prima facie we start?

9                THE COURT:  Sure.  Okay.

10               (Sidebar discussion concludes.)

11               (Continued on the next page.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Mr. Singer - Summations                    896

1          THE COURT:  Members of the jury, before we hear from

2     Mr. Singer we're going to give you a quick break.  So please

3     put your notebooks face down.  Do not talk about the case.

4     We'll come and retrieve you when we're ready to proceed.

5     Thank you for your attention.

6               (Jury exits the courtroom.)

7          THE COURT:  I think we should figure out how to fix

8     the issue.  Obviously the arguments are not evidence but you

9     showed an exhibit that is not in evidence, that is a situation

10    we should address with the jury.  So why don't you confer

11    after you get back from the break, Mr. Singer, and we'll move

12    forward.  Thank you.

13              (Brief recess.)

14              (Jury enters the courtroom.)

15         THE COURT:  All our jurors are present.  Please have

16    a seat.

17              Mr. Singer, if you would like to be heard please

18    step up to the podium.

19         MR. SINGER:  Thank you, your Honor.

20              Good morning, folks.  I hope it will come as no

21    surprise to you that I'm going to have a slightly different

22    take on the evidence that you've heard, that you just heard

23    from the prosecutors.

24              I'll speak louder.

25              The trial that you sat through, and we appreciate

1    your time, it's been a very busy week.  You've heard a lot

2    over the last four days.

3              There are essentially three different sets of

4    charges, right, and each one is not related to the other,

5    there isn't overlap.  The first three charges relate to

6    Jonnica, the fourth charge relates to Shyya, the fifth charge

7    relates to Mellisa.  They are all separate; in a way, separate

8    trials themselves.  You'll be asked shortly to evaluate the

9    evidence and make your own judgments about them.

10             I want to come back to something that Mr. Hine told

11   you in opening statement, which has been our position and is

12   our position now.  That, aside from the word of these three

13   women, there is no evidence to support sex trafficking.  There

14   is no evidence, meaning force, fraud, coercion.  There is no

15   evidence other than the word of Jonnica and Shyya that they

16   were forced.  And by the use of force or fraud, they'll use

17   force as a general term, but it encompasses all of the

18   different pieces of it, force, threats of force, fraud,

19   coercion, there is no evidence that that was in any way what

20   caused these women to engage in prostitution with Mr. Forney,

21   other than the word of Jonnica and of Shyya.

22             With regard to Mellisa, it's different because the

23   charge is different, it's not a sex trafficking charge.  With

24   regard to Mellisa, there is no evidence that Mr. Forney and

25   Mellisa actually engaged in sexual intercourse, other than the

Mr. Singer - Summations                            898

1    testimony of Mellisa.

2           And what you are being asked to do here is determine

3    whether the Government has proven each one of these

4    accusations beyond a reasonable doubt.  It's not a matter of

5    sitting back and going, well, what do I think happened.  Or,

6    who is telling me the truth.  Is it Mr. Forney, is it Jonnica

7    is it?  It is Mr. Forney, is it Mellisa?  It's not a matter of

8    who is telling you the truth.  Under the law -- our contention

9    is that Mr. Forney has told you the truth -- under the law you

10   could disregard with everything he has to say and that doesn't

11   prove the accusation.  The Government still has to prove that

12   the word of these women is true.

13          Often times, evidence is used to corroborate or

14   support or back up in some way, something else is brought in

15   to corroborate it.  There is nothing here.  I'm going to go

16   through it all with you.

17          I'll start with Jonnica, there is a lot to talk

18   about with Jonnica.  She lied to you.  She lied to you

19   repeatedly, and over and over again.  She lied to the

20   Government.  I submit that when she sat up there on

21   cross-examination, never on direct examination, but on

22   cross-examination over and over again:  I don't remember, I

23   don't recall, I don't know, I don't know who father in my

24   contacts is, I don't know.  She was lying to you.

25          She lied to you about why she came to New York.  She

Mr. Singer - Summations                                     899

1    initially when -- she never reported, this as you know --

2    federal agents show up and start asking her questions and

3    asking questions about Mr. Forney, and she lied to them.  And

4    kept that lie for several years until about a month ago.  But

5    her lie was, well, I came here, I met Leah on Glide and I was

6    coming for a marketing job.

7            You might have wondered why I asked:  Did you

8    embellish that by talking about how you worked with your

9    brother, or your brother worked in computers and you had been

10   shown some things by him.  Whether that's true or not is not

11   the point, the point is that she embellished her lie about

12   coming here for a marketing job.  She didn't just lie, she

13   embellished the lie about the story about my brother.  She

14   lied to them about why she was coming here.  And about a month

15   ago, or so, she indicated she told them, well, I wasn't

16   telling you the truth.

17           The Government dug up all sorts of evidence about

18   Mr. Forney going back many, many years.  They don't have any

19   evidence of the number or content of any conversations with

20   Leah on Glide.  So you don't have anything to support

21   Jonnica's claim about why she was or what she was talking to

22   Leah about.  So the new lie that she came up with is that Leah

23   told her she was an escort, come to New York and she could be

24   an escort.  She would have fancy clothes and be on yachts and

25   drinking martinis; that that's why she came.

Mr. Singer - Summations                    900

1          What is interesting about this is her explanation

2     about why and why this is the story.  So when the agents first

3     contact her in New York, she indicated that she was in some

4     legal situation.  That was certainly something that she was

5     dealing with at the time.  And she said, she was worried when

6     they started asking her about Mr. Forney because she knew she

7     had worked as a prostitute with Mr. Forney, she knew she had

8     been arrested a number of times for prostitution, and she said

9     she was concerned, worried, about those prostitution arrests

10    and what impact those might have on what was going on with

11    her; that that's what she was concerned about.  That's what

12    she told you.

13         So let me get this right.  Being an escort, if you

14    are simply a woman who dresses up nice and goes out on dates

15    with men, regular dates not sex dates, regular dates, you go

16    to dinner, you go to a movie, and a man will be pay for your

17    time to be out with them.  There is nothing illegal about

18    that, there is nothing illegal about that.

19         Working as a prostitute is illegal, although she

20    told you on the witness stand that she didn't know that it was

21    illegal.  She told you that as a 21-year-old -- I don't care

22    if you live in little town Wisconsin, this isn't 1900 in

23    Little House on the Prairie, this is 2016 -- she had a

24    smartphone, she had the Internet, you're connected to the

25    world.  She told you she didn't know that prostitution was

Mr. Singer - Summations                                901

1    illegal in 2016 as a 21-year-old?  She lied to you.

2         And what is interesting here is she said she was

3    worried about, the reason she lied to the federal agents at

4    the beginning was because she was worried about the

5    prostitution arrest.  So she lied about the part that was

6    legal, the escort stuff, and told them all about her work as a

7    prostitute, which is the illegal part.  It doesn't make any

8    sense.

9         She lied to them from the beginning, and then when

10   she changed it, she was locked in here, she got a subpoena,

11   she would have been forced to come in.  She had to come in.

12   She wasn't coming in saying, I was poor, I was desperate;

13   which is why many or most women who are engaged in

14   prostitution go there.  Because men are animals and women have

15   something that they will pay for.  Right.  The world's oldest

16   profession.  And women will do that.  It's not a judgment

17   about it, it's a realty.  It's sick and horrible reality of

18   the world we live in and that humanity has always lived in.

19   That's where we are.  That's why women turn to prostitution.

20   That's why this woman turned to prostitution.

21        She wasn't happy.  Her daughter had been taken away.

22   She didn't have any money.  She had an opportunity to work in

23   prostitution.  And the fact that she won't admit that, I

24   submit, is certainly grounds to discount whatever she's

25   telling you.

Mr. Singer - Summations                    902

1          Now, Mr. Forney told you that he received and email

2   from her.  Jonnica acknowledged communicating with Mr. Forney

3   in someway, she said a telephone call.  Mr. Forney said I got

4   an email from her on May 11, from ████████████, her

5   email address, to Sirbar.PI, his email address.  Mr. Forney

6   told you that there were images, attachments to the email that

7   included, this was he sent in an email on May 11, that

8   included images of her face and nude images.

9          One of the pieces of evidence I'm going to ask be

10  brought up, the images, this was Defense Exhibit ES, the

11  sealed version so I'm asking that it only be shown to the jury

12  not the public.  What you should be seeing on the screen --

13  I'm going by memory, I don't have it in front of me.

14          THE COURT:  It's on the screen.

15          MR. SINGER:  I can't see a screen from where I am.

16          THE COURT:  Do you want to use the Government's

17  screen?

18          MR. SINGER:  I'll look at Mr. Hine's and speak very

19  loudly for this purpose.

20          If you look at, this is from the images folder from

21  the extraction of Jonnica's phone, all right.  You'll recall

22  that when Jonnica, Jonnica says she brought her phone with her

23  from Wisconsin and when she was arrested in Connecticut on

24  July 14 of 2016 the police seized her phone.  There is a

25  stipulation that that phone was, that the police seized it

Mr. Singer - Summations                    903

1   lawfully, that they did a full extraction from the phone.  And
2   part of the extraction, the extraction is just removing all
3   the data from the phone, and part of that extraction is broken
4   down into a file of images that are on her phone.  What we put
5   into evidence here -- again the defense did, the Government
6   had this and chose not to present it to you -- but these are
7   images on Jonnica's phone.

8           If you look at number 73, the second one on the page
9   in front of you, in the middle column, there is something that
10  says capture time.  It shows May 10 of 2016, the day before
11  the email that was sent by Jonnica to Mr. Forney.  And if we
12  scroll down, before we get to that, numbers 73 and 74 are
13  photographs of Jonnica also captured on May 10, 2016 of her
14  face, those were taken at 11:48:56 p.m. and 11:49:07.  And
15  then we go to the next one, number 75, that is nude photo,
16  again doesn't show the face it shows from the shoulders down
17  to approximately the knees, but it's a frontal nude photo
18  captured on May 10, 2016, 53 seconds after the photo before
19  that.  If we go down to 76, there is a nude photo from the
20  side, May 10, 2016, 11:50:45.

21          So these are photos that Jonnica took of herself on
22  May 10 and emailed to Mr. Forney the next day on May 11
23  because she was going to be an escort and not because she was
24  coming to engage or that she wanted to or was willing to
25  engage in commercial sex.  Why in the world would she send

Mr. Singer - Summations                                904

1    these pictures?  And the fact that she doesn't acknowledge it,

2    her claim not to remember it.  Really?  She doesn't remember

3    sending these photos?  She's lying to you.

4            So she told us now that when she's coming to New

5    York she decides she's going to come, and again, other than

6    her say so there is no evidence before you of what was

7    communicated back and forth about why she was coming.  She

8    tells her brother Gabe where she's going.  And Gabe is her

9    biological brother living in California, she said.  And she

10   communicated with him.  And whatever their relationship was,

11   whether it was new, whatever the relationship was, she felt

12   comfortable enough with him to tell him where she was going.

13   In fact, the phone records that were introduced, they've been

14   marked as Government Exhibit 322 -- although the Government

15   chose not to introduce them, the defense introduced them, it's

16   still labeled as Government Exhibit 322 -- that file is part

17   of the extraction report from Jonnica's phone.  And it lists,

18   it references a call log.

19           Can we have this up for the public as well?  There

20   is nothing else that I'm bringing up that is sealed.  Anything

21   else can be made public.

22           Okay, so this is a call log.  And, you have to look

23   carefully at it to be able to read it, but it indicates in the

24   second column, it's got a time stamp, there is a date and

25   time.  It indicates whether a call was answered or not.  And

Mr. Singer - Summations                                905

1    the first column where it says parties, where you can see that

2    there are names included.  There is a telephone number and a

3    name, there is a name included if that phone number is in the

4    contacts of the phone.  So when you've got somebody in your

5    contacts in your phone, you've got wife with a number, when

6    you dial the number it shows as wife or when the incoming call

7    is coming it shows who the contact is.  This operates the same

8    way.  These records show if a number that was either called,

9    it indicates it's an outgoing call or incoming call.  It tells

10   you whether it was answered or not and how long the call

11   lasted for.

12           These are in evidence for you.  And I'm not going to

13   go through them page by page, I encourage you to.  Because

14   what you'll see is that there were nine or ten telephone calls

15   with Gabe, including like a 24-minute call, before she arrived

16   in New York on the evening of June 10.

17           So they were talking a lot.  Those are nine or ten

18   calls in the days before.  She was talking to him a lot.  I'll

19   come back to it in a minute, you don't need to focus on those

20   right now.

21           She acknowledged that, she had told the Government

22   at some point so she had to acknowledge this, that she had

23   before arriving in New York she had established a code with

24   Gabe if she was in trouble.  It makes sense.  Young woman

25   coming to New York for the first time.  Getting into the

Mr. Singer - Summations                                  906

1   business that she was going to be getting into.  It's, like,

2   how about if you're in trouble there is a way for you to let

3   me know so we can try to do something for you.  It's

4   reasonable.  It makes sense.  If it was Gabe's idea, I give

5   him a lot of credit.  It was a smart thing to do.

6          And the code is "bananas."  It's not a word, it's

7   not I'm no trouble, it's a code word.  So you can communicate

8   to the other person that there is a problem without saying it

9   out loud and tipping off the person who is causing the

10  trouble.

11         According to Jonnica -- and again, it's our

12  contention that she's lying about this -- Jonnica says, I'm

13  picked up at the train, I'm taken to a hotel, and Mr. Forney,

14  in essence, forces himself on me and has sex with me.  I

15  didn't want it.  I didn't ask for it.  I submitted, but it

16  wasn't what I wanted.  And that was the beginning of what she

17  described as her ordeal.

18         I submit that from that moment forward she was in

19  trouble, because that was the moment, if her story is to be

20  believed, that's when everything changed and she was in

21  trouble.

22         The ad, she said that Mr. Forney took pictures and

23  placed an ad, Government Exhibit 400.92.  The sex with

24  Mr. Forney was before the ad was placed.  First he has to

25  impose himself on her, and then tells her this is what you're

Mr. Singer - Summations                    907

1   going to do.  What you're seeing on --

2            THE COURT:  This is not for the public, is it?

3            MR. SINGER:  It's redacted, so it's okay for the

4   public.

5            THE COURT:  400 --

6            MR. SINGER:  400-92R, that's the redacted one.

7            It shows you on when it was posted, Friday, June 10

8   at 10:36 p.m.  Which means that it was before 10:36 p.m. that

9   she was in trouble, according to her.  She texted with Gabe

10  after that.

11           On the evening of June 10, this is again marked

12  Government Exhibit 323 -- although the Government did not

13  enter into evidence, for whatever reason they chose not to

14  show this to you but we entered it into evidence and it had

15  already been marked so we used the same designation.

16  Government Exhibit 323 is from the extraction from Jonnica's

17  phone.  And it's in the file, I think chats on the first page,

18  so it's all the chats what we commonly refer to as text

19  messages that came off of that phone.

20           We can pull up 323 and go to page 167.  On the left

21  side you see a chat from Gabe to owner, the owner of the phone

22  which we know is Jonnica.  And in the lower, right-hand corner

23  of the blue bubble it indicates the date and the time that it

24  was sent.  So it was June 10, 2016 at 10:54 p.m., and that

25  10:54 p.m. is 18 minutes after the ad was posted.  So she

1  already had sex.  She already had the pictures.  She was

2  forced to put these clothes on and forced to take the

3  pictures, and ads were being posted.  And now she receives a

4  text from her brother Gabe, who she has a code word with.  And

5  he's checking in with her.  And her response is:  LOL, bro.

6  Call me tomorrow.  I'm working.  He tells her to be safe.

7  Another indication that he knew what she was doing.  She says:

8  Will, bro, making money.  That goes into 168 the next page.

9         And these are all after she is in trouble.  I was

10 too scared to say anything.  The word is bananas.  How is

11 things going?  It's like things are bananas.  It's not

12 difficult.  She didn't send the code word.  I submit to you

13 the reason she didn't send the code word is because she wasn't

14 in trouble.

15        Because she knew what she was here for, and it was

16 happening as she believed it would and anticipated it would.

17 She did not believe she was in trouble.  It's not because she

18 was so frightened.

19        Again this is in evidence.  You can see it because

20 we're showing it to you, not because the Government entered

21 it.

22        She tells us that Mr. Forney took her phone,

23 controlled her contact or controlled her communication.  That

24 once he had sex with her and forced her to go to work, he was

25 in control.  He controlled everything, when she slept, when

Mr. Singer - Summations                             909

1    she ate, you can't communicate with anybody.  You are my

2    slave.  That is what she is portraying, what Jonnica is

3    portraying, in her testimony.

4           For this, again, I'm going to encourage you to go

5    through the call log.  There are a number of pages in the call

6    log, 29 pages.  There is lots and lots of calls listed.  To

7    summarize here, because I've gone through them page by page

8    and I'm not going to do that with you because it would be

9    long, over the next month, starting the evening of June 10,

10   over the next month until July 14 when her phone was seized by

11   the Connecticut police, she had 14 different telephone calls

12   with Gabe.  Fourteen.  If you go through June 14, two on

13   June 18, June 19, June 23, June 29, July 2, July 4, July 6 two

14   calls, July 7, July 8, July 9, July 11.  All while Mr. Forney

15   was in total control of her life and communications and her

16   phone.

17          She spoke to her brother Gabe on 14 occasions, no

18   indication that anything was bananas.

19          Now those call logs show you much more than that.

20   Because the call logs show not only telephone calls with Gabe,

21   but telephone calls with a whole host of people from her life.

22   Her area code is 608 the area of Wisconsin, there are calls to

23   people in her contacts, two are from people in her contacts,

24   there are calls to other from people in the 608 area code, so

25   it may not be in her contacts but people who she is in

Mr. Singer - Summations                          910

1   communication with; sometimes we talk to people who are not in

2   our contacts.  You can count it up for yourself, but I did it

3   for you.  From the time she got to New York until July 14 when

4   her phone was taken that month, a month and a few days, there

5   were a total of 97 calls either to or from someone in her

6   contacts or to or from someone in the 608 the area in

7   Wisconsin where she was from.  Ninety-seven calls, that

8   averages three a day.

9           She was able to do this, although Mr. Forney was

10  both in total control and forbid communication with the

11  outside world, because he's the only one you can communicate

12  with.  That's a story they are telling, that's the account

13  they are providing to you.  The evidence simply doesn't

14  support it.

15          These phone records show that she was in regular

16  contact with these people.  There were 15 peoples with the

17  contact name father.  Father.  I believe she said in terms of

18  what she recalled or what she didn't recall -- it's possible I

19  misstate some of these -- my memory was she didn't know who

20  father was.  Mommy home is a contact.  Mommy home.  There were

21  15 calls, again, I'm talking only about calls after she was in

22  trouble on the evening of June 10.  Fifteen calls with mommy

23  home.  There is a person named Bia is the contact name.

24  You'll see it repeated in those contacts as you go through

25  those pages.  She indicated that it was her sister, 28 calls

Mr. Singer - Summations                    911

1   over the next month with her sister.  Nothing said.  Four with

2   mom, five with Carla.  Ninety-seven calls.

3           She's not telling you the truth.  That's the upshot

4   of it.  When she says she was brought here her under false

5   pretenses and forced to do the work she was doing, these

6   records belie that claim.  They certainly call into question

7   the credibility of her testimony, and I urge you to consider

8   them.  So.

9           She says that the control included I couldn't sleep

10  or eat, I got smacked around.  Because he was forcing her to

11  work and if she didn't make enough in one place she had to

12  continue to work and make more money.  But at the same time

13  she is going from place to place.  She's going to different

14  states.

15          If Mr. Forney is simply beating her into submission

16  and forcing her to work and work and work no matter what the

17  circumstances, and forced her to work and forced her to make

18  money because she had to make money for him, he's driving her

19  to Connecticut and putting her in a hotel, paying for gas

20  paying for the hotel.  Driving to Philadelphia.  If it's an

21  AirBnB or hotel there is a cost to get there, if it's gas or

22  time; every one of these trips take time.  Time away from when

23  they could be slaving away making money.

24          Mr. Forney provides an explanation for that.  The

25  Government just wants you to disregard everything because they

Mr. Singer - Summations                          912

1   dug up some things from something from 2012.  But the

2   explanation he provides actually makes sense.  We're doing

3   this to make money.  You go to different places where it's

4   fresh, you look for areas where men -- the animals that men

5   are -- but they live everywhere, so we go to the places where

6   men are that have higher incomes and you've got someone new

7   who is now working in the area and you're going to be able to

8   attract new business and more business by doing that.  That's

9   why you move from place to place.

10          Otherwise, why are you doing that?  Why would you do

11   that?  Why are you driving to Washington DC?  What sense does

12   that make?  If you've got essentially a sex slave working for

13   you, who will do anything that you tell her and you force her

14   to do, whatever it is she has to do, why are you traveling all

15   over the place and spending all this money?  You don't need to

16   do that.  It doesn't make any sense because it's money out of

17   your own pocket because he's paying for it.

18          She lied about having to work the Track.  She says

19   it was at night, I don't remember anything about it.  She says

20   I had to work the Track after Backpage got shut down.  She

21   left in February 2017, the agent testified the Backpage was

22   shutdown in 2018, but she told you she had to work the Track

23   because Backpage got shut down.  There wasn't as much

24   business, she told you that too, if you recall.

25          She says repeatedly that she stayed for eight months

Mr. Singer - Summations                                    913

1   because she could not get away.  She was arrested in

2   Connecticut.  The officer from Connecticut told you that they

3   separated her and Leah.  Leah went to make a statement.  She

4   was separate from Leah, she had the opportunity.  She had the

5   opportunity to notify Gabe or any other member of her family

6   or friends.  She had the opportunity to speak with police in

7   Connecticut.  She had the opportunity to speak to police in

8   Philadelphia when she was arrested there.  She had the

9   opportunity to speak to police in Upstate New York when she

10  was arrested there.

11          She doesn't remember -- if I've got this correct --

12  she doesn't remember going to Planned Parenthood for birth

13  control several times?  Do you believe her?  Do you believe

14  that that claim is true?  It's simply not true.  She went.  It

15  makes sense that a woman doing sex work needs birth control

16  and you go and get it.  You go to Planned Parenthood, you have

17  an opportunity to speak to someone privately, that's what

18  Planned Parenthood is about.

19          (Continued on next page.)

20

21

22

23

24

25

Summation - Mr. Singer                        914

1    (Continuing)

2              MR. SINGER:  She didn't do that.

3              She went to Chicago.  She's from Wisconsin.  She

4    knows where Wisconsin is in relation to Chicago.

5              She doesn't remember.  When I asked her whether Leah

6    left the day before her to go to Philadelphia and she came

7    back to New York:  I don't remember that.

8              She had an opportunity to get away then and she

9    didn't.

10             She left in February of 2017.  And she lied to you

11   about the circumstances of that, too, and I'm going to show

12   you how.

13             She says that she made cash that day, working in the

14   hotel in Manhattan.  She made cash that day.  And she saw an

15   opportunity and she left.  And she went to the train and

16   bought a ticket and went home.  Did you pay for the ticket

17   with cash?  I mean, you're in a hurry.  You are fleeing after

18   eight months of forced degradation and you go to the train

19   station and you've got cash.  Amtrak takes cash.

20             No, I didn't do that.  I put some of the money on my

21   card, my credit card from TD Bank.

22             Really?  You stopped, when you were fleeing, to put

23   money onto a card when you could just walk up to the window at

24   Amtrak, lay down 300 bucks, and give me a ticket to Wisconsin,

25   get me the hell out of here.

Summation - Mr. Singer                                         915

1              And she tells you that the credit card that she

2     used, it was a bank account that was set up by Mr. Forney,

3     that was in his name with his -- it might have been her name,

4     but it had his address on it, that he set it up and he

5     controlled it.

6              Can you pull up Government Exhibit 905, please?

7              (Exhibit published.)

8              MR. SINGER:  This is a record of the Amtrak, the

9     trip that Jonnica took from New York to Wisconsin, leaving on

10    February 17th of 2017.  Okay?  It's got -- you know, it

11    actually reads from the bottom to the top.  So the bottom one

12    is segment number one, and it's a trip from New York, the

13    first leg of the trip going back to Wisconsin.

14             Look over on the right side of that.

15             The e-mail address used to purchase the ticket:

16    Jonnica.

17             The phone number used is put on the ticket:  608.

18    It's Jonnica's number.

19             The billing name and address:  Jonnica.  You know,

20    we blocked out the specifics of the address, but it's an

21    address in Wisconsin.

22             It's not Mr. Forney's name or address on that

23    account.  It's an account that she had, that she had money in

24    and she went and purchased a ticket.

25             She lied to you when she told you it was

Andronikh M. Barna, Official Court Reporter, RPR, CRR

1   Mr. Forney's account or that his name was on it or his address

2   was on it.  She lied to you about it.  It was her own account.

3   And it's consistent with what Mr. Forney told you, is that

4   he -- is that he split the money, he split the net proceeds

5   60/40 with Jonnica, with the other women.  She had money.  She

6   had a bank account.  She had a credit card.  She had phones.

7   She had means and ability and ultimately she decided to leave.

8           Her claim about why and what circumstances she left

9   under is not credible.  And again, to convict Mr. Forney of

10  sex trafficking as to Jonnica, you have to find that her story

11  is credible.  Her story makes no sense.

12          She told you that while she was here being degraded

13  by Mr. Forney, she asked Mr. Forney to help her write a letter

14  that she could use in Wisconsin in an effort to get her

15  daughter back.  Why is she asking him?  Of all the people,

16  you're asking him?  He's degrading her and forcing her to work

17  as a prostitute, it is a living hell every single day.  Hey,

18  can you help me out?  She acknowledges it and acknowledges

19  that Mr. Forney helped her out, helped write a letter for her

20  that she could use to try and open communication with her

21  parents, in the hope of getting her daughter back.  That is

22  much more consistent, I submit to you, with Mr. Forney's

23  account of what was going on than with her account.

24          Every time I pointed out issues to her, she fell

25  back:  I can't remember, I don't recall.

1           And you get to determine whether you believe her.

2           There is zero evidence introduced of any injuries to

3   her.  She says she got beat up over and over.  Zero evidence

4   of injuries.

5           Zero evidence of her ever being on the Track.

6           There is zero evidence of force or coercion.

7           There are -- in Government Exhibit 300, there are a

8   series of texts between her and Mr. Forney.  There are a

9   series of texts in evidence between her and Leah.  And again,

10  these are texts taken off of Jonnica's phone.

11          (Exhibit published.)

12          MR. SINGER:  There are messages coming off the

13  phone, showing you that these are there.  They're in evidence.

14  You're looking at them on the screen, are from the chat's file

15  that I referenced earlier.

16          If you go through and look at the communication

17  between her and Mr. -- between Jonnica and Mr. Forney, between

18  Jonnica and Leah -- and there are many of them on there, in

19  that file -- there is not one single text message from

20  which -- that suggests or for which you could read into it

21  that there's a problem.  There's not a single text that

22  indicates any concern on her part or that betrays any concern

23  on her part.

24          She asked him whether -- she asked Mr. Forney

25  whether ads were posted.

1           Could we have that particular page up?

2           It's on the screen right there.  She is texting to

3   Mr. Forney and asking him, right?  It's the -- the text is

4   from the owner to Sir:  Is the ad put up yet?  She's asking

5   him whether the ad was put up yet.  Because she needs the ad

6   to be put up so that she can get business so that she and him

7   can make money.  Why is she encouraging him or bugging him

8   about whether an ad is up if she's forced to do this and she

9   doesn't want to?

10          There is nothing in these text messages -- and

11  again, with her and Leah as well.  There's nothing to suggest

12  that she is not a willing participant.

13          There is banter, there is LOLs back and forth.

14  There's just routine contact, but nothing to suggest that

15  she's not there as a willing participant.

16          And these are before you because the Defense put

17  them in before you.  Actually, the 300 was put in by the

18  Government.  They're certainly not highlighting these.  They

19  asked her about one, where Mr. Forney -- where she says to

20  Mr. Forney thanks for taking care, or thanks for caring.

21          You can take that down.  Thank you.

22          There is nothing in the evidence to suggest, much

23  less prove beyond a reasonable doubt, that Jonnica was

24  persuaded or had to be persuaded or induced or enticed or

25  coerced to come to New York to work as a prostitute.  Nothing

Summation - Mr. Singer                                919

1    in any of the evidence to suggest it beyond her word.  She was

2    willing to, she made the decision to, and she came.  She, on

3    her own, sent photographs to Mr. Forney.  She did that.  She

4    wasn't -- there's no evidence of any of the communications

5    before she came.  She says this is why I came.

6              That's a lot on Jonnica.  I'm not going to do nearly

7    as much on Shyya or Mellisa.  Jonnica, I urge you to disregard

8    her testimony.  She has lied repeatedly and thoroughly.

9    There's nothing to support her claims from start to finish,

10   before she came until after she left.

11             Mr. Forney indicated that she got e-mails from her

12   after she left.  After she left.  Hey, do you have those

13   photos?  Do you have those photos that you have of me?  Hi,

14   Sir, how are you?  Asking for another copy of the letter

15   because she was about to go to court.  She doesn't remember

16   any of it.  She's not worthy of your belief.  Without her

17   testimony here, there is no sex trafficking charge, there's no

18   interstate prostitution charge under Count Three.  It's simply

19   not there.

20             So, let me talk about Shyya.  Shyya is over a year

21   later.  It's the -- the indictment says from May to September

22   of 2017.  And the only charge with regard to Shyya is sex

23   trafficking.  Now, the sex trafficking charge requires -- and

24   the Government put these on the screen.  But they require that

25   there was force -- and again, I use it broadly -- force,

Summation - Mr. Singer                                    920

1   threats of force, fraud, coercion.  But there was force used

2   that caused Shyya to engage in commercial sex.  And it's

3   the -- there's two things that we're challenging:  Whether

4   there was force of any kind, however it's defined, whether the

5   evidence proves that beyond a reasonable doubt, and whether it

6   caused -- the causation part.  Did it cause it?  There is, as

7   to Jonnica, zero evidence to support her claims.  There is

8   zero evidence that Mr. Forney ever hit Shyya.  There is zero

9   evidence that he ever took her phone.  Unfortunately, her

10  phone apparently wasn't seized by the police and so we don't

11  have extractions from her phone.  There is zero evidence of

12  these things other than her claim that it happened.  There is

13  no photos of any injuries that she claimed to have received.

14  There is no videos.

15          The Government has gone at great lengths here,

16  clearly did their investigative work.  They dug up a YouTube

17  video from 2012 of him hanging out with his friends, one of

18  whom is a pimp, in his studio and just talking with friends

19  about stuff that they know.  And the Government bringing it

20  here, a video from 2012 that they dug up, to say this is what

21  he means, this is what he is, it's not just banter among

22  friends in language and a community that they have a joint

23  understanding about.  There isn't anything pretty in those

24  comments, but it's not a confession, which the Government

25  would have you believe, of a crime.

1           They also pull up a -- off of his Instagram account,

2     or off his phone, somewhere, a rap video.  A rap video.  That

3     that somehow is a confession.  It's art, it's music, it's

4     beats that he's trying to make.  But they're trying to turn

5     that -- you rap or you put down tracks about things that you

6     understand and language that you understand, but it's not a

7     confession.  It's art.

8           They get all that, they dug up all those things, but

9     they don't have any videos from the Track that shows

10    Mr. Forney out on the Track, that shows Shyya out on the

11    Track, that shows them interacting or anything happening on

12    the Track.

13          I mean, they put up -- put into evidence photos of a

14    CubeSmart.  All right?  A CubeSmart that has cameras all over

15    it.  And of the White Castle in Pennsylvania Avenue in

16    Brooklyn, there's cameras all over.  There's this Galaxy

17    Motel.  There's cameras on these places.  There's cameras

18    everywhere.  And for all the work they did digging up videos

19    of Mr. Forney from 13 years ago, they don't have any video out

20    on the Track of Mr. Forney or of Shyya or of anything

21    happening between them.

22          And I'm going to mention Jessica here.  I mean, I'd

23    submit Jessica really isn't important because they didn't call

24    her on their direct case.  And, you know, they put up Jonnica

25    and Shyya saying Mr. Forney beat me, and he said in his

Summation - Mr. Singer                           922

1    testimony I didn't beat her, and so now they bring Jessica in

2    and, you know, again, forced her -- they give her a subpoena

3    and force her in here and put her on the witness stand and say

4    oh, yeah, yeah, he beat me, too.  And he beat me out on the

5    Track, right out by the CubeSmart.  And they don't have any

6    video of that, but again, it's her saying so.

7            But she also says that after it happens, she speaks

8    to a truck driver and the truck driver used his phone or she

9    used his phone to call 9-1-1, to call the police.  Or to call

10   her pimp.  It was to call the police.  But they don't have

11   that.  They don't find the truck driver, they don't have the

12   call.  They don't put any of that in front of you.

13           So they don't have anything which shows that it

14   happened.  They have women who come in and say these things

15   happened, but they have not brought you any evidence to

16   support it.

17           Shyya acknowledged that she voluntarily chose up

18   with Mr. Forney.  Mr. Forney didn't force her to work for him

19   or with him.

20           And I'm going to mention one other thing with

21   Jessica that we submit highlights the absurdity of the

22   Government's position.  Jessica says that Mr. Forney was

23   recruiting her to work as a prostitute for him, he was

24   recruiting.  She was not working for him, he was trying to

25   convince her to work for him.  And the line he used, according

Summation - Mr. Singer                              923

1   to Jessica, is Mr. Forney told her:  I'm a real pimp.  And a

2   real pimp, as they say, is someone who takes all the money, no

3   split.

4           Like, hey, you could come -- I would like you to

5   come work for me or you can work for my friend here.  My

6   friend here says, going to do the same work, you'll do the

7   same work, it's just a question of whether it's for him or for

8   me, my friend will pay you to do the work.  But hey, I'm a

9   good guy, you could do the work for me and I'll take all the

10  money and give you nothing.  You taking that job?  I mean,

11  what kind of sales pitch is that?  That's what they told you.

12  Come work for me.  I'm a real pimp.  I'll take all the money

13  and I won't share any of it with you.  It makes absolutely no

14  sense.

15          Hitting Shyya in the face or bruising her makes no

16  sense.  The business is to make money.  You've got women who

17  you're getting clothes to make them look provocative for men

18  and you bruise them up and you beat them up?  It makes no

19  sense.  It's contrary to your own business interests.

20          Shyya chose to leave Mr. Forney.  He didn't force

21  her to work for him.  He didn't use force to cause her to

22  engage in commercial sex.  She voluntarily left.  She said she

23  voluntarily left because he hit me, but she voluntarily left.

24  He didn't force her to work for him.  They didn't bring a

25  simple assault case, they brought a sex trafficking case.

1           And even after that, she never gave him a dollar.

2    When she left, she left.  Never gave him another dollar, never

3    had to pay any kind of fee, she talked about.

4           And, in fact, she reached out to him later, just

5    like Jonnica had.  You reached back out to the guy who's

6    treated you like this, who's done this to you?

7           Mr. Forney is not charged with being a pimp, he's

8    charged with forcing Shyya to do the work.  The causation

9    element isn't there.  Look carefully at that.  It's not there.

10   Whatever this was -- and we submit it was voluntarily working

11   as a prostitute for the pimp, Mr. Forney, but whatever it was,

12   it was not sex trafficking, as the law defines it to you.

13          Mellisa is a different case.  Obviously, this is not

14   a sex trafficking charge.  And this charge depends entirely on

15   whether the Government has proved beyond a reasonable doubt

16   that these two people had sex.

17          The Google Hangouts text and chats are a little

18   creepy when you look at them and you know who is who.

19   Mr. Forney indicates I didn't know how old she was.  She, I

20   think, says at one point that she was 16.  The Government --

21   which is still under age and still a problem, but the

22   Government keeps harping on 14, it's a 14-year-old.  The age

23   is obviously a problem because you can't have sex with

24   someone, but there's nothing in the law that says you can't

25   engage in this sexual banter.  Banter.  But they have to prove

Summation - Mr. Singer                                925

1    more than that.  For this charge to exist, there has to be

2    sex, and there is zero evidence that they did.

3           Read the chat.  Read through it.  I mean, the

4    Government had Mellisa read through it page by page.  Read

5    through it.  There is nothing to suggest that they actually

6    met in person.  Nothing.

7           When you think about it, you know, in our own lives

8    we meet people, you might meet somebody new, you or your

9    spouse or your partner might meet somebody new, you go out to

10   dinner with them, you go to the park with them, you know,

11   whatever it is, you meet them at a golf course, whatever it

12   might be, you meet somebody, you have some kind of meeting and

13   then you communicate afterwards.  There's ordinarily some kind

14   of recognition like, hey, it was nice seeing you; or hey, that

15   was a fun day; or I enjoyed seeing you; or, you know, that was

16   a little weird, what was that all about?  Something.  Some

17   kind of acknowledgment in the exchanges that you had been

18   together and that something had happened.

19          Go through that chat.  There is nothing.  And she

20   says the sex happened some time in August.  Go through it.

21   There is nothing that even hints at them ever being together.

22          At the end, they're still communicating the same way

23   they were at the beginning.

24          And the Government goes, like, why would she lie

25   about this?  I'm a 68-year-old man; and being asked to

Summation - Mr. Singer                                926

1    speculate about why a teenage girl might lie about something,

2    I'm afraid to step into that.

3              But here's what we know.  She, like the other women,

4    was contacted by federal authorities.  If the feds come

5    knocking on your door and you don't know why, it's a little

6    scary.  She's a young woman when the feds come knocking on her

7    door.  And they want to talk to her about Mr. Forney, a guy

8    that she was engaging in these provocative texts with a number

9    of years earlier, when she was a kid.  Is she scared?  Is she

10   worried?  Like, what is this all about?  What am I into here?

11   She comes up with a story.  I'm suggesting one possibility.  I

12   don't know the answer.  I don't know the answer, but I'm

13   suggesting she comes up with a story.  And once you give a

14   story to the feds, you're stuck with it and you stay with it.

15             What suggests that they never met up and had sex?

16   They interview her.  The feds interview Mellisa and ask her

17   about -- asking her about Mr. Forney and at some point show

18   her photographs.  And she doesn't identify anybody in the

19   photographs.  Now, there's no evidence that Mr. Forney's

20   photograph is in the photos that they showed her, but come on,

21   of course it is.  Why else would they be showing her

22   photographs when they're asking her to talk about Mr. Forney?

23   She doesn't identify.

24             She doesn't identify in here, on the witness stand.

25   Doesn't look across the room.  I mean, who else isn't going to

1  be in here?  They don't ask her to identify him here.

2          She said that she rides on the train with him -- or

3  on the bus with him, that she spent -- she spent some time

4  with him.  She can't identify him.  She doesn't know where his

5  basement is.  She doesn't give any description.  What was the

6  ride about?  Where you stopped and went to this place where

7  the basement was, what is it?  Was it an apartment?  Was it a

8  house?  What color was it?  What was it made of?  Was it

9  brick?  Was it vinyl?  What is it?  Describe something about

10  it.  She gives no description of the street or the house and a

11  very limited and vague description of what she says is the

12  basement.  It was dark, there was a bedroom, there was a TV.

13  Okay, she doesn't provide anything.  Or what bus she took.

14  She took the bus back.  She doesn't know what bus she took.

15          Look, folks, sex trafficking is real.  It exists.

16  There are special units in the Department of Justice for it.

17  There are special prosecutors that work on sex trafficking

18  cases.  It is a -- it's a bad thing.  I'm not up here

19  extolling the virtues of sex trafficking.  Sex trafficking is

20  real.  But this, this trial, this indictment was a prosecution

21  of Mr. Forney in search of a victim.  The Government started

22  this.  They started the investigation.  None of these women

23  came forward.  This is a prosecution in search of a victim.

24  We don't have Leah, we don't have Foxy, we don't have any of

25  their communications.  None of the women went to law

Summation - Mr. Singer                                928

1    enforcement.

2           And I submit to you with regard to Jonnica, with

3    regard to Shyya, with regard to Mellisa, if you're going to

4    charge any person -- in this case, Mr. Forney -- if you're

5    going to charge him with offenses as serious as this, come

6    with evidence, come with something.  They didn't.  They've got

7    the word of these three women.  And as I tried to just point

8    out to you, there are things lacking with regard to each one

9    of them and no evidence to support what they said.

10          The charges are serious.  Mr. Forney is asking and

11   counting on you, and I'm sure you will, to take your

12   responsibility here seriously.  Please look through the phone

13   calls, the text messages and everything else.  Look through it

14   all.  The evidence does not support these charges.  We urge

15   you to find Mr. Forney not guilty.

16          Thank you very much.

17          THE COURT:  Does the Government want a rebuttal?

18          MS. BOWMAN:  Yes, Your Honor.

19          A quick bio break, please?

20          THE COURT:  Yes.  Let's give everybody a quick

21   break.

22          Will the jurors kindly leave their notebooks face

23   down on their chairs.  Don't talk about the case.  We will

24   bring you back as soon as we're ready to proceed.

25          Thank you for your service.

Andronikh M. Barna, Official Court Reporter, RPR, CRR

Proceedings                                    929

 1              (Jury exits.)

 2              (Recess taken.)

 3              (In open court; jury not present.)

 4              THE COURT:  Are we ready to bring the jury back?

 5              I think one thing we need to deal with is that

 6       exhibit.

 7              MS. RANGEL:  Yes, Your Honor.

 8              THE COURT:  So perhaps now, once we bring the jury

 9       back.  But how do you want to deal with it?

10              MR. SINGER:  Whatever you think works is fine with

11       me.  I don't think it matters.

12              THE COURT:  All right.

13              MR. SINGER:  There is -- they were using it to prove

14       the date of birth of Mellisa.  Her passport is in evidence,

15       which has her date of birth on it.  Whatever is easiest and

16       most convenient for the Government and the Court is fine with

17       me.

18              THE COURT:  How would you like to deal with it?

19              Ms. Bowman, are you going to cover this in your

20       rebuttal, to talk about Exhibit 802 not being evidence?  That

21       was the birth certificate, but the 803 is the evidence you

22       have for the date of birth.

23              MS. RANGEL:  I think it would probably just be maybe

24       easier if you just instructed them that in one of the slides

25       in the closing there was an -- inadvertently a Government

Proceedings                                      930

1   exhibit that wasn't admitted, but that Ms. Rangel also

2   discussed Government Exhibit 803, which is in evidence.

3        Because I did mention it, just what was pulled up on

4   the screen was 802.

5        So they are to disregard Government Exhibit 802

6   because it's not in evidence, but Government Exhibit 803 is

7   Mellisa's passport, which includes her date of birth.

8        THE COURT:  All right.

9        We'll bring the jury -- is that acceptable to you,

10  Mr. Singer and Mr. Hine?

11       MR. SINGER:  That's fine.

12       THE COURT:  All right.  We'll bring them back in.

13       (Pause in proceedings.)

14       (Jury enters.)

15       THE COURT:  All jurors are present.

16       Please have a seat.

17       Members of the Jury, the Government will have an

18  opportunity to make a rebuttal summation.  But before they do

19  that, I wanted to just correct the record.

20       You were shown, during the Government's closing, an

21  Exhibit 802, which was not -- which is not in evidence.  It

22  was the birth certificate.  That exhibit is not in evidence,

23  but instead it was a mistake.  Government Exhibit 803 is in

24  evidence, and that is a passport of Mellisa, which shows her

25  date of birth.  So, that will be available for you to review,

1    Government Exhibit 803, and disregard 802.

2              With that, Ms. Bowman, if you would like to offer

3    rebuttal argument, you may.

4              MS. BOWMAN:  Thank you, Your Honor.

5              What Defense Counsel just told you is a complete

6    distraction from the actual evidence in this case.

7              On the facts in this case, pimping is a crime, a

8    crime which the Defendant committed.  The evidence in this

9    trial has shown Joel Forney is a pimp and a trafficker who

10   induced women into prostitution with the promise of money,

11   success, and then coerced them to continue in that business

12   for his own financial benefit.  He is also the same man to

13   keep his touch as a man, lured a young girl to have sex with

14   him who was no more than 15 years old.  That, Members of the

15   Jury, is what the evidence in this case has shown.

16             My colleague just walked you through a lot of

17   evidence.  I'm not going to back to every piece of evidence in

18   this case, but I will tell you why you should reject the

19   arguments you just heard.

20             Before we get back to the evidence, let's talk about

21   the burden here.  As my colleague noted, I expect that

22   Judge Matsumoto will instruct you that the burden of proof

23   lies with the Government.  And we embrace that burden,

24   Members of the Jury.

25             I also expect that the Judge will instruct you that

Rebuttal - Ms. Bowman                           932

1   a defendant in a criminal case never has any duty to testify

2   or come forward with any evidence, and that is because -- but

3   because the Defendant in this case testified, you should

4   examine and evaluate his testimony just as you would the

5   testimony of any witness in this case, any witness who took

6   that stand.  That's the evidence you are to consider here.

7           In doing so, you can assess the Defendant's

8   arguments and testimony using your common sense.  No one says

9   check your common sense at the door, Ladies and Gentlemen.

10  You must use it in your deliberations.  And when you do, you

11  will see that everything the Defendant and his counsel are

12  arguing is hollow.

13          The Defense attorney just spent a lot of time

14  talking about the sex trafficking charges.  I will do the

15  same, because that's what he's saying is in dispute.  So,

16  let's start there.

17          The evidence shows that the Defendant preyed upon

18  the vulnerability of his victims, the victims who sat up there

19  and told you in vivid and intimate details about what he did

20  to them.  And you heard that when necessary, he did not

21  hesitate to use violence or threats of violence to maintain

22  control of them.  That is what the evidence showed.

23          As an initial matter, remember as my colleague said,

24  the Judge will instruct you that initial consent is not a

25  defense to the charges here, meaning that if any of his

1   victims chose to work for the Defendant, it does not mean that

2   they were trafficked, it doesn't mean that they were not

3   trafficked.  Similarly, it is not our burden that every sex

4   act in which they engaged while working -- to show that every

5   sex act his victims engaged in while working for the Defendant

6   was coerced.  Instead, if you find that these women engaged in

7   one commercial sex act because of the Defendant's force, fraud

8   or coercion, he is guilty of sex trafficking them.

9          Now let's turn to why the Defense Counsel's

10  criticism of Shyya and Jonnica's testimony is hollow.  When

11  you use your common sense, you know that Jonnica's time with

12  the Defendant was not entirely consensual because Jonnica

13  testified that the Defendant kept all of her money and that

14  she had a quota that she had to meet.  And that when she had

15  attitude or did something the Defendant did not like, she

16  feared she would get beat.

17         The bank account you heard about was merely a

18  convenience.  It enabled him to control what she was able to

19  access.  It enabled food to get sent to the room, Ladies and

20  Gentlemen.  It was a convenience.  It didn't mean that he was

21  not in control of her.

22         The fear that kept Jonnica working for him is laid

23  out in incidents she talked about on the stand.  I will review

24  them briefly again.

25         Remember when the Defendant showed her a picture of

Rebuttal - Ms. Bowman                    934

1   a dismembered body and said:  This is what happens to whores

2   who don't obey their pimps.

3          While the Defendant admitted to showing her the

4   photo under some circumstances that also allegedly impacted

5   him, you can still believe that that photo had a deep impact

6   on Jonnica.  Seeing a photograph of a dismembered body would

7   affect anyone.  And coupled with those words, this is what

8   happens to whores who don't obey their pimp, how would that

9   make you feel?  Jonnica told us how it made her feel.  That is

10  easy to relate to.

11         And imagine how a hundred-pound Jonnica felt next to

12  the towering, over-six-feet-tall defendant when she came to

13  New York and had sex with him in a hotel room hours before

14  other men were going to come into that room and have sex with

15  her for money, too.  She was a long way from home.  And that

16  sex act between them was a form of control.  He wanted to test

17  his goods and he wanted to dominate her.  And that's what

18  happened.

19         Jonnica also told you about the time the Defendant

20  walked into a hotel room.  He didn't knock.  He had a key.  He

21  was always appearing.  He was always close by.  And what did

22  he do when he entered?  He turned on the shower.  She was

23  asked:  Did you take a shower?  She said no.  Why do we think

24  the water was running?  To drown out her screams.  Because you

25  know what happened next.  He beat her up.  And again, to

1    maintain control and dominate his subject that he used for

2    money, he had sex with her.  Another tactic of his control.

3            And then there were times when he didn't even have

4    to hit her because there was this fear in her mind about what

5    could happen.  He set that up.  It was part of his playbook.

6    This is the instance where she woke up.  And again, he was

7    just in the room, sitting across from her when she was

8    sleeping and said:  You know, you can't be going to bed.

9    There's going to be consequences.

10           Throughout her testimony she talked about the sleep

11   deprivation that she had to endure.  Why?  Because she had to

12   work when the Defendant said work.

13           (Continued on the next page.)

14

15

16

17

18

19

20

21

22

23

24

25

1          MS. BOWMAN:  Sleep came second.  Her wellbeing
2    came second to making money and she was afraid to rebel
3    because he established what the consequences would be.  And
4    that was really demonstrated when she talked about the
5    incident where the defendant made a gesture that he was
6    going to hit her and she physically reacted, she cowered
7    because she couldn't envision what that would feel like.
8    Again, a hundred-pound Jonnica was in a situation with a man
9    much bigger than her, who had power over here, and who had
10   control over her.  He didn't have to hit her every time.  He
11   designed their relationship that way.

12          When you assess her credibility about these
13   incidents, go back to your memory of how she appeared.
14   You'll remember that she got visibly upset.  She was talking
15   about horrible things that happened to her, stuff of
16   nightmares.  It was painful and traumatic.

17          And what's more, she's clearly embarrassed about
18   this chapter in her life.  And unlike the defendant who held
19   himself out there like a proud pimp, as he did when he
20   testified before you, Jonnica was demure.  She was sad.  She
21   was tired.  And she was ashamed about this part of her life.
22   The part of her life when she came to New York in shambles,
23   broke, lost, not having custody of her child, not having
24   close relations with her family.  That's the Jonnica we saw
25   and heard about.

*Rebuttal Summation - Ms. Bowman*                    937

1          And if you still have doubts, I ask you to again
2    go back to that first night in the hotel room with the
3    defendant.  Regardless of the circumstances that led her to
4    that room, that led her to get on the Amtrak, that led her
5    to New York, the defendant put her in a situation where she
6    didn't feel like she could say no and had sex with her.
7    When you come to a place for a job interview, is that what
8    happens?  Even if you come because you're going to be an
9    escort, does your boss need to test you out before the real
10   customers come?

11         And go back to those images he posted.  Her
12   breasts and her vagina were exposed.  Look at her
13   expression.  Those are the pictures that he put on the
14   internet to drive customers to her bed so that he could
15   profit.  This was his playbook; this was his plan.

16         A picture is worth a thousand words and that
17   picture shows that whatever Jonnica was expecting when she
18   arrived in New York, she did not get it.  It was not her
19   vision of luxury, completely different.  The defendant broke
20   her in like an animal and the nightmares began.

21         And what's the worse, it was only the beginning.
22   She was in that situation for nearly eight months regardless
23   of how she got to that room.  For the next eight months, the
24   defendant took the money Jonnica made, having sex with other
25   men at the defendant's direction.  She only got food when he

1    said so.  She only got clothes when he said so.  That was

2    her new reality.

3              And when she broke his rules or disappointed him,

4    the punishment was real in addition to the threats and

5    violence, you heard about the Penn Track and you saw

6    pictures of Penn Track.  It's not a yacht.  It's a series of

7    streets in a commercial area after Brooklyn, a commercial

8    area in Brooklyn that comes alive at night.  It's a

9    marketplace for sex where the women are forced to walk on

10   the street, nude, barely wearing any clothes no matter the

11   weather.  And Jonnica's punishment was frequently doing that

12   in the winter.

13             Counsel made a big show about the lies that she

14   told and about whether she was forthcoming with the

15   Government about coming to New York to be an escort or not.

16   That's a distraction.  She told you about it.  It's out

17   there.  It doesn't mean that everything she told you after

18   that is a lie.  Because everyone agrees now that Jonnica

19   knew she was coming to engage in some type of work that

20   involved going on dates.  She even told you that those dates

21   could involve the possibility of having sex with men but she

22   thought it was going to be her choice.  What she thought she

23   was coming for and the reality were completely different.

24   And just because she may be came to be an escort does not

25   mean that she wasn't trafficked.  And again, the judge is

*Rebuttal Summation - Ms. Bowman*                939

1   going to instruct you that initial consent is not a defense

2   to the crime of sex trafficking.

3           For the same reason, what the defense counsel just

4   did up here about the nudes is also a distraction.  It

5   doesn't matter how she got to the defendant, it doesn't

6   matter what happened.  What matters is what he did to her

7   when she was here.

8           Now, let's talk about why she didn't tell the

9   police, why didn't she tell her family.

10          Again, her testimony demonstrates that it is not a

11  leap to say that the defendant instilled fear for her,

12  instilled fear in her from day one to the day she left.

13  Yes, there's evidence she had her phone.  Yes, there's

14  evidence that she was having communications with people.

15  Sometimes it's hard to reach out for help when you're in a

16  bad situation.  That's a relatable principle.  There's

17  people who are in toxic relationships they can't get out.

18  They don't tell anyone, they get beat they don't call the

19  police.  It's hard to break negative cycles.

20          She was paralyzed.  And her brother Gabe that we

21  heard so much about she testified that she never met him.

22  Maybe it was nice just having someone on the outside to say

23  hi to.  What was Gabe going to do?  They had never met.  She

24  didn't have friends to call.  She felt that people that were

25  in her life were not going to show up with her.  She didn't

*Rebuttal Summation - Ms. Bowman*                    940

1    think that anyone could do anything.  Maybe that was wrong.

2    But that doesn't change what the defendant did.  When you

3    contextualize that against the threats and the violence that

4    was being inflicted upon her, her behavior is not that

5    farfetched.  If she had only stayed one day after that

6    night, based on the circumstance she was in the defendant

7    would still be guilty.  And the fact that she stayed nearly

8    eight months is just more evidence of how she was coerced

9    and compelled to stay.  Don't ignore it.  Use it, assess it.

10   The evidence shows that he is guilty of sex trafficking her.

11            Let's now turn to Shyya.

12            Defense counsel also spent some time on Shyya.

13   Defense counsel told us that he's disputing whether there

14   was force used to engage her to engage in sex trafficking

15   for the defendant.  We submit that force compelled her to

16   stay with him.  When Shyya took the stand, you will recall

17   that she was direct, straightforward.  She painted a vivid

18   picture of the life on the Track and the rules on the Track.

19            It's true, she lived a messy life.  She was broke,

20   she was homeless, this is exactly how the defendant was able

21   to persuade her to work for him as long as she did.  Under

22   the rules of the Track, the rules which the pimps set, she

23   had to choose a pimp.

24            And she chose the defendant because the place she

25   was staying was filled with mice.  She was in an impossible

1  situation.  She was in a line of work that required her to

2  not be a renegade, as Jessica F. said, and to choose

3  someone.  But doing that, again, initial consent is not a

4  defense.  And moreover, she stayed in that relationship

5  because of the fear and the violence just like Jonnica.

6          Go back to her testimony about the pimp circle,

7  what would that feel like?  She said she was dizzy, people

8  were yelling at her, her options were limited.  But that

9  didn't waive her right to be in a work situation that didn't

10 include violence and threats and her's did with the

11 defendant.  The law protects women from being subjected to

12 violence in the circumstances Shyya found herself in where

13 that violence was why she stayed.

14         In Shyya's words, she stayed because she was

15 afraid that that man would beat her ass.  She testified that

16 she did not want to get smacked, and when she left that is

17 exactly what happened.  Her fear was real.  Specifically,

18 you will recall that Shyya testified about being smacked

19 across the face by him another time and go back to this

20 image.  They were in a hotel room, he took all of his

21 clothes for what she assumed was to ensure that he wouldn't

22 get blood on his nice clothes and then proceeded to hit her

23 on the head.  This act was so violent, members of the jury,

24 she had a headache for at least two weeks.  And, again, she

25 knew he was violent because she'd experienced it.  And when

*Rebuttal Summation - Ms. Bowman*                                942

1    she left, she experienced more violence.  He found her and

2    smacked her just like she knew he would.  And you just don't

3    have to think it only happened to her because the witnesses

4    in this case corroborate each other, and we're going to

5    spend a lot of it time on it.

6              So let's talk about the another incident with

7    another victim that Shyya brought out, she brought up Foxy.

8    She testified that she watched the defendant beat Foxy and

9    that this had the same impact as the dismembered photo, the

10   photo of the dismembered woman had on Jonnica.  This

11   incident of Foxy getting beat had the same impact on her.

12   She said that after she saw the defendant punch and hit

13   Foxy, she was terrified leading her to believe that if she

14   did something wrong, tried to leave, she would experience

15   violence.

16             And as I just said, that is what happened.  It's

17   also pretty realistic and easy to understand why Shyya

18   didn't tell anyone.  When asked why she didn't seek medical

19   attention after she experienced abuse, she said she did not

20   have time to worry about where she was going to go

21   afterwards.  She was so focused on just getting by.  It

22   would have been a burden on her to go seek help because she

23   was homeless and she just had to keep going.  Yes, she even

24   told you that they talked again.  But again think about who

25   Shyya was.  When she needed something she reached out to

1   people.  She was in a cycle of life where she was just

2   trying to survive so the choice she is made were about

3   survival.  And the contact with him, did it lead her to go

4   work for him again.  She was just feeling out in the world

5   for attention.  She needed attention, she needed things, and

6   that's what the contact with an about she told you that.

7   And, again, that's not an unusual principle to think about.

8   When people are living in dire straits their choices are

9   limited.

10              You sat here throughout the course of this trial

11  and I'm sure you were making the same comparisons that I'm

12  about to make.  Shyya and Jonnica's testimony lines up.

13  Well, they are both two very different people they presented

14  differently while they came from different backgrounds there

15  were some commonalities.  They were both raised in the

16  foster system and they were both broke and seeking to make

17  money.  Perfect?

18              MR. SINGER:  Objection, that is not accurate as to

19  Jonnica.

20              THE COURT:  I'm sorry, did you want to be heard at

21  sidebar?  What is not accurate?  We can talk at sidebar.

22              MR. SINGER:  About Jonnica being raised in the

23  foster system.

24              MS. BOWMAN:  The testimony showed she was adopted.

25              MR. SINGER:  That's a different thing.

1        THE COURT:  All right.

2        MS. BOWMAN:  Whatever the circumstances

3   specifically were, the defendant saw the same thing in these

4   two women, they were vulnerable.  So he chose them as

5   victims and use them for his own financial gain.  And their

6   testimony was about different time periods and they never

7   met and it lines up let's visit that.  There's a number of

8   categories we'll do it categorically.

9        Both Jonnica and Shyya testified that the

10  defendant took all of their proceeds on this point.  Shyya

11  said the defendant told her he was a real pimp, meaning, he

12  kept all the profits.  We heard that term a lot of times and

13  it all meant the same every time it came up.  And Jonnica

14  testified that the defendant would try and recruit her girls

15  by saying he was a real pimp.  They both had quotas.

16  Jonnica testified that her quota was about $2,000 every day.

17  Shyya testified that her quota was about $600 a day.  Both

18  Jonnica and Shyya had to keep working until they hit those

19  quotas even when they were sick or tired on or their

20  periods.

21        Now, on to the rules, the rules that benefited the

22  pimps.  They said that they both had to look down and not

23  look pimps in the eye.  They both had to ask the defendant

24  for basic necessities.  And importantly, they both

25  experienced violence and threats of violence at the hands of

112 of 227 PageID #:

1    the defendant.  And notably, they both experienced specific

2    dramatic incidents.  Jonnica with the shower being turned on

3    to drown out her screams, and Shyya with the defendant

4    taking off his clothes to avoid getting bloody.  He did

5    those things to create fear and it worked.  Common sense

6    leads us to the conclusion that these women did not make

7    these stories up.  They're similar because that man had a

8    playbook and he had motive to use violence.  Let's do some

9    math.

10           Based on Jonnica's testimony we know he made a lot

11   of money off of her.  Let's assume based on her testimony

12   that she was sleeping with on average ten men a night, seven

13   days a week, at $150 an interaction.  That meant she was

14   likely making an average of $1,500 a night, and if she hit

15   her quota of 2,000 even more.  So she was working with him

16   for eight months that would put her profits for the

17   defendant at over $300,000.  $300,000.  Those numbers show

18   you that the defendant had incentive and motive to keep

19   these women working for him by any means.

20           And we just walked through those means.  We

21   brought you multiple victims, not one, not two, but three.

22   You heard from Jessica F. just yesterday so I'm sure her

23   testimony is pretty fresh in your mind but I'm going to

24   bring it up again so that we're all on the same page about

25   what the evidence really is here.

1          Let's set the discrepancy.  The day before, I was

2    cross-examining the defendant and I asked him if he ever hit

3    a prostitute.  What did he say?  Never.  I asked him had you

4    ever hit a woman?  He said yes.  And what was the story

5    there?  He hit the mother of his child.

6          The next day, Jessica F., who doesn't know Shyya,

7    who doesn't know Jonnica comes in here and tells you that

8    she was beat by the defendant.  And what's more, there were

9    photos of it.  That is the evidence.  That is the

10   corroboration for the violence he inflicted upon Jonnica and

11   Shyya.  And notably, Jessica also knew Foxy, the same woman

12   the defendant beat in front of Shyya.  These are real people

13   who experienced abuse at the hands of the defendant.  And

14   even if there's not photos, the evidence lines up because

15   they all have similar stories and we brought you photos

16   through Jessica.

17         What defense counsel is asking you to do, members

18   of the jury, is basically say he is the most unlucky man in

19   the world.  So unlucky that three separate people walked in

20   here and accused him of acts of violence.  All who happen to

21   be prostitutes.  And it was his testimony that he had never

22   hit a prostitute.  How unlucky is he?  The evidence shows he

23   wasn't unlucky.  The evidence shows that he used violence in

24   his profession to profit on the backs of women.  So this is

25   all to say that the defendant has clearly hit more than one

*Rebuttal Summation - Ms. Bowman*                    947

1   woman.

2          We also know that Jessica F. is credible because

3   her testimony about the rules of the Track mirror the

4   testimony of Shyya and Jonnica.  I'll just mention a few.

5   Prostitutes aren't able to look at a pimp or get on the

6   sidewalk, they have to be in the street.  They have to look

7   straight ahead or at the ground.  Women who do not follow

8   the rules of the Track would get beat up.  When you don't

9   have a pimp, you're a renegade.

10          Sir, the defendant, tried to recruit women by

11  saying he was a real pimp.  There's that term again.  They

12  didn't all say he was a gentleman pimp.  They said he was a

13  real pimp.  And that's because that's what he was telling

14  his victims and that's how he marketed himself.  Not as a

15  gentleman.

16          You can reject the fairytale the defendant has

17  tried to paint for you.  Defense counsel wants you to

18  believe that the defendant's version of events is true

19  despite the similarity and the narratives we just walked

20  through.  But in order to accept that narrative, you'd have

21  to reject the testimony of Shyya, Jonnica, and Jessica.  We

22  also have more evidence than just their testimony.

23          Let's go to the defendant's own words.

24          In order to believe his version of events, you'd

25  also have to believe that his rap song is just art.  My

1   colleague artfully compared those lyrics to Shyya's life.  I

2   submit this song is not art, it is true.  It mirrored her

3   testimony line by line by line.  It also mirrored the

4   testimony of other victims in this case.  Think about it

5   these phrases in the rap song in the jury room and how we

6   showed you that it is true.  "Crack your feet on the

7   pavement, I'm getting paid."  "Talking to the bitch, she

8   looked down."  "Real pimp."  "$500 a bitch.  $1,500 any

9   night."  His words.  He admitted those words to being his on

10  his song.  Titled "Sir Bar Down."

11          And don't forget, that the song also included the

12  refrain, "I remember my life so I never run out of lyrics."

13  This song was not a freestyle, it was true.  Yes, we brought

14  you a video from 2012 because it was relevant, deeply

15  relevant.  In that video, he's talking about how to recruit

16  women in 2012 outside the time period in which he says he

17  was not pimping but the context of that video is that he is

18  very much trying to get women to work for him.  So much so

19  that he knows that the best way is not to be honest but to

20  sell them a fantasy.

21          In that video, you'll recall that he says that if

22  you tell a woman they're going to be a ho they probably

23  won't come to you but selling an idea of being an escort is

24  a much better fantasy that people are going to buy into.

25  You don't have to accept my words or my characterization,

1    you can play it back.  You can hear his words.

2              His testimony was self-serving.  He wanted you to

3    believe that he was admitting to something by saying he was

4    a pimp.  But the type of pimp he wants you to believe is not

5    supported by the evidence.

6              Let's now talk about Mellisa, the charges against

7    her are vastly different.

8              We all sat through Mellisa's testimony and saw how

9    hard it was for her to describe the day the defendant had

10   sex with her in his basement.  Yet, the defendant is

11   contending that her count is made up.  But there is no

12   motive for Mellisa to have fabricated such a story.  The

13   messages say it all.  They're not innocent and harmless

14   messages, these are calculated messages.  He was trying to

15   entice her so that he could have sex with her and that's

16   what happened.  Immediately after meeting Mellisa, it is

17   clear from the messages that he was interested in her

18   sexually.  We talked about those messages in detail.

19             So you will remember that he told her that she was

20   sexy, that she looked real good, and that he indicated in

21   his own words his sexual desire.  "May have to have you,"

22   even after she was sending him pictures clearly indicating

23   that she was a minor.  Go back to the pictures of her

24   holding a Teddy bear.  Further indication of his sexual

25   desire for her was the fact that he sent a picture of

1    himself in his underpants.  And this was just after she

2    isn't that right Teddy bear picture.

3              The messages also show that they made plans to

4    meet up.  Numerous indications they were trying to make

5    plans and just because the meeting that occurred is not

6    present in the messages doesn't mean it doesn't happen.  We

7    also have her testimony.  And her testimony has indicated

8    that she has nothing to be gained from fabricating the

9    story.  She was emotional.  She's now an adult.  The conduct

10   happened when she was a minor.  Why would she want to drudge

11   that up.  Her account was also detailed.

12             Put yourself on the walk to the bus or the walk to

13   his apartment where they didn't speak and on the bus they

14   didn't sit together.  He was embarrassed to be seen with her

15   because she was a child.  Who would fabricate those details?

16   Her testimony was about her lived experience.  People don't

17   always report the horrible things that happened to her.  She

18   didn't tell anyone until the FBI contacted her.  She moved

19   away shortly after the incident and when the defendant

20   reached back out to her many years later, she said, I am a

21   changed person.  She had moved on.  That doesn't mean she

22   made it up.

23             The defendant's theory would mean that her

24   motivation to lie was so strong that it would outweigh the

25   stress of walking into federal court and lying under oath

1    about being raped as a child.  It doesn't add up.

2          Further, the explanation we got on

3    cross-examination doesn't add up.  The defendant wants you

4    to believe that Mellisa's account isn't true because, by his

5    account, at the time he was messaging Mellisa in 2014, he

6    was also messaging thousands of women to flirt because he

7    was at home alone with his children and he felt like he was

8    using his touch as a man.

9          Go back to the messages with Mellisa.  He wanted

10   to meet her he had a sexual desire for her and they met and

11   he raped her.  Talking about his activities on the internet

12   trying to look for women as a distraction to what was

13   happening in his life is a distraction to you and a

14   distraction to the evidence.  He also gave us another reason

15   that they were talking.  He said that he was talking to her

16   it promote his party business and trying to recruit her to

17   participate in his party business.  The record again, tells

18   a different story.

19          You will remember the defendant made a number

20   statements about money to Mellisa.  Statements she didn't

21   understand now or then.  "Come get this money."  "But are

22   you down to get this money with me?"  "Be with me, make this

23   money and being happy."  If all he was doing was asking her

24   to send a link out for party flyers so that he could get

25   paid for promoters driving the advertisement to said flyers,

1   whatever that really means, why did he say, "Come get this

2   money, be with me."  More is clearly going on here.

3          The evidence shows that it is plausible he was

4   trying to recruit her as a prostitute.  Jessica F. told you

5   that she started working on the Track at the tender age of

6   15.  And we know that the defendant was interested in

7   recruiting as early as 2012 because of his own words and

8   that YouTube video.

9          We know that this man has a playbook.  We sent a

10  lot of time walking you through this.  Likes to have sex

11  with him to test them out before he controls them and pushes

12  them into prostitution for his benefit that's what happened

13  with Jonnica.

14         Defense counsel also raised that Mellisa didn't

15  make an in-court I.D. and that when the police, the FBI

16  approached her, she didn't identify the defendant.

17         Let's go back to the messages he sat on that stand

18  and said that's me.  That's me.  That's me.  This is my

19  conversation with Mellisa.  Compare those photos to what

20  this man looks like.  That's him, ladies and gentlemen.  You

21  didn't need anything more from her.  Look at the photos,

22  make the comparison.  We've been talking a lot about

23  credibility.  I don't really need to find it for you because

24  everyone in this room has their own Spidey sense or gut

25  feeling about when people are telling the truth.  It's human

*Rebuttal Summation - Ms. Bowman*                    953

1    nature to figure out if you can trust someone.  If you think

2    they're telling you the truth.  Latch on to that, use it in

3    the jury room.  Remember their body language, remember their

4    demeanor, and think about how their testimony made you feel.

5    You know when something doesn't add up.  Reject the

6    defendant's self-serving statements and look at the

7    evidence.

8            Let's apply those principles to a few more things

9    the defendant said.  Let's look at his words again.

10           The defendant got on the stand and tried to limit

11   his admissions to a specific time period.  He told you that

12   he was a gentleman pimp between 2016 and 2018.

13           MR. SINGER:  Judge, I object.  This is simply not

14   a proper rebuttal summation.  This is far beyond what's

15   permitted as a rebuttal.

16           THE COURT:  Well, again, jurors this argument.

17   None of the arguments you heard today is evidence.  I think

18   that, in terms of a rebuttal, you're probably going a little

19   bit beyond what would be appropriate.  I'm not saying it's

20   wrong but I'm saying that the rebuttal is to the defense

21   argument.

22           MS. BOWMAN:  Understood, your Honor.

23           (Continued on the next page.)

24

25

1          MS. BOWMAN:  Understood, your Honor.

2          THE COURT:  To the extent she's rebutting

3    credibility which was raised by the defense, that is an issue

4    for the jury to decide, which witnesses or which portions of

5    the witnesses' testimony are credible.

6          If you don't have a lot more on this subject, I'll

7    allow you to wrap that credibility part up.

8          MS. BOWMAN:  Understood.

9          THE COURT:  Okay.

10         MS. BOWMAN:  One other thing to mention on this

11   topic is to go back to the line questioning about what PI

12   meant at the end of his social media accounts.  The

13   defendant's answer was that PI did not stand for pimp, but it

14   stood for math.  You heard testimony from Jonnica that she was

15   named by the defendant as Minnie Pro.  The evidence shows that

16   the defendant was deliberate.  PI clearly meant pimp.

17         Now, I'll briefly touch on Count Two and Three which

18   defense counsel touched on his rebuttal.  I believe his

19   argument was that if the defendant had a sex slave why did he

20   travel from place to place.  Go back to the defendant's own

21   testimony.  He told you about the research he did.  He told

22   you how it was profitable to move from place to place.  And in

23   that testimony or admission that you should consider, as my

24   colleague referenced in her summation, my colleague noted and

25   I ask you to remember in response to the defendant's argument

Ms. Bowman - Rebuttal Summation                955

1   that the defendant as to Count Two by his own admission is

2   guilty of that offense.  And as to Count Three, please

3   remember the defendant told you he was a pimp, that Jonnica

4   traveled from Wisconsin to New York, and New York to

5   Connecticut to work in commercial sex for money.  They crossed

6   state lines while the defendant intended to sell her body for

7   sex; therefore, the element is proven.

8           Don't be distracted about why they needed to travel.

9   Look at the evidence and consider his admissions.

10          The defense attorney said that the victims were

11  lying.  But surely if they were lying their stories would be

12  more elaborate.  There would be more instances of violence,

13  and surely Mellisa would have told someone.  But that is just

14  not what the evidence shows.  So consider their testimony

15  carefully.

16          And the Judge is likely going to instruct you that

17  the testimony of one witness is enough to prove the

18  defendant's guilt; and there is much, much more than the

19  testimony of the single witness here.  So you just don't have

20  to rely on them, go back to the documents, go back to

21  everything we put on in our case this week and consider how

22  all evidence lines up.

23          And if you're still wondering where the police

24  reports and photos of brutal attacks are for the sex

25  trafficking counts, remember, his victims feared leaving and

1  reporting him because they already knew what the consequences

2  were.  He would punish them.  And Jessica F. Showed you the

3  photos of what can happen when he struck a woman.

4          In defense's summation you heard about all the

5  evidence we could have shown you.  I expect that the Judge

6  will instruct you that while, yes, we have a burden, and yes,

7  we embrace it, there is no duty to call any witnesses or to

8  produce all evidence or use a particular investigative

9  technique.  And what is before you, is the evidence you need

10  to convict on all of the counts.

11          The victims who came in here told you about the

12  nightmares that they lived through at the hands of the

13  defendant.  Compare that with the rap song, compare that with

14  the defendant's own words.

15          And remember the demeanor of each witness who took

16  that stand.  And remember how the defendant had a playbook,

17  and think about how it applied to each victim.

18          Now it is time for you to sit with the evidence, to

19  latch on to your gut feeling, and deconstruct the defendant's

20  baseless narrative that he did not commit the crimes charged.

21  Based on the evidence and not the conjecture that you've

22  heard, we ask that you find the defendant guilty on all counts

23  pertaining to Jonnica, Shyya, and Mellisa.  Thank you.

24          THE COURT:  Members of the jury, it's now time for

25  me to instruct you.  I know I'm standing between you and your

1   lunch, but I ask you to please give me your careful attention.

2           These are the legal principles upon which you will

3   decide this case based on the evidence as you find it.  I told

4   you at the start of the trial that your primary duty during

5   the trial would be to pay attention to the evidence, listen

6   carefully, and observe each witness who testified.  It has

7   been obvious to me, and to counsel, that you have all

8   faithfully discharged this duty.  I thank you for your

9   attentiveness and your service.  You're about to begin your

10  final duty to decide the facts in this case.

11          Now that you've heard all the evidence and each

12  parties' closing arguments, it is my duty to instruct you on

13  the applicable law.  I ask that you please pay close

14  attention.  I'll try to be clear as possible.

15          My instructions will come in three parts.  First I

16  will state some general rules and the way in which you are to

17  review the evidence in this case.  Second, I will instruct you

18  on the particular crimes charged and the elements that the

19  Government must prove beyond a reasonable doubt with respect

20  to each.  Third, I'll give you some general roles regarding

21  your deliberations.  Please do not single out any instruction

22  that I give you as alone stating the law.  Rather, you should

23  consider these instructions as a whole when you retire to the

24  jury room to deliberate on your verdict.

25          First, as I mentioned the role of the Court at this

1  point is to instruct you on the law.  It is your duty to

2  accept these instructions of law and apply them to the facts

3  as you determine them, just as it has been my duty to preside

4  over the trial and decide what testimony and evidence is

5  relevant under the law for your consideration.

6          On each of these legal matters you must take the law

7  as I give it to you.  If any attorney or witness has stated a

8  legal principle different from any that I state to you in my

9  instructions, it is my instruction that you must follow.  You

10 should not, any of you, be concerned about the wisdom of any

11 rule that I state, regardless of any opinion that you may have

12 about what the law may be or ought to be.  It would violate

13 your sworn duty to base your verdict of any view of the law

14 other than the one that I will give you.

15         I remind you that you may only consider the evidence

16 admitted in at the trial and may not be use any other

17 information obtained outside this courtroom, including but not

18 limited to, what you may have heard or seen or learned through

19 training, experience, media or otherwise.

20         As jurors you are the sole and exclusive judges of

21 the facts.  Your role is to pass on the weight of the

22 evidence, determine the credibility of witnesses, resolve any

23 conflicts in witness's testimony, and draw whatever reasonable

24 inferences you decide to draw from the facts as you find them.

25 In determining the facts, you must rely on your own

Jury Charge                                        959

1   recollection of the evidence.  What the lawyers have said in

2   their opening statements in their closing arguments, in their

3   objections, or in any of their questions is not evidence.  Nor

4   is anything that I may have said during the trial or may say

5   during these instructions with respect to a factual matter to

6   be taken in substitution for your own independent

7   recollection.

8         What I say is not evidence.  Because you're the sole

9   and exclusive judges of the facts, I do not need to indicate

10  any mean to indicate any opinions as to the facts or what your

11  verdict should be.  The rulings I have made during the trial

12  are not any indication of my views of what your decision

13  should be as to whether or not the Government has proven its

14  case.  I also ask you draw no inference from the fact that

15  upon occasion I may have asked questions of certain witnesses.

16  I've done so with the intent only for clarification or to

17  expedite matters.  And certainly my questions were not

18  intended to suggest any opinion on my part as to the verdict

19  that you should render, or whether any of the witnesses may

20  have been more credible than any other witness.  You are

21  expressly to understand, the Court has no opinion as to any of

22  the issues in this case or as to what verdict you should reach

23  in this case.

24        I know that you will try the issues that have been

25  presented to you according to the oath that each of you took

1    at the beginning of this case, in which you promised that you

2    would well and truly try this case, the issues joined in this

3    case, and render a true verdict.  If you follow that oath and

4    try the issues without fear, favor, bias, prejudice or

5    sympathy you will arrive at a true and just verdict.

6            Now you've heard about reasonable doubt.  What is

7    reasonable doubt?  It is a doubt based on reason and common

8    sense.  It is a doubt that a reasonable person would have

9    after carefully weighing all of the evidence or lack of

10   evidence.  Proof beyond a reasonable doubt, therefore, is

11   proof of a convincing character that a reasonable person would

12   not hesitate to rely and act upon in the most important of his

13   or her own affairs.  A reasonable doubt is not a caprice or a

14   whim.  It is not speculation or suspicion.  It is not an

15   excuse to avoid performing an unpleasant duty.  And it is not

16   sympathy.

17           Under your oath as jurors, you are not to be swayed

18   by sympathy.  You are to be guided solely by the evidence in

19   this case.  The crucial question that you must ask yourselves

20   as you sit through the evidence is, has the Government proven

21   the guilt of the defendant beyond a reasonable doubt.

22           It is for you alone to decide whether the Government

23   has proven that the defendant is guilty of the crimes charged

24   solely on the basis of the evidence and subject to the law as

25   I charge you.  It must be clear to you that once you let fear,

1  prejudice, or bias, or sympathy interfere with your thinking,

2  there is a risk that you will not arrive at a true and just

3  verdict.  If you have a reasonable doubt as to a defendant's

4  guilt, you should not hesitate for any reason to find a

5  verdict of acquittal.  On the other hand, if you should find

6  that the Government has met its burden of proving a

7  defendant's guilt beyond a reasonable doubt, you should not

8  hesitate because of sympathy or any other reason to render a

9  verdict of guilty.

10          The law does not require that the Government prove

11  guilt beyond all possible doubt.  Prove beyond a reasonable

12  doubt is sufficient to convict.  If after fair and impartial

13  consideration of all the evidence or the lack of evidence

14  concerning a particular charge against the defendant, you have

15  a reasonable doubt, it is your duty to acquit the defendant of

16  that charge.  And on the other hand, if at fair and impartial

17  consideration of all the evidence you are satisfied of the

18  Government has proven the defendant's guilt beyond a

19  reasonable doubt, you should vote to convict him on that

20  charge.

21          Now, a word about the equality of the parties before

22  the Court.  You are to perform the duty of finding the facts

23  without bias or prejudice as to any party.  You are to perform

24  your final duty in an attitude of complete fairness and

25  impartiality.

Jury Charge                                962

1          The fact that the prosecution is brought in the name

2    of the United States of America entitles the Government to no

3    greater consideration than that afforded to any other party to

4    a litigation.  And by the same token, the United States is

5    entitled to no less consideration.  All parties, whether the

6    Government or individuals, stand as equal before the bar of

7    justice.

8          The defendant is before you today because he has

9    been charged by an Indictment with violations of federal law.

10   Again, the Indictment is merely an accusation and nothing

11   more.  It is not evidence.  It gives notice to the defendant

12   of the charges.

13         The defendant has pleaded not guilty to the

14   Indictment; the defendant is, therefore, presumed to be

15   innocent of the charges against him and that presumption of

16   innocence alone, unless overcome, is sufficient to acquit him.

17   To convict a defendant the burden is on the prosecution or the

18   Government to prove the defendant's guilt of each element of

19   every charge beyond a reasonable doubt.  This burden of proof

20   will never shift to the defendant for the simple reason that

21   the law presumes that a defendant is innocent and never

22   imposes upon a defendant in a criminal case the burden or duty

23   of calling any witnesses or producing any evidence.

24         A defendant does have the right to do so, however.

25   In other words, a defendant is never required to prove that he

Jury Charge                          963

1   is innocent because his innocence is presumed.  Again, I

2   remind you that the defendant starts with a clean slate and is

3   presumed innocent of each charge, unless and until such time,

4   if ever, that you as a jury unanimously find that the

5   Government has proven that the defendant is guilty of a given

6   charge beyond a reasonable doubt.

7           A word about venue.  Venue refers to the location of

8   the charged crime.  The Indictment alleges that crimes charged

9   occurred in part in this judicial district, the Eastern

10  District of New York.  The Eastern District of New York

11  encompasses the boroughs of Brooklyn, Queens, and Staten

12  Island, as well as Nassau and Suffolk Counties on Long Island.

13  To establish the venue for a charged crime is appropriate in

14  this district the Government must prove that some act in

15  furtherance of the crime occurred here in the Eastern District

16  of New York.  This means that with respect to each of the

17  crimes charged, venue is established in the Eastern District

18  of New York so long as some act in furtherance of the crime

19  took place in this district, even if other acts were committed

20  outside the district, or if a crime was completed elsewhere.

21          Let me further instruct that you although the

22  Government's burden as to everything else in this case is

23  beyond a reasonable doubt, a standard that I have already

24  explained to you, venue need only be proven by the lesser

25  standard of a preponderance of the evidence.  To prove

Jury Charge                                964

1   something by a preponderance of the evidence, simply means to

2   prove that a fact is more likely true than not true.  That

3   means that venue as to each of the charged crimes in this

4   district is proper if you find it more likely than not that

5   some act in furtherance of the particular crime charged

6   occurred in this district based on all the evidence presented,

7   both direct and circumstantial.  Again this lesser burden of

8   proof applies only to venue.  The Government's burden of proof

9   on all other parts of this case is to prove guilt beyond a

10  reasonable doubt.

11          In determining whether some act in furtherance of

12  the charged crime you are considering occurred in the Eastern

13  District of New York in regard to each of the offenses, you

14  may consider several things, such as physical presence,

15  electronic communications, phone calls, and text messages.

16          Again, I caution you, that the preponderance of the

17  evidence standard only applies to venue.  The Government must

18  prove each of the evidence elements of all counts beyond a

19  reasonable doubt.

20          I will now remind and instruct you as to what

21  evidence is and how you should consider it.  What is evidence?

22  It comes to you in several forms.

23          First, sworn testimony of witnesses on both direct

24  examination and cross-examination.

25          Second, exhibits, whether documents, photos, videos,

1   recordings that have been received by the Court in evidence.

2          Third, certain exhibits admitted in evidence in the

3   form of charts, summaries and demonstratives may be considered

4   for the purposes for which they have been offered.

5          And fourth, stipulations of fact to which the

6   parties have agreed.  A stipulation means simply that the

7   Government and the defendant accepted the truth of a

8   particular proposition or fact.  Here, the parties entered

9   into stipulations concerning certain exhibits and facts that

10  are relevant to this case.  You must accept those stipulations

11  as evidence and regard those facts as proven; however, you are

12  to determine what weight to give that evidence.  If evidence

13  was received for a limited purpose, you must consider that

14  evidence only for that purpose.

15         Now let's talk about and remind you what is not

16  evidence.  You must disregard these as you decide what the

17  facts are.

18         First, the Indictment is not evidence.  It is merely

19  a statement of the charges against the defendant and is not

20  entitled to any weight in your evaluation of the facts.

21         Second, arguments or statements by the attorneys are

22  not evidence.

23         Third, counsel's questions in and of themselves are

24  not evidence.  Only the answer in the context of the question

25  is evidence.  That also goes for any questions by the Court or

1   comments by the Court.

2           Fourth, objections to the questions or to offered

3   exhibits are not evidence.  Attorneys have a duty to object

4   when they believe evidence should not be received.  You should

5   not be influenced by the objection or by my ruling on it.  If

6   the objection was sustained, ignore the question.  If the

7   objection was overruled, treat the answer just as you would

8   any other answer.

9           Fifth, testimony or statements stricken by the Court

10  for which you are instructed you to disregard are not

11  evidence.

12          Sixth, any exhibits identified but not admitted into

13  evidence by the Court are not evidence.

14          Seven, obviously anything you may have seen or heard

15  outside this courtroom is not evidence.

16          Eight, in reaching your verdict it is improper for

17  you to consider any personal feelings that you might have

18  about a defendant's or a witness's race, religion, national

19  origin, ethnic background, sex or age.

20          Nine, in addition, it would be improper for you to

21  to allow any feelings you might have about the nature of the

22  crimes charged to interfere with your decision-making process.

23  Your verdict must be based exclusively on the evidence or lack

24  of evidence in this case.

25          Here, again, let me remind you that whether based

1    upon direct or circumstantial evidence or upon the logical

2    reasonable inferences drawn from such evidence, you must be

3    unanimously be satisfied of the guilt of the defendant beyond

4    a reasonable doubt as to a particular count before you may

5    convict him of that count.

6              Now I'm going to instruct you or remind you about

7    direct and circumstantial evidence.

8              Evidence comes in various forms, such as sworn

9    testimony of witnesses and exhibits.  There are, in addition,

10   different types of evidence that you may consider, both direct

11   and circumstantial.  Direct evidence is physical evidence or

12   testimony about a fact by an eye witness or a participant who

13   testifies to knowing a fact through one of the five senses.

14   Circumstantial evidence is proof of a chain of circumstances

15   pointing to the existence or non-existence of certain facts.

16   That is all there is to circumstantial evidence, based on the

17   facts you find have been proven you may draw reasonable

18   inferences or conclusions as seem justified in light of your

19   experience and common sense.

20             To give a simple example.  Suppose that you came

21   into the courthouse today and the sun was shining, and it was

22   a nice day.  But the courtroom blinds were drawn and could you

23   not look outside.  Then later as you were sitting here,

24   several people walked in with dripping wet umbrellas and

25   dripping wet raincoats.  Because you cannot look outside the

Jury Charge                                                    968

1   courtroom and you cannot see whether or not it is raining, you

2   have no direct evidence that it is raining.  But on the

3   combination of facts about the dripping wet umbrellas and

4   raincoats, it is reasonable for you to infer that it had begun

5   to rain.

6           That is all there is to circumstantial evidence.

7   Using your reason and common experience you infer from facts

8   that you find are established the existence or non-existence

9   of some other fact.

10          Whether a given inference should be drawn is

11  entirely a matter for you, the jury, to decide.  Please bear

12  in mind, however, that an inference is not to be drawn by

13  guesswork or speculation.  The law makes no distinction

14  between direct evidence and circumstantial evidence, and you

15  may consider both.  Circumstantial evidence is of no less

16  value than direct evidence.  And you may consider either or

17  both and may give them such weight as you conclude is

18  warranted.

19          Now, in this trial there has been use of recordings

20  and transcripts.  Audio recordings of Mr. Forney have been

21  admitted into evidence.  While the recordings were played you

22  were also shown transcripts of those recordings.  The

23  transcripts of the recordings have been offered as aids and

24  contain the Government's interpretation of what appears on the

25  audio that have been received as evidence; however, they are

Jury Charge                                           969

1    not in and of themselves evidence.  You alone should decide

2    what appears on the recordings based on what you, the jury,

3    has heard.  If you think you heard something different than it

4    appeared on the transcript, then what you heard is

5    controlling.

6              Let me say again, you the jury are the sole judges

7    ever the facts.  Whether you approve or disapprove of the

8    recordings may not enter your deliberations.  I instruct you

9    that the recordings were made and received in evidence in a

10   lawful manner, that no one's rights were violated, that the

11   Government's use of this evidence is entirely lawful, and that

12   it was properly admitted into evidence at this trial.  You

13   must, therefore, regardless of any personal opinions give this

14   evidence full consideration along with all the other evidence

15   in the case in determining whether the Government has proved

16   beyond a reasonable doubt the guilt of the defendant.  Of

17   course, it is for you to decide what weight, if any, you give

18   this evidence.

19             If you wish to hear any of the recordings again, or

20   see any of the transcripts of those recordings, they will be

21   made available to you during your deliberations.

22             In addition, during the course of the trial there

23   were charts and summaries shown to you in order to make the

24   underlying supporting evidence more meaningful and to aid you

25   in considering that evidence.  These charts or summaries were

Jury Charge                                    970

1   introduced as compilations of evidence.  They are not direct

2   evidence.  They are summaries of the evidence.  They are

3   visual representations of information or data as set forth

4   either in the testimony of a witness or in stipulation or some

5   documents.  They are admitted as aids to you.  They are not in

6   and of themselves evidence; instead, they are intended to of

7   be assistance to you in your deliberations.

8           In presenting the evidence which you have heard, it

9   is often easier and more convenient to utilize summary charts

10  than to place all the relevant evidence in front of you.  It

11  is up to you to decide whether these charts fairly and

12  correctly present the information in the testimony and in the

13  documents.  The charts are not to be considered by you as

14  direct proof of anything, they are merely graphic

15  demonstrations of what the underlying testimony and documents

16  are.  To the extent the charts conform with what you determine

17  the underlying evidence to be, you may accept them.  I'll add

18  that the underlying evidence will be with you as well.

19          Permissible inferences drawn from the evidence.

20  During the trial you heard the attorneys use the term

21  inference.  And in their arguments they've asked you to infer

22  on the basis of your reason, experience, and common sense from

23  one or more established facts the existence of some other

24  facts.

25          (Continued on next page.)

Rivka Teich, CSR, RPR, RMR, FCRR, Official Court Reporter

Charge of the Court                    971

1    (continuing)

2         THE COURT:  An inference is not a suspicion or a

3    guess.  It is a reasonable doubt, logical decision to conclude

4    that a disputed fact exists on the basis of another fact that

5    you know exists.

6         There are times when different inferences may be

7    drawn from the facts, whether proved by direct or

8    circumstantial evidence.  The Government asks you to draw one

9    set of inferences, while the Defense asks you to draw another.

10   It is for you, and you alone, to decide what inferences, if

11   any, you will draw.

12        The process of drawing inferences from facts in

13   evidence is not a matter of guesswork or speculation.  An

14   inference is a deduction or a conclusion that you, the jury,

15   are permitted to draw, but are not required to draw -- from

16   the facts that have been established by either direct or

17   circumstantial evidence.  In drawing inferences, you should

18   exercise your common sense.

19        So, while you are considering the evidence presented

20   to you, you are permitted to draw, from the facts that you

21   find to be proven, such reasonable inferences as would be

22   justified in light of your experience.

23        Here again, let me remind you that, whether based on

24   direct or circumstantial evidence, or on the logical,

25   reasonable inferences drawn from such evidence, you must be

Charge of the Court                                    972

1    satisfied of the guilt of the Defendant beyond a reasonable

2    doubt as to the specific count before you may convict him of

3    that count.

4              You've heard about the credibility of witnesses.

5    And as judges of the facts, you are the sole judges of the

6    credibility or the believability of the witnesses and the

7    weight that their testimony deserves.  You should carefully

8    scrutinize all the testimony given, the circumstances under

9    which each witness testified, and every matter in evidence

10   that tends to show whether a witness is worthy of belief.

11             Your decision whether to believe a witness may

12   depend on how that witness impressed you.  For example, how

13   did the witness appear?  Was the witness candid, frank, and

14   forthright, or did the witness seem evasive or suspect?  How

15   did the way the witness testified on direct examination

16   compare with the way the witness testified on

17   cross-examination?  Was the witness consistent in the

18   testimony given or were there contradictions?  Did the witness

19   appear to know what she or he was talking about?  Did the

20   witness strike you as someone trying to report their knowledge

21   accurately?  These are examples of the kinds of common sense

22   questions you should ask yourselves in deciding whether a

23   witness was truthful.

24             How much you choose to believe a witness may also be

25   influenced by the witness's bias.  Does the witness have a

Charge of the Court                973

1    relationship with the Government or the Defendant that may

2    affect how the witness testified?  Does the witness have some

3    incentive, loyalty, or motive that might cause the witness to

4    shade the truth?  Does the witness have some bias, prejudice,

5    or hostility that may cause the witness to give you something

6    other than a complete and accurate account of the facts about

7    which the witness testified?

8            You should consider whether a witness had an

9    opportunity to observe the facts they testified about.  Also,

10   you should consider whether the witness's recollection of the

11   facts holds up in light of all the other evidence in the case.

12           In other words, what you must try to do in deciding

13   a witness's credibility is to size up the person just as you

14   would in any important matter in which you are trying to

15   decide if a person is truthful, straightforward, and accurate

16   in his or her recollection.

17           You should also take into account any evidence that

18   the witness who testified may benefit in some way from the

19   outcome of this case.  Therefore, if you find that a witness

20   whose testimony you are considering may have an interest in

21   the outcome of this trial, you should bear that factor in mind

22   when evaluating the credibility of his or her testimony and

23   accept it with great care.

24           This is not to suggest that every witness who has an

25   interest in the outcome of the case will testify falsely.  It

Charge of the Court                                    974

1    is for you to decide to what extent, if at all, the witness's

2    interest has affected or colored his or her testimony.

3            There are several persons whose names you have heard

4    during the course of the trial who did not appear here to

5    testify, and one or more of the attorneys may have referred to

6    their absence from the trial.  You should not draw any

7    inference, speculate or reach any conclusions as to what a

8    witness would have testified to had that witness been called.

9    Their absence should not affect your judgment in any way.

10           I remind you, however, because the law presumes the

11   Defendant to be innocent, the burden of proving the

12   Defendant's guilt beyond a reasonable doubt is on the

13   Government throughout the trial.  And although I instruct you

14   that each party has an equal opportunity or lack of

15   opportunity to call any of these witnesses, the burden -- the

16   Defendant never has the burden of proving his innocence or of

17   presenting any evidence or calling any witnesses at all.

18           The Court has determined that certain witnesses can

19   testify and be identified in open court by first name and last

20   initial only.  The full names of these witnesses are known to

21   the Court and the parties.  Allowing a witness to testify by

22   first name and last initial is simply intended to protect the

23   witness's privacy.  You should not make any inferences as to

24   the Defendant's guilt or non-guilt from the fact that certain

25   last names are being withheld from the public.

Charge of the Court                      975

1          The Defendant in a criminal case never has any duty
2    to testify or to come forward with any evidence.  This is
3    because, as I have told you, the Constitution protects a
4    defendant's right to remain silent.  The burden of proof
5    beyond a reasonable doubt remains on the Government at all
6    times, and the Defendant is presumed innocent.  In this case,
7    Mr. Forney did testify, and he was subject to
8    cross-examination just like any other witness.  You should
9    examine and evaluate his testimony just as you would the
10   testimony of any other witness.  You should not disregard or
11   disbelieve his testimony simply because he is charged as a
12   defendant in this case.
13          Also during this trial, you have heard the testimony
14   of law enforcement officials.  The fact that a witness may be
15   employed as a law enforcement official does not mean that his
16   or her testimony is necessarily deserving of any more or less
17   consideration or greater or lesser weight than any other
18   ordinary witness.
19          At the same time, it is quite legitimate for
20   Defense Counsel to try to attack the credibility of law
21   enforcement witnesses -- sorry.  Excuse me.  I'm sorry.
22          Let me start that over.
23          At the same time, it is quite legitimate for
24   Defense Counsel to try to attack the credibility of law
25   enforcement witnesses on the grounds that his or her testimony

Charge of the Court                              976

1   may be colored by a personal or professional interest in the

2   outcome of this case.

3           It is your decision, after reviewing the evidence,

4   whether to accept the testimony of a law enforcement witness

5   and to give that testimony whatever weight, if any, you find

6   that it deserves.

7           Next, there was testimony at trial that law

8   enforcement officers or attorneys interviewed witnesses when

9   preparing for trial.  You should not draw any unfavorable

10  inference from that testimony.  To the contrary, the attorneys

11  have an obligation to prepare their case as thoroughly as

12  possible, and in the discharge of that responsibility properly

13  interview witnesses in preparation for the trial and from time

14  to time may be required -- as may be required during the

15  course of the trial.

16          There is no duty to call all witnesses, to produce

17  all evidence, or to use a particular investigative technique.

18  Although the Government bears the burden of proof and although

19  a reasonable doubt can arise from the lack of evidence, you

20  are instructed that there is no legal requirement that the

21  Government use any specific investigative technique or pursue

22  every investigative lead to prove its case.  Therefore,

23  although you are carefully to consider the evidence presented

24  by the Government during this trial, you are not to speculate

25  as to why the Government used the investigative techniques

Charge of the Court                    977

1    that it did or why the Government did not use other

2    techniques.

3           In this regard, the law does not require any party

4    to call all persons who may have been present at any time or

5    place that is involved in this case, or who may appear to have

6    some knowledge of the matters in issue at this trial.  Nor

7    does the law require any party to produce as exhibits all

8    papers and things mentioned during the course of the trial.  I

9    reiterate, however, that the Government does bear the burden

10   of proof, and you may consider both the evidence and lack of

11   evidence when deciding whether the Government has met its

12   burden.

13          During this trial, you've heard evidence about a

14   variety of investigative techniques and methods of collecting

15   evidence, including evidence recovered during arrests of

16   various individuals and searches of vehicles, cell phones and

17   premises.  I instruct you that any evidence that was presented

18   to you was lawfully obtained, and you may consider it.  The

19   methods used to collect evidence or to investigate should not

20   enter into your deliberations in any respect.  I instruct you

21   that the Government's use of the evidence at this trial is

22   entirely lawful.

23          Some of the exhibits in evidence are redacted.

24   "Redacted" simply means that part of the document was taken

25   out, either blacked out or there's a blank.  You are to

Charge of the Court                                978

1  concern yourself only with the part of the exhibit that has

2  been admitted into evidence.  You should not consider or

3  speculate why the other part of the document has been deleted

4  or speculate about what was deleted.

5          You've also heard evidence that the Defendant

6  engaged in conduct other than the crimes charged in the

7  indictment.  The Defendant is not on trial for committing any

8  acts not charged in the indictment.  Consequently, you cannot

9  consider evidence of those acts as a substitute for proof that

10 the Defendant committed the crimes charged.  Nor may you

11 consider evidence of these other acts as proof that the

12 Defendant has a criminal propensity to commit those acts, that

13 is, that he likely commit the crimes charged in the indictment

14 because he was predisposed to criminal conduct.

15         Instead, you may consider evidence of uncharged

16 conduct by the Defendants for limited purposes, and you may

17 consider it only for those limited purposes, which I will now

18 describe.  You may only consider evidence of uncharged

19 crimes -- or uncharged conduct:

20         First, as evidence of the Defendant's motive in

21 carrying out the charged crimes.

22         Second, as evidence of the Defendant's knowledge and

23 intent in carrying out the charged crimes.

24         Third, as evidence of the development of a

25 relationship of trust between the Defendant and others.

1          Fourth, as evidence enabling you to understand the

2    complete story of the charged crimes.

3          Fifth, as evidence of conduct that is inextricably

4    tied with the charged crimes.

5          Sixth, as evidence corroborating the testimony of

6    other Government witnesses.

7          Evidence of uncharged conduct by the Defendant may

8    not be considered by you for any purpose other than the ones I

9    have just listed.

10         You have heard evidence that a witness may have made

11   a statement on an earlier occasion which counsel argues is

12   inconsistent with the witness's trial testimony.  Evidence of

13   a prior inconsistent statement is not to be considered by you

14   as affirmative evidence bearing on the Defendant's guilt.

15   Evidence of the prior inconsistent statement was placed before

16   you for the more limited purpose of helping you to decide

17   whether to believe the trial testimony of the witness who

18   contradicted himself or herself.  If you find that the witness

19   made an earlier statement that conflicts with their trial

20   testimony, you may consider that fact in deciding how much of

21   his or her trial testimony, if any, to believe.

22         In making this determination, you may consider

23   whether the witness purposely made a false statement or

24   whether it was an innocent mistake; whether the inconsistency

25   concerns an important fact, or whether it had to do with a

1   small detail; whether the witness had an explanation for the

2   inconsistency, and whether that explanation appealed to your

3   common sense.

4            It is exclusively your duty, based upon all the

5   evidence and your own good judgment, to determine whether the

6   prior statement was inconsistent, and if so how much, if any,

7   weight to be given to the inconsistent statement in

8   determining whether to believe in all or part of the witness's

9   trial testimony.

10           Now we are going to turn to the charges.

11           I will instruct you as to the specific elements of

12   the crimes charged in the indictment.

13           First, I instruct you on the charges in the

14   indictment which will contain the words "knowledge" and

15   "intent," so my instructions will start there.  Because each

16   count in the indictment implicates the concept of knowledge

17   and intent, I will instruct you at the outset about these

18   principles.

19           As a general rule, the law holds persons accountable

20   only for conduct they intentionally engage in.  Thus, before

21   you can find a defendant guilty, you must be satisfied that

22   the Defendant was acting knowingly and intentionally.

23           A person acts "knowingly" when he acts intentionally

24   and voluntarily, and not because of ignorance, mistake,

25   accident, or carelessness.  Whether a defendant acted

Charge of the Court                     981

1   knowingly may be proven by his words and conduct and by all of

2   the facts and circumstances surrounding the case.

3        A person acts "intentionally" when he acts

4   deliberately and purposefully.  That is, a defendant's acts

5   must have been the product of his conscious, objective

6   decision rather than a product of mistake or accident.

7        To act "knowingly or intentionally," the person not

8   need be aware of the specific law or rule that his conduct may

9   violate, but he must act with a specific intent to do whatever

10  it is that the law forbids.

11       These issues of knowledge and intent require you to

12  make a determination about the Defendant's state of mind,

13  something that is rarely proven directly.  A wise and careful

14  consideration of all the circumstances of the case permit you

15  to make such a determination as to the state of mind of the

16  Defendant.  Indeed, in your everyday lives and affairs, you

17  frequently are called upon to determine a person's state of

18  mind from his or her words and actions in a given

19  circumstance.  You are asked now to do the same thing here.

20       In order to place my instructions in context, I will

21  start by giving you a summary of the crimes charged in the

22  indictment.  The Defendant is formally charged in a

23  superseding indictment, which is not evidence.  As I mentioned

24  to you at the beginning of this case, an indictment is a

25  charge or an accusation.  The superseding indictment in this

Charge of the Court                                    982

1    case contains five separate counts, which I will summarize for

2    you.  After summarizing the charges, I will instruct you in

3    the details as to the law that you will apply to each charge

4    in the superseding indictment.  You will be called upon to

5    render a separate verdict on each of the five counts.  And

6    finally, I will give you further rules with respect to your

7    deliberations.

8                First, the summary of the superseding indictment.

9    Count One charges Mr. Forney with sex trafficking Jonnica C.

10   between April 2016 and February 2017.  Count Two charges

11   Mr. Forney with knowingly and intentionally transporting

12   Jonnica C. in interstate commerce with the intent that she

13   engage in prostitution between April 2016 and July 2016.

14   Count Three charges Mr. Forney with knowingly and

15   intentionally persuading, inducing, enticing, and coercing

16   Jonnica C. to travel in interstate commerce to engage in

17   prostitution between April 2016 and July 2016.  Count Four

18   charges Mr. Forney with sex trafficking Shyya H. between

19   May 2017 and September 2017.  Count Five charges Mr. Forney

20   with using the internet and mobile internet applications,

21   including Google Hangouts, to knowingly and intentionally

22   persuade, induce, entice, and coerce Mellisa N. to engage in

23   sexual activity for which a person could be charged -- can be

24   charged with a criminal offense, between June 2014 and

25   December 2014.

Charge of the Court                           983

1          I have summarized the counts in the superseding

2    indictment simply to give you an overview of the charges.  You

3    will not be furnished with a copy of the superseding

4    indictment and I will reiterate now that the superseding

5    indictment is only an accusation.  The superseding indictment

6    is not evidence.

7          In your deliberations as to each count, you must, as

8    a matter of law, consider each count of the indictment

9    separately, and you must return a separate verdict on each of

10   the counts with which Mr. Forney is charged.  Your verdict as

11   to each count must be unanimous, meaning you must all agree.

12   Whether you find the Defendant guilty or not guilty as to one

13   count must not affect your verdict as to the other charged

14   counts.

15         Some counts of the indictment accuse the Defendant

16   of violating the same statute in more than one way.  The

17   indictment may allege that the Defendant violated the statute

18   by various acts which are joined in the indictment by the word

19   "and," while the statute and the elements of the offense are

20   stated using the word "or."  In these instances, it is enough

21   for a finding of guilt if the evidence establishes beyond a

22   reasonable doubt that the violation of the statute by any one

23   of the acts charged.

24         Before I explain the law that applies to each count

25   of the indictment, I should draw your attention to the fact

Charge of the Court                                984

1   that the indictment charges that the offenses alleged in

2   Counts One through Five occurred "in or about," or "on or

3   about," and "between" certain dates.  The evidence need not

4   establish with certainty the exact date of the alleged

5   offenses.  The law only requires a substantial similarity,

6   between the dates alleged in the indictment and the date

7   established by testimony and exhibits.

8            Before turning to the specific offenses charged, I

9   will also inform you of the principles of aiding and abetting

10  liability under federal law.

11           Aiding and abetting is defined in federal law at

12  Title 18, United States Code, Section 2(a) and 2(b), which

13  provide in pertinent part as follows:

14           2(a) states:  Whoever commits an offense against the

15  United States or aids and abets or counsels, commands or

16  induces, or procures its commission, is punishable as a

17  principal.

18           And 2(b) provides:  Whoever willfully causes an act

19  to be done which, if directly performed by him, would be an

20  offense against the United States, is punishable as a

21  principal.

22           Aiding and abetting liability under 18 U.S. Code

23  Section 2(a) provides that "whoever commits an offense against

24  the United States or aids and abets or counsels, commands or

25  induces, or procures its commission, is punishable as a

1    principal."  Under this statute, it is not necessary for the

2    Government to show that a defendant himself physically

3    committed the crime with which he is charged in order for the

4    Government to sustain its burden of proof.  A person who aids

5    or abets another person to commit an offense or willfully

6    causes another person to commit an offense is just as guilty

7    of that offense as if he committed it himself.

8          Accordingly, you may find a defendant guilty of the

9    offense charged if you find beyond a reasonable doubt that the

10   Government has proven that another person actually committed

11   the offense with which the Defendant is charged and that the

12   Defendant aided or abetted that person in the commission of

13   the offense or willfully caused that person to commit the

14   offense.

15         As you can see, under the aiding and abetting

16   statute, the first requirement is that you find that another

17   person has committed the crime charged.  Obviously, no one can

18   be convicted of aiding and abetting the criminal act of

19   another if no crime was committed by the other person in the

20   first place.  But if you find that a crime was committed, then

21   you must consider whether the Defendant aided or abetted the

22   commission of that crime.

23         In order to aid and abet another to commit a crime,

24   it is necessary that the Defendant knowingly and willfully

25   associated himself in some way with the crime, and that he

Charge of the Court                          986

1   participated in the crime by doing some act to help make the

2   crime succeed.  To establish that the Defendant knowingly

3   associated himself with the crime you are considering, the

4   Government must establish that the Defendant knew that the

5   crime was being committed.

6          To establish that the Defendant participated as an

7   aider and abettor in the commission of a crime, the Government

8   must prove that the Defendant engaged in some affirmative

9   conduct or overt act for the specific purpose of bringing

10   about that crime.

11          The mere presence of a defendant where a crime is

12   being committed, even coupled with knowledge by the Defendant

13   that a crime is being committed, or merely associating with

14   others who were committing the crime, is not sufficient to

15   establish aiding and abetting liability.  One who has no

16   knowledge of that -- that a crime is being committed or is

17   about to be committed but inadvertently does something that

18   aids in the commission of that crime is not an aider and

19   abettor.  An aider and abettor must know that the crime is

20   being committed and act in a way that is intended to bring

21   about the success of the criminal venture.

22          To determine whether a defendant aided or abetted

23   the commission of the crime with which he is charged, ask

24   yourself these questions:

25          Did he participate in the crime charged as something

Charge of the Court                            987

1    he wished to bring about?

2          Did he knowingly associate himself with the criminal

3    venture?

4          Did he seek by his actions to make the criminal

5    venture succeed?

6          If your answer to all of these questions is "yes,"

7    then the Defendant is an aider and abettor.  If, on the other

8    hand, your answer to any one of these questions is "no," then

9    the Defendant is not an aider and abettor.

10          Now, the second prong of the aiding and betting

11   statute is at 18 U.S. Code Section 2(b).

12          As I stated, 18 U.S. Code Section 2(b) of the aiding

13   and abetting statute reads as follows:  Whoever willfully

14   causes an act to be done which, if directly performed by him,

15   would be an offense against the United States, is punishable

16   as a principal.

17          What does the term "willfully caused" mean?  It does

18   not mean that the Defendant himself need have physically

19   committed the crime or supervised or participated in the

20   actual criminal conduct charged in the indictment.

21          The meaning of the term "willfully caused" can be

22   found in the answers to the following questions:

23          One, did the Defendant intend the crime charged be

24   committed?

25          Two:  Did the Defendant intentionally cause another

1  person to commit the crime charged?

2         If you are unanimously persuaded beyond a reasonable

3  doubt that the Defendant -- that the answer to both of these

4  questions is "yes," then the Defendant is an aider and abettor

5  just as if the Defendant himself had actually committed the

6  crime charged.  If, on the other hand, your answer to any one

7  of these questions is "no," then the Defendant is not an aider

8  and abettor.

9         So the aider and abettor statute will apply to some

10 of the counts, and I will explain when that occurs.

11        Count One is sex trafficking of Jonnica C.

12        Count One of the indictment charges the Defendant

13 with sex trafficking as to Jonnica C as follows:

14        In or about and between April 2016 and

15 February 2017, both dates being approximate and inclusive,

16 within the Eastern District of New York and elsewhere, the

17 Defendant Joel David Forney, also known as "Sirbar," together

18 with others, did knowingly and intentionally recruit, entice,

19 harbor, transport, provide, obtain and maintain by any means a

20 person, to wit:  Jonnica C, an individual whose identity is

21 known to the Grand Jury, in and affecting interstate commerce,

22 and did benefit, financially and by receiving anything of

23 value, from participation in a venture which engaged in such

24 acts, knowing and in reckless disregard of the fact that means

25 of force, threats of force, fraud and coercion, as described

Charge of the Court                              989

1    in 18, United States Code, Section 1591(e)(2), and Jonnica C.

2    to engage in one or more commercial sex acts, which offense

3    was effected by means of force, threats of force, fraud and

4    coercion, and a combination of such means.

5                    (Continued on the next page.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*Jury Charge*                                                    990

1          THE COURT:  I instruct you that Section 1591 of

2     Title 18 of the United States Code states in pertinent part:

3                Whoever knowingly in or effecting interstate

4     commerce, recruits, entices, harbors, transports, provides,

5     obtains, or maintains by any means a person or benefits,

6     financially or by receiving anything of value, from

7     participating in a venture which has engaged in an act just

8     described knowing or in reckless disregard of the fact that

9     means of force, threats of force, fraud and coercion or any

10    combination of such means will be used to cause the person

11    to engage in the commercial sex act shall be punished.

12               In order to find the defendant guilty of the crime

13    charged in Count One, the Government must prove the

14    following four elements beyond a reasonable doubt.

15               First, A, the defendant knowingly recruited,

16    enticed, harbored, transported, provided, obtained or

17    maintained a person by any means; or,

18               B, the defendant knowingly benefited financially

19    or by receiving something of value from participating in a

20    venture that recruited, enticed, transported, provided,

21    obtained, or maintained a person.

22               Second, the defendant knew or acted in reckless

23    disregard of the fact that force, threats of force, fraud,

24    or coercion would be used with respect to such person.

25               Third, that the defendant knew or acted in

*Jury Charge*                                                  991

1   reckless disregard of the fact that means of force, threats

2   of force, fraud, or coercion or any combination would be

3   used to cause such person to engage in a commercial sex act.

4   And.

5          Fourth, that the defendant's conduct was in or

6   affecting interstate commerce.

7          So, I'm going to now talk about each of those four

8   elements.

9          The first element is recruiting, enticing,

10  harboring, transporting, providing, obtaining, maintaining,

11  or benefiting from such a venture.

12         The first element that the Government must prove

13  is that the defendant knowingly transported, recruited,

14  enticed, harbored, provided, obtained, or maintained a

15  person, or that the defendant knowingly benefited

16  financially or by receiving anything of value from

17  participating in a venture by has engaged in any act just

18  described.

19         The statute sets forth two different ways that the

20  Government can prove this element.  The first way is by

21  proving that the defendant himself engaged in at least one

22  of the prohibited trafficking activities, that is,

23  recruiting, enticing, harboring, transporting, providing,

24  obtaining, or maintaining.  And the second way is by proving

25  that the defendant took part in a venture that engaged in at

1  least one of these trafficking activities, and that the

2  defendant benefited financially or by receiving anything of

3  value from that venture.

4          The first way that the Government must satisfy the

5  first element is that by proving the defendant himself

6  knowingly recruited, enticed, harbored, transported,

7  provided, obtained or maintained a person.  In considering

8  whether the defendant did any of these acts in the statute,

9  I instruct you that use the ordinary, everyday definition of

10 these terms.  To recruit means to employ or find a person to

11 join.  To entice means to attract, tempt, or persuade a

12 person by offering something.  To harbor a person means to

13 provide shelter for that person.  To transport a person

14 means to move a person from one place to another.  To

15 provide a person means to make someone available for use.

16 To obtain a person refers to acquiring, controlling, or

17 possessing that person even if only for a short period of

18 time.  To maintain a person means to upkeep someone or to

19 put care or work into them.

20         Now, I will explain the second alternative way to

21 satisfy the first element.  To satisfy this first element

22 the second way, the Government need not prove that the

23 defendant engaged in the trafficking activities of

24 recruiting, enticing, harboring, transporting, providing,

25 obtaining, or maintaining a person.  The Government need

1   only prove that the defendant participated in a venture that

2   engaged in one these activities and that the defendant

3   benefited financially by receiving anything of value from

4   the venture.  In considering whether the defendant

5   participated in such a venture, I instruct you that a

6   venture is defined as any group of two or more individuals

7   associated in fact whether or not as a legal entity.  So if

8   two or more people associated with one another, you may find

9   that those two people formed a venture.

10          You may find that the defendant participated in

11  the venture if the defendant in any way took part in that

12  venture.  The defendant may be, but need not be, one of the

13  people who formed the venture.  Likewise, the defendant need

14  not be an organizer or a main participant in the venture and

15  need not have participated throughout the length of the

16  venture.  It is enough if the defendant took some part in or

17  played some role in the venture for any period of time while

18  the venture was still ongoing.  It is sufficient if the

19  defendant played any role in the venture even if that role

20  was minor and even if that role was not related to that

21  actual recruiting, enticing, harboring, transporting,

22  providing, obtaining, or maintaining of a person for

23  commercial sex acts that the venture engaged in.

24          I think I better read that over.

25          It is sufficient if the defendant played any role

*Jury Charge*                                                    994

1   in the venture even if that role was minor, and even if that

2   role was not related to the actual recruiting, enticing,

3   harboring, transporting, providing, obtaining, or

4   maintaining a person for commercial sex acts that the

5   venture engaged in.

6           The statute also requires the Government to prove

7   that the defendant acted knowingly.  So the Government must

8   prove that the defendant acted knowingly in either engaging

9   in the trafficking activity or in joining a venture that

10  engaged in the traffic activity.  I've already instructed

11  you that regarding what it means to act knowingly and you

12  should apply that instruction here.

13          The second element of Count One is force, threats

14  of force, fraud, or coercion.  The Government may prove the

15  second element of sex trafficking in either one of two ways.

16  It may prove beyond a reasonable doubt that either the

17  defendant knew or the defendant acted in reckless disregard

18  of a fact that force, threats of force, fraud, or coercion

19  or any combination would be used with respect to the victim.

20          The term "force" means any form of power,

21  violence, or physical pressure directed against a person.

22          Fraud, as I have just used that term, means that

23  the defendant knowingly made a misstatement,

24  misrepresentation, or omission of a material fact to entice

25  the victim.  A material fact is one that a reasonable person

*Jury Charge*                                                            995

1    would expect to real upon when making a decision.

2               A threat is a serious statement expressing an

3    intent to inflict harm at once or in the future as

4    distinguished from idle or careless talk, exaggeration, or

5    something said in a joking manner.  A statement is a threat

6    if it was made under such circumstances that a reasonable

7    person would, upon hearing the statement, understand it as a

8    serious expression of intent to cause harm.  The term

9    serious harm includes physical and non-physical types of

10   harm including psychological, financial, or reputational

11   harm that is sufficient under all the surrounding

12   circumstances to compel a reasonable person in the same

13   circumstances to perform, or continue to perform, commercial

14   sexual activity in order to avoid such harm.  To determine

15   whether the defendant made a threat of serious harm, you

16   should consider the victim's station in life, physical and

17   mental condition, age, education level, experience and

18   intelligence.  A threat of serious harm is one that would

19   overcome the will of an ordinary person in the same

20   situation as that of the victim.  This threat of serious

21   harm causes a person to reasonably believe that there is no

22   real choice except to engage in such sexual acts as directed

23   by the defendant.

24               Coercion means, A, a threat of serious harm or

25   physical restraint against a person; or,

*Jury Charge*                                                          996

1          B, any scheme, plan, or pattern intended to cause

2    a person to believe that failure to perform an act would

3    result in serious harm to or physical restraint against a

4    person.  Coercion can also mean that the defendant's course

5    of action or behavior was intended to cause the victim to

6    believe that if they did not engage in such sexual acts, any

7    person would such serious physical harm or physical

8    restraint.

9          Even if a person agrees to engage in prostitution

10   for the defendant, they may be subsequently coerced in

11   violation of the second element of sex trafficking under

12   18, United States Code, Section 1591 if you find that the

13   defendant used force, threats of force, fraud, or coercion

14   to cause them to continue engaging in prostitution.

15         Whether or not the defendant had the required

16   knowledge is a question of fact to be determined by you on

17   the basis of all the evidence.  As I mentioned, or as I

18   instructed you earlier, an act is done knowingly only if it

19   is done purposefully and deliberately and not because of

20   accident, mistake, members, or other innocent reason.  If

21   you find the evidence establishes beyond a reasonable doubt

22   that the defendant actually knew that fraud, force, threats

23   of force, or coercion would be used, then this element is

24   satisfied.  Even if the evidence does not establish the

25   defendant's actual knowledge, this element is satisfied if

1   you find that the Government has proven beyond a reasonable

2   doubt that the defendant acted with reckless disregard of

3   the facts concerning the use of coercion.  The phrase

4   "reckless disregard of the facts" means that the defendant

5   had deliberate indifference to the facts that, if considered

6   and weighed in a reasonable manner, indicate the highest

7   probability that the victim was coerced to engage in a

8   commercial sex act.

9          The third element that the Government must prove

10  beyond a reasonable doubt is that the defendant knew that

11  the victim would be engaged in a commercial sex act.  A

12  commercial sex act is any sex act on account of which

13  anything of value is given to or received by a person.  It

14  is not required that the victim actually performed a

15  commercial sex act as long as the Government has proven that

16  the defendant recruited, enticed harbored, transported,

17  provided, obtained, or maintained the victim for the

18  purposes of engaging in a commercial sex act.  A thing "of

19  value" need not involve a monetary exchange; it need not

20  have any financial component.  The phrase "any sex act"

21  should be given its plain meaning and may include any act

22  performed with another for sexual gratification.

23         The fourth element is affecting interstate

24  commerce.  The fourth element that the Government must prove

25  beyond a reasonable doubt is that the conduct of the

*Jury Charge*                                                    998

1    defendant was in or affecting interstate commerce.

2    Interstate commerce simply means the movement of money,

3    goods, services, and individuals between any two or more

4    states.

5           To satisfy this element, the Government must prove

6    that the defendant's conduct affected interstate commerce in

7    any way.  You do not have to find that the defendant's

8    conduct actually affect interstate commerce if you find that

9    the defendant's conduct would have interstate commerce if

10   the defendant had successfully and fully completed his

11   actions.  I instruct you that as a matter of law if the

12   defendant used a cell phone or the internet in furtherance

13   of sex trafficking as defined above, that would satisfy this

14   element.  The Government does not have to show that the

15   defendant actually knew his actions affected or would affect

16   interstate commerce.

17          Now, in Count One, the defendant is also charged

18   under section two of Title 18 of the United States Code also

19   known as The Aiding and Abetting Statute.  I've already

20   instructed you on liability as an aider and abettor.  You

21   should apply those instructions here.

22          Next, I'll instruct you on Count Two, Mann Act

23   Transportation of Jonnica C.  Count Two in the superseding

24   indictment charges the defendant with knowingly and

25   intentionally transporting Jonnica C. in interstate commerce

*Jury Charge*                                                      999

1  with the intent that she engaged in prostitution in

2  violation of Section 2421 of Title 18 of the United States

3  Code which is also known as the Mann Act.  That section in

4  pertinent part provides and this is from the statute.

5          Whoever knowingly transports any person in

6  interstate commerce with the intent that such individual

7  engage in prostitution shall be guilty of a crime.

8  18, U.S. Code, section 2421(a).

9          Count Two reads as follows:

10         In or about and between April 2016 and July 2016,

11 both dates beings approximate and inclusive within the

12 Eastern District of New York and elsewhere, the defendant

13 Joel David Forney also known as "Sirbar" together with

14 others did knowingly and intentionally transport an

15 individual to wit:  Jonnica C., in interstate commerce with

16 the intent that she engage such individual engage in

17 prostitution.

18         To prove that the defendant committed the crime

19 charged in Count Two, the Government must first prove the

20 following two elements beyond a reasonable doubt.

21         First, that the defendant knowingly transported or

22 caused the transportation of Jonnica C. in interstate

23 commerce as alleged in the superseding indictment; and,

24         Second, that the defendant transported Jonnica C.

25 with the intent that she would engage in prostitution.

*Jury Charge*                                                  1000

1          The first element, transportation in interstate

2    commerce, that the Government must prove beyond a reasonable

3    doubt is that the defendant knowingly and intentionally

4    transported or caused the transportation of Jonnica C. in

5    interstate commerce as alleged in the superseding

6    indictment.  This means the Government must prove the

7    defendant knew both, one, that he was transporting or

8    causing the transportation of Jonnica C., and two, that he

9    was transporting Jonnica C. or causing the transportation of

10   Jonnica C. in interstate commerce.  I've already instructed

11   you as to what it means to act knowingly and intentionally

12   and you should apply those instructions here.

13          I instruct you that if you unanimously find that

14   the defendant knowingly and intentionally transported or

15   caused the transportation of Jonnica C. in interstate

16   commerce within the intent that she engage in prostitution

17   whether or not Jonnica C. consented to travel in interstate

18   commerce, the purpose of prostitution is irrelevant.

19          Interstate commerce means movement between one

20   state and another.  The Government does not have to prove

21   that the defendant personally transported Jonnica C. across

22   a state line.  It is sufficient to satisfy this element that

23   the defendant was actively engaged in or caused the making

24   of the travel arrangements such as by purchasing or causing

25   the purchase of the ticket necessary for the individual to

*Jury Charge*                                                                1001

1    travel as planned.

2           The second element that the Government must prove

3    beyond a reasonable doubt is that the defendant transported

4    or caused the transportation of Jonnica C. with the intent

5    that she would engage in prostitution.  I've already

6    instructed you as to what it means to actually to act

7    intentionally or with intent and you should apply those

8    instructions here.  Direct proof of a person's intent is

9    almost never available.  It would be a rare case where it

10   could be shown that a person wrote or stated that as of a

11   given time, they committed an act with a particular intent.

12   Such direct proof is not required.  The ultimately fact of

13   intent, though subjective, may be established by a

14   preponderance of the evidence, I'm sorry, strike that.  I

15   misspoke.

16          The ultimate fact of intent, though, subjective

17   may be established by circumstantial evidence based upon the

18   defendant's outward manifestation, his words, his conduct,

19   his acts, and all the surrounding circumstances disclosed by

20   the evidence and the rational or logical inference that may

21   be drawn from them.

22          In order to establish this element, it is not

23   necessary for the Government to prove that engaging in

24   prostitution was the sole purpose of crossing the state

25   line.  A person may have several different purposes or

*Jury Charge*                                          1002

1   motives for such travel and each may prompt in varying

2   degrees the act of making the journey.  The Government must

3   prove beyond a reasonable doubt, however, that a significant

4   or motivating purpose of the travel across a state line was

5   that Jonnica C. would engage in prostitution.  In other

6   words, that prostitution must not have been merely

7   incidental to the trip.

8             Now, aiding and abetting liability has been

9   charged in this count.

10            In Count Two, the defendant is also charged under

11  Section 2 of Title 18 of the United States Code also known

12  as the aiding and abetting statute and I have already

13  instructed you on liability as an aider and abettor you

14  should apply those instructions here.

15            You have heard evidence about multiple interstate

16  trips pertaining to Jonnica C. during the time period

17  charged in Count Two, April 2016 to July 2016 including,

18  first, a trip from Wisconsin to New York; and second, a trip

19  from New York to Connecticut.  I instruct you that you must

20  unanimously decide whether the Government has proven beyond

21  a reasonable doubt the first and second elements of the

22  offense charged in Count Two separately as to each of those

23  trips.  A special verdict form will be provided for you to

24  ensure that you are unanimous in your verdict as to each of

25  these trips.  If you unanimously find that the Government

1   has proven beyond a reasonable doubt the first and second

2   elements of the offense charged in Count Two as to the

3   transportation of Jonnica C. from Wisconsin to New York, you

4   may indicate such by answering yes on the special verdict

5   form and returning a guilty verdict.  If you unanimously

6   find that the Government has proven beyond a reasonable

7   doubt that the first and second elements of the offenses

8   charged in Count Two as to the transportation of Jonnica C.

9   from New York to Connecticut you may indicate as such by

10  answering yes on the special verdict form and returning a

11  guilty verdict on would.

12          Conversely, if you unanimously find that the

13  Government has not proven beyond a reasonable doubt the

14  first and second elements of the offense charged in Count

15  Two as to the transportation of Jonnica C. from Wisconsin to

16  New York and New York to Connecticut, you may indicate as

17  such by answering no it both questions on the special

18  verdict form and returning a verdict of not guilty.

19          Count Three charges Mann Act interstate

20  prostitution of Jonnica C.

21          Count Three of the superseding indictment charges

22  defendant with Mann Act interstate prostitution of Jonnica

23  C. in or about and between April 2016 and July 2016.  Count

24  Three states:

25          In or about and between April 2016 and July 2016,

*Jury Charge*                    1004

both dates being approximate and inclusive, within the
Eastern District and elsewhere, the defendant Joel David
Forney, also known as "Sirbar" together with others, did
knowingly and intentionally persuade, induce, entice, and
coerce an individual to wit:  Jonnica C., to travel in
interstate commerce to engage in prostitution.

The relevant statute of Title 18, United States
Code, Section 2422 provides in pertinent part:

Whoever knowingly persuades, induces, entices, or
coerces any individual to travel in interstate and foreign
commerce to engage in prostitution shall be guilty of a
crime.  18, United States Code, Section 2422(a).  I'm sorry,
strike that.

To prove that the defendant committed the crime
charged in Count Three, the Government must prove the
following three elements beyond a reasonable doubt:

First, that the defendant knowingly persuaded
induced, enticed, or coerced Jonnica C. to travel in
interstate commerce.

Second, that Jonnica C. traveled in interstate
commerce.

And third, that the defendant acted with the
intent that Jonnica C. would engage in prostitution.

(Continued on the next page.)

Jury Charge                                    1005

1        THE COURT:  The first element, knowingly persuading,

2   inducing, enticing or coercing travel in interstate commerce.

3   The first element that the Government must prove beyond a

4   reasonable doubt is that the defendant knowingly persuaded,

5   induced, or coerced Jonnica C. To travel in interstate

6   commerce.  I instruct you that if you unanimously find that

7   the defendant did knowingly persuade, induce, entice or coerce

8   Jonnica C. To travel, whether or not Jonnica C. Consented to

9   travel in interstate commerce is irrelevant.  I've instructed

10  you to the term knowingly and should apply those instructions

11  here.  In considering whether the defendant did any of these

12  acts in the statute, I instruct you to use the ordinary, every

13  day definitions of the terms persuade, induce, entice or

14  coerce.

15       The second element is travel in interstate commerce.

16  The second element that the Government must prove beyond a

17  reasonable doubt is that Jonnica C. Traveled in interstate

18  commerce as alleged in the Indictment.  I've already

19  instructed you as to the meaning of interstate commerce and

20  you should apply those instructions here.

21       The third element that the Government must prove

22  beyond a reasonable doubt is that the defendant acted with the

23  intent that Jonnica C. Would engage in prostitution.  I've

24  already instructed you as to what it means to act

25  intentionally or with intent and you should apply those

1   instructions here.

2         Direct prove of a person's intent is almost never

3   available.  It would be a rare case where it can be shown that

4   a person wrote or stated that as of a given time he committed

5   an act with a particular intent.  Such direct proof is not

6   required.  The ultimate act of intent, though subjective, may

7   be established by circumstantial evidence based upon the

8   defendant's outward manifestations, his words, his conduct,

9   his acts and all the surrounding circumstances disclosed by

10  the evidence, and the rationale or logical inferences that may

11  be drawn from them.

12        In Count Three the defendant is also charged under

13  Section 2 of Title 18 of the United States Code also known as

14  the aiding and abetting statute.  I've already instructed you

15  on liability as an aider and abettor and you should apply

16  those instructions here.

17        Now, the trips charged in Count Three.  You've heard

18  evidence about multiple interstate trips pertaining to Jonnica

19  C. During the time period charged in Count Three, April 2016

20  to July 2016, including, one, a trip from Wisconsin to New

21  York, and two, a trip from New York to Connecticut.  I

22  instruct you that you must unanimously decide whether the

23  Government has proven beyond a reasonable doubt the first,

24  second and third elements of the offense charged in Count

25  Three, separately as to each of these trips.  A special

Jury Charge                                    1007

1    verdict form has been prepared for you to ensure that you are

2    unanimous in your verdict as to each of these trips.

3           If you unanimously find the Government has proven

4    beyond a reasonable doubt that the first, second, and third

5    element of the offense charged in Count Three as to the travel

6    of Jonnica C. From Wisconsin to New York, then you may

7    indicate as such by answering yes on the special verdict form

8    and returning a guilty verdict.  If you unanimously find that

9    the Government has proven beyond a reasonable doubt the first,

10   second, and third elements of the offenses charged in Count

11   Three as to the travel of Jonnica C. From New York to

12   Connecticut, you may indicate as such by answering yes on the

13   special verdict form and returning a guilty verdict.

14          Conversely, if you unanimously find that the

15   Government has not proven beyond a reasonable doubt the first

16   second and third elements of the offense charged in Count

17   Three as to the travel of Jonnica C. From Wisconsin to New

18   York, and New York to Connecticut, you may indicate as such by

19   answering no to both questions on the special verdict form and

20   returning a verdict of not guilty on that count.

21          Count Four sex trafficking Shyya H.  Count Four of

22   the Superseding Indictment charges defendant with sex

23   trafficking in or about May 2017 and September 2017.  Count

24   Four states:  In or about and between May 2017 and

25   September 2017 both dates being approximate and inclusive

Jury Charge                                                    1008

1    within the Eastern District of New York and elsewhere, the

2    defendant Joel David Forney, also known as Sirbar, together

3    with others did knowingly and intentionally recruit, entice,

4    harbor, transport, provide, obtain and maintain by any means a

5    person, to wit, Shyya H., an individual whose identity is

6    known to the Grand Jury, in and affecting interstate commerce

7    and did benefit financially and by receiving anything of value

8    from participation in the venture which engaged in such acts

9    knowing and in reckless disregard, that threats of force,

10   fraud, and coercion as defined in Title 18 United States Code

11   Section 1591(e)(2) and a combination of such means would be

12   used to cause Shyya to engage in one or more commercial sex

13   acts, which offense was affected by means of forced, threat,

14   threats of force, fraud, and coercion and a combination of

15   such means.

16          I've already instructed you on the elements of the

17   sex trafficking and on the definitions of force, threats of

18   force, fraud and coercion.  I've also instructed you on the

19   meaning of interstate commerce and what it means to act

20   knowingly and intentionally.  You should apply those

21   instructions here.

22          Moving on to Count Five.  Count Five of the

23   Superseding Indictment charges the defendant with using a

24   facility of interstate commerce to persuade, induce, entice,

25   or coerce Mellisa N. To engage in illegal sexual activity.

Jury Charge                                              1009

1   Count Five reads as follows:  In or about and between

2   June 2014 and December 2014 both dates being approximate and

3   inclusive within the Eastern District of New York and

4   elsewhere, the defendant Joel David Forney, also known as

5   Sirbar, using one or more facilities and means of interstate

6   and foreign commerce, to wit, the Internet and mobile Internet

7   applications including Google Hang Outs, did knowingly and

8   intentionally persuade, induce, entice, and coerce an

9   individual who had not yet attained the age of 18 years, to

10  wit Mellisa N., an individual whose identity is known to the

11  Grand Jury, to engage in sexual activity for which a person

12  can be charged with a crime, with a criminal offense, to wit,

13  a violation of New York Penal Law Section 130.252, rape in the

14  third degree.

15          The Indictment charges the defendant with violating

16  Section 2422(b) of Title 18 of the United States Code, which

17  provides in relevant part, whoever using any facility or means

18  of interstate commerce knowingly persuades, induces, entices

19  or coerces any individual who has not obtained the age of 18

20  years to engage in any sexual activity from which any person

21  can be charged with a criminal, offense shall be guilty of a

22  crime, 18 United States Code Section to 2422(b).  To prove the

23  defendant committed the crime charged in Count Five the

24  Government must prove the following four elements beyond a

25  reasonable doubt.

Jury Charge                                    1010

1        First, the defendant used a facility of interstate
2   commerce.
3        Second, the defendant knowingly persuaded, induced,
4   enticed or coerced Mellisa N. To engage in sexual activity.
5        Third, that this sexual activity would violated New
6   York criminal law.
7        And fourth, that Mellisa N. Was less than 18 years
8   old at the time of the acts alleged in the Indictment.
9        I'll now further define these elements.  The first
10  element is use of the Internet.  The first element that the
11  Government must prove beyond a reasonable doubt is that the
12  defendant used a facility of interstate commerce.
13  Transmission of communications by means of the telephone or
14  Internet constitutes the use of a facility of interstate
15  commerce regardless of whether the communication actually
16  crossed state lines.  However, you must find beyond a
17  reasonable doubt that the specific communication in question
18  was actually transmitted by means of the telephone or the
19  Internet.
20       The second element that the Government must prove
21  beyond a reasonable doubt is that the defendant knowingly
22  persuaded, induced, enticed or coerced Mellisa N. To engage in
23  sexual activity.  The words persuade, induce, entice, or
24  coerce should be given their ordinary meaning, and do not
25  require that the defendant overcame the will of the

Jury Charge                                           1011

1   defendant -- the words persuade, induce, entice or coerce

2   should be given their ordinary meanings and do not require

3   that the defendant overcame the will of the victim.  I've

4   already instructed you on the term knowingly and you should

5   apply those instructions here.

6           In order to establish this element it is not

7   necessary for the Government to prove that the sexual activity

8   was the defendant's sole purpose for using a facility of

9   interstate commerce to communicate with Mellisa N.  A person

10  may have several different purposes or motives for such

11  conduct and each may prompt in varying degrees a person's

12  action.  The Government must prove beyond a reasonable doubt,

13  however, that a significant or motivating purpose of using a

14  facility of interstate commerce to communicate with Mellisa N.

15  Was that he would engage in illegal sexual activity.  In other

16  words, the illegal sexual activity must not have been merely

17  incidental to the use of the interstate facility.

18          The third element the Government must prove beyond a

19  reasonable doubt is that the sexual activity would violate New

20  York criminal law.

21          Count Five of the Superseding Indictment charges

22  that the defendant persuaded, induced, enticed, or coerced

23  Mellisa N. To engage in sexual activity in violation of New

24  York Penal Law Section 130.252, specifically rape in the third

25  degree.  I instruct you that as a matter of law, the third

1  degree rape sexual act provision that I have listed and I will

2  instruct you on now were violations of New York penal law at

3  the time of the conduct alleged in Count Five of the

4  Superseding Indictment; that is, in or about and between

5  June 2014 and December 2014.

6         Under New York law a person is guilty of rape in the

7  third degree when being 21 years old or more, being engaged in

8  sexual intercourse with another person less than 17 years old.

9  Under New York law it is not a defense that the defendant did

10 not know the age of the person or believe the person to be

11 greater than 17 years old.  Under New York law, sexual

12 intercourse means any penetration, however slight, of the

13 penis into the vaginal opening.  In other words, any

14 penetration of the penis into the vaginal opening regardless

15 of the distance of penetration constitutes an act of sexual

16 intercourse.  Sexual intercourse does not require erection of

17 the penis, emission or orgasm.

18        Under New York penal law, a person is deemed

19 incapable of consenting to sexual intercourse when he or she

20 is less than 17 years old.  Thus, New York law deems sexual

21 intercourse with someone less than 17 years old to be without

22 consent, even if in fact that person did not object to sexual

23 intercourse.

24        The fourth element that the Government must prove

25 beyond a reasonable doubt is that Mellisa N. Was less than 17

Jury Charge                                                    1013

1   years old at the time of the sexual activity alleged in Count

2   Five of the Superseding Indictment as provided by New York

3   penal law.  The Government does not need to prove that the

4   defendant knew Mellisa N. Was less than 17 years old at the

5   time of the acts alleged in the Superseding Indictment.  It is

6   not a defense that the defendant did not know that the person

7   with whom the defendant had sexual intercourse was less than

8   17 years old, or that the defendant believed that such a

9   person was 17 years old or more on the date of the crime.

10              Now we'll move to the closing instructions.

11              First, when you retire to the jury room you will

12  select one member of your jury as the foreperson.  That person

13  will preside over the deliberations and speak for you here in

14  open court.  So that your deliberations may proceed in an

15  ordinarily fashion, you must have a foreperson.  But, of

16  course, his or her vote and views are not entitled to any

17  greater weight than that of any other juror.  That person is

18  simply a type of organizer, a communications conduit between

19  the jury and the Court.

20              Second, all of you have the duty to deliberate.

21  Your function to reach a fair conclusion from the law and the

22  evidence is an important one.  When you retire to the jury

23  room, you may finally discuss this case.  It is in fact the

24  duty of each of you to consult with your fellow jurors and to

25  deliberate with a view of reaching an agreement on a unanimous

Jury Charge                                    1014

1    verdict, if you can do so without violating your individual

2    judgment and conscience.  In the course of your deliberations

3    no one should surrender conscientious beliefs of what the

4    truth is and what the weight and effect of the evidence is.

5    Moreover, each of you must decide this case for yourself and

6    may not merely acquiesce in the conclusion of your fellow

7    jurors.  Nevertheless, I do ask you to examine the issues and

8    the evidence before you with candor and frankness and with a

9    proper deference to and regard for the opinion of one another.

10   Do not hesitate to change your opinions if you become

11   convinced that they were wrong.

12           I instruct you that the question of possible

13   punishment of the defendant is of no concern to the jury and

14   should not in any way enter into or influence your

15   deliberations.  Your sole role is to decide whether the

16   Government has proven beyond a reasonable doubt the charges in

17   this case.  Your function is to weigh the evidence in the case

18   and to determine whether or not the defendant is guilty beyond

19   a reasonable doubt solely upon the basis of the evidence here

20   at the trial.  Under your oath as jurors, you cannot allow a

21   consideration of the punishment that may be imposed upon the

22   defendant, if you do unanimously find him guilty, to influence

23   your verdict in any way or in any sense enter into your

24   deliberations.

25           In addition, during your deliberations you must not

Jury Charge                                                1015

1   communicate with or provide any information to anyone by any

2   means about this case.  You may not use an electronic device

3   or media such as a phone, cellphone, smart phone, iPhone,

4   Blackberry, smart watch, computer, the Internet, or any

5   Internet service any text or instant messaging service, any

6   Internet chat room, blog, or website such as Facebook,

7   LinkedIn, YouTube, or Twitter, to communicate with anyone any

8   information about the case, nor may you conduct any research

9   about this case until I accept your verdict.  So don't do any

10  outside research until your verdict is reached and I accept

11  it.  In other words, you cannot talk to anyone on the phone,

12  correspond with anyone or electronically communicate with

13  anybody about this case.

14        You may only discuss this case in the jury room with

15  your fellow jurors during deliberations.  All of the jurors

16  must be present when you deliberate.  So if one of you steps

17  out to use the bathroom, you must stop your deliberations

18  until that juror returns.  All of you must be present.  I

19  reiterate that your verdict must be unanimous; that is, with

20  respect to each count you must all agree as to whether your

21  verdict is guilty or not guilty.

22        Now if it becomes necessary during your

23  deliberations to communicate with me for any reason, simply

24  send me a note signed and dated by your foreperson or by one

25  or more members of the jury.  No member of the jury should

Jury Charge                                           1016

1    ever attempt to communicate with me or any other court

2    personnel by any means other than by a signed writing.  I will

3    not communicate with any member of the jury on any subject

4    touching on the merits of this case whether or not -- I will

5    not communicate with any member the jury on any subject

6    touching on the merits of this case other than in writing or

7    orally here in open court.

8              In your note do not ever disclose how the jury

9    stands numerically or otherwise on the issue of whether the

10   defendant is guilty or not guilty.  Please ask the question as

11   clearly as you can that you need to have answered.  So, it

12   will be in writing, I hope the person's writing is legible,

13   and the notes must be signed by the foreperson.

14             You will have most the exhibits and a list of the

15   exhibits received in trial in the jury room with you during

16   your deliberations.

17             If you wish to have any portion of the testimony

18   repeated, you can simply indicate that in a note.  But please

19   be as specific as possible if you make a request to hear

20   testimony read back.  Let us know which exhibit or which part

21   of an exhibit, a specific witness's testimony you want to

22   hear.  If you can, provide the name of the witness and the

23   subject matter of his or her testimony.  Please be patient

24   while we locate the testimony.  If you need further

25   discussions on instructions on any point of law, you should

Jury Charge                                    1017

1    request that in a note signed and dated by your foreperson.

2          I will instruct you that you will have a laptop

3    containing all of the exhibits that have been admitted in

4    trial.  You will also have a monitor about the size of the one

5    sitting at the end of the jury box so you can play or project

6    the evidence from the laptop and you may all see it.  We may

7    have an IT staff person just instruct on the use of a laptop.

8    The laptop is not connected to any other Internet and it

9    contains nothing but the exhibits, both the Government's and

10   the defendant's, that have been admitted.

11         Now, when you have all reached a unanimous verdict,

12   simply send me a note signed and dated by your foreperson that

13   states that you have reached a unanimous verdict.  Do not

14   indicate in the note what your verdict is.

15         To record a verdict, you must be unanimous in all

16   respects you must not render a verdict -- you must render a

17   verdict for each count with which the defendant is charged in

18   the Indictment.  Five counts, five separate unanimous

19   verdicts.

20         To help you, I've prepared a verdict sheet that may

21   be of assistance to you in your deliberations.  On the verdict

22   sheet are spaces marked guilty and not guilty for each of the

23   five counts.  The sheet is in no way intended to indicate how

24   you must deliberate or decide the facts in this case.  The

25   foreperson should use a check mark in the appropriate space

1  indicating either guilty or not guilty for each count of the

2  Indictment, and should answer all questions on the verdict

3  sheet, again with a check mark.  The foreperson should also

4  place his or her initials and the date and sign each mark on

5  the verdict sheet, and should then sign and date the verdict

6  sheet.

7          Finally, I want to remind all of you the oath that

8  you took when you were sworn as jurors in the beginning of

9  this case.  Remember in your deliberations that this case is

10 no passing matter for the Government or for the defendant.

11 The parties and the Court rely upon you to give full and

12 conscientious deliberation and consideration to the issues and

13 events before you.  By doing so you carry out to the fullest

14 extent your oath as jurors:  To well and truly try the issues

15 in this case and a true verdict render.

16         Before I ask you to retire to the jury room and

17 begin your deliberations, I'll consult with counsel to be

18 certain that I have not overlooked any points.

19         Did the Government have anything more?

20         MS. RANGEL:  No, your Honor.

21         THE COURT:  Does the defense?

22         MR. SINGER:  No.

23         THE COURT:  All right.  So what I'll do is I'll

24 instruct the jurors seated in seats one through 12 to follow

25 Ms. Jackson back to the jury room, or Ms. Picard.  You'll be

Proceedings                                          1019

1  in the jury room, the lunches should be there for you.  Before

2  you do that, I'll have a court security officer come to the

3  courtroom.  He or she will take an oath to make sure that you

4  are able to deliberate without any interference.

5           THE COURTROOM DEPUTY:  They are on their way.

6           THE COURT:  Jurors seated in seat 13 through 16 will

7  be isolated in a separate room.  You'll have your lunch there.

8  You are directed not to talk about the case.  Now, be advised,

9  if one of the 12 jurors is unable to continue deliberating and

10  is excused, the juror designated as alternate one will be

11  called upon to replace the juror who is excused.  Until and

12  unless you're in the jury room, don't talk about the case.

13           Have the parties had the opportunity to review the

14  list of exhibits in evidence?

15           THE COURTROOM DEPUTY:  It will be printed out now,

16  Judge.

17           THE COURT:  Did it comport with your understanding

18  of what is evidence, Ms. Rangel?

19           MS. RANGEL:  Yes, your Honor.

20           THE COURT:  Does it comport with your understanding,

21  Mr. Hine?

22           MR. HINE:  I have a couple of corrections.

23           THE COURTROOM DEPUTY:  It was revised.

24           MR. HINE:  Okay.

25           THE COURT:  Ms. Jackson will give you an updated.

Proceedings                                              1020

1   Can you give it to them now, please.

2              (CSO enters courtroom.)

3              THE COURT:  Sir, please come forward.  State your

4   name for the record.

5              OFFICER LOTUFO:  CSO Robert Lotufo, L-O-T-U-F-O.

6              (CSO sworn.)

7              THE COURTROOM DEPUTY:  Thank you.

8              THE COURT:  You may follow the court security

9   officer, jurors one through 12, into the jury room.  We will

10  bring you the exhibits as soon as they are ready.

11             Jurors 13 through 16, we'll bring you to another

12  room.  Please do not discuss the case.

13             (Jury exits the courtroom.)

14             (Time 3:00 p.m.)

15             THE COURT:  Let's take jurors 13 through 16 into the

16  other room.  You'll have to leave your notebooks face down.

17  Enjoy your lunch and we will come and let you know when it is

18  time to be excused at day's end.

19             (Alternate jurors exit the courtroom.)

20             THE COURT:  Where are the exhibits?

21             THE PARALEGAL:  In these two binders.

22             THE COURT:  Not in the laptop?

23             THE PARALEGAL:  We have a drive and a laptop as

24  well.

25             THE COURT:  What?

Proceedings                                    1021

1          MS. BOWMAN:  Can we have a moment to confer with the

2     paralegal?

3               (Continued on next page.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Jury Deliberations                              1022

1    (Continuing)

2              THE COURT:  What is the situation, please?

3              MS. RANGEL:  So we have the hard copies of the

4    exhibits.  And then we also do have a laptop, but the laptop

5    needs to be logged into when accessed and requires an

6    identification card to be put in it.

7              THE COURT:  Is it there?

8              MS. RANGEL:  It is, but we would have to, like, use

9    a pass code to log them in.

10             THE COURT:  All right.

11             Do you have the information, the pass card and the

12   pass code to give to the jury?

13             MS. RANGEL:  Well, it's our paralegal's, like, PIV

14   and pass code, so we would have to -- essentially, if the jury

15   wants something electronically, we can plug the drive in, pull

16   it up, make it available and give them the laptop, but...

17             I guess that's how we've done it in the past.

18             THE COURT:  Well, I have not seen that done where

19   the paralegal is there punching in passwords.

20             My understanding, and the way it's been done in the

21   last couple of trials, is the laptop has the pass code that

22   the jurors are given to log into a laptop which contains only

23   the evidence admitted.  And they use that in the jury room,

24   they don't have to come out and have her punch in each time.

25             Is that not happening?

Jury Deliberations                                    1023

1            MS. RANGEL:  So we do have a loaner laptop that only

2    has the exhibits.  For whatever reason, the way it's set up

3    requires a PIV.  We can urgently get IT to see if there is

4    anything that we're able to do.  But it is currently the

5    process that you just put a PIV card in so the laptop has

6    nothing else but the exhibits.

7            THE COURT:  All right.

8            So for now, we'll get them started with just the

9    paper copies of the exhibits then.

10           MS. RANGEL:  Yes, Your Honor.

11           THE COURT:  I'm not asking that her ID be used, but

12   usually there is a code.

13           MS. RANGEL:  Yes, we understand.  We'll inquire.

14           THE COURT:  Okay.  At this time --

15           THE COURTROOM DEPUTY:  We have a laptop in the room.

16           UNIDENTIFIED PERSON:  A flash drive or regular CD.

17           MS. RANGEL:  Basically, what I understand now, is

18   that the court has a laptop, and so we have the drive and we

19   just plug it into the laptop that you guys already have.

20           THE COURT:  All right.

21           So what I will do is then we will ask our IT staff

22   to go into the jury room and then you'll put it -- yes.

23           UNIDENTIFIED PERSON:  The laptop is already set up.

24   All they need to do is plug in the USB.

25           THE COURT:  May I ask permission of the parties to

Jury Deliberations                                1024

1   have our IT person just give them instructions as to how to

2   get the laptop up and running?

3              MR. SINGER:  Of course.

4              THE COURT:  All right.

5              MS. RANGEL:  Yes, of course.

6              THE COURT:  So she'll go back.  All right.

7              MR. HINE:  Thank you, Your Honor.

8              I'm almost done going through the revised exhibit

9   list.  We found one exhibit, in theory, that wasn't admitted

10  into evidence.  And I'm just on the last page.

11             THE COURT:  Okay.

12             THE COURTROOM DEPUTY:  Okay.

13             THE COURT:  If it's not in evidence, then it

14  shouldn't be in the hard copies and it shouldn't be on the

15  laptop.

16             MR. HINE:  Government Exhibit 216.  There is a 216-1

17  and a 216-2 that were admitted as evidence, but

18  Government Exhibit 216 itself was not.  I don't think it was

19  ever introduced.

20             MR. SINGER:  The transcript reflects that.

21             MS. BOWMAN:  Was it on the Court's list or the

22  Government's list?

23             MR. HINE:  It's on this list.

24             THE COURT:  We're going to check the transcript.

25  All right?

Jury Deliberations                              1025

1           MR. SINGER:  I just looked at the index at the end

2      of the day and on August 13th and it wasn't listed.

3           (Pause in proceedings.)

4           THE COURT:  All right.  216-1 and 216-2 are in the

5      transcript.

6           THE COURTROOM DEPUTY:  Okay.

7           THE COURT:  But Exhibit 216 alone is not in the

8      transcript, so it was not introduced.

9           Good catch, Mr. Hine.

10          MS. RANGEL:  Just to make the record clear, the

11     Government Exhibit 216 is not in the paper copy or the

12     electronic copy and will be removed from our list and we'll

13     provide an updated list.

14          MR. HINE:  And other than that, the list matches

15     everything that we understand to have been admitted.

16          THE COURT:  All right.

17          So, what we're going to be doing is taking the

18     laptop, it's in the room, you need a USB.

19          (Pause in proceedings.)

20          THE COURT:  We're going to bring the laptop in the

21     court out to the jury room right now.  And you will then make

22     sure that it's all in order.

23          UNIDENTIFIED PERSON:  Yes.

24          (Pause in proceedings.)

25          THE COURT:  Just for the record, we also have one

Jury Deliberations                                1026

1  verdict sheet and six copies of the charges for the jury.  We

2  usually ask them to share, just like the screens.

3          What we're going to do is ask all of you to put your

4  phone numbers on a piece of paper.

5          No, no, bigger one.

6          Just please put your cells.  Don't go more than

7  five minutes away from the courthouse, please.  Because when

8  we get a note, we're going to call everybody, including the

9  marshals, to bring Mr. Forney in.  Then we'll get the jury

10 out.

11         Sometimes we don't need to bring them out.  We can

12 just communicate with them by note.  What I do generally is,

13 when I get a note, I will label it "Court Exhibit" whatever.

14 I will publish the note on the record.  I'll also give you

15 copies of it.  And my response will be written on the note as

16 Court Exhibit, for example, 3A, for Court Exhibit 3, and then

17 that note will go back.  So we won't really be talking to the

18 jury.

19         However, if the jury needs to come hear testimony,

20 what I ask the parties to do is to confer on the transcript,

21 figure out what portions are relevant, redact all the

22 sidebars, objections, everything that's not appropriate, and

23 copies of those pages will then go back to the jury room.

24         MR. SINGER:  As opposed to reading it in court?

25         THE COURT:  Yes.

Jury Deliberations                              1027

1        MS. RANGEL:  Just two things.

2        The Government, during Ms. Bowman's rebuttal

3   summation, she stated Jessica F's last name.  We request that

4   that be stricken from the transcript.

5        THE COURT:  Yes.  Yes, I heard that.

6        MS. RANGEL:  And the other thing we wanted to raise

7   is that Defense Counsel never filed their *Brady* motion.  And

8   we disclosed what they with *Brady*, and Defense Counsel was

9   able to use it during trial throughout, not only on

10  cross-examination, but in their summations.  So we're

11  requesting a finding that there was no *Brady* violation.

12       THE COURT:  Well, I think Mr. Singer did state on

13  the record that he wasn't making a motion.  And if he did --

14  if he was to make a *Brady* motion, he would file such a motion,

15  but that his oral statement in court where he mentions a *Brady*

16  violation was not the motion.

17       All right?  Okay.

18       MS. RANGEL:  Thank you.

19       THE COURT:  Thank you.

20       MR. SINGER:  Judge, is there any chance, I have to

21  get someplace to drop -- I can't take my briefcase with my

22  computer to the show.  I just need time because once you pull

23  them out, it takes 15 minutes or so to let everybody go and I

24  need time to get around.

25       You want to stay later?

Jury Deliberations                                    1028

1          MS. RANGEL:  Yes.  I mean, if the jury wants to stay

2    later, I think that we should stay, especially since we

3    represented that we thought the trial was going to be shorter.

4    I just want to be respectful of their time.

5          (Pause in proceedings.)

6          (Court Exhibits 5, 5A and 6, so marked.)

7          THE COURT:  Okay.  The Court's exhibit list is

8    Court Exhibit 6, the charges that were read today were

9    Court Exhibit 5, and the verdict sheet is 5A.

10         If we get a note, it will be Court Exhibit 7.

11         All right.  So, don't go far.

12         MS. RANGEL:  Thank you, Your Honor.

13         THE COURT:  Thank you.

14         (Recess taken.)

15         (In open court; all parties present.)

16         (Court Exhibits 7 and 8, so marked.)

17         THE COURT:  All right.  We have Mr. Forney present

18   and all counsel.

19         We've received two notes from the jury.

20         The first is Court Exhibit 7.  It reads:  Please

21   provide transcript of Shyya H's testimony.  Thank you.

22         And Court Exhibit 8 reads:  Please provide clarity

23   on D, fourth element, affecting interstate commerce, page 43.

24   More specifically, the use of a cell phone for the use of

25   interstate commerce.

Jury Deliberations                                1029

1       All right.  So I'm going to ask that the parties

2   confer regarding the Shyya H. testimony and provide copies

3   with redactions for objections, sidebars and that kind of

4   thing.

5       And then with regard to the note, Court Exhibit

6   No. 8, I think that we should have a discussion as to the

7   clarity.  I would give them further instructions in writing.

8   I'm not sure quite sure what his issue is.

9       MS. RANGEL:  Your Honor, on the first matter with

10  respect to the transcripts, would you like to provide the jury

11  with physical copies or would you like to provide it

12  electronic?  Or both?

13      THE COURT:  Well, I think both would be good.  I

14  mean, we could do it electronically if that's faster.  The

15  only point I was going to make is that we usually upload the

16  exhibits into the docket.

17      Is there a way to upload an electronic response into

18  the docket, the note?

19      Well, we would put the note and the response, i.e.,

20  the transcripts into the docket, what we gave them.

21      Fortunately, it seems that this case doesn't have a

22  lot of sidebars during Shyya, right?

23      MS. RANGEL:  Yes.

24      Yes.  And we're working on redacting anything

25  that -- either a sidebar or an objection.

Andronikh M. Barna, Official Court Reporter, RPR, CRR

Jury Deliberations                1030

1     THE COURT:  Okay, great.  Thank you.

2     MS. RANGEL:  But to answer the Court's question, it

3  would be -- we would just provide a PDF of that portion of the

4  transcript.

5     THE COURT:  Yes, that would be fine.

6     Yes, if Mr. Singer and Mr. Hine could then review

7  it.

8     And then I guess we should talk about

9  Court Exhibit 8.

10    MS. BOWMAN:  Your Honor?

11    THE COURT:  Yes.

12    MS. BOWMAN:  Your Honor, would you like us to e-mail

13 the proposed redactions to Shyya H's testimony to Your Honor

14 and Defense Counsel or run back and get hard copies or give

15 hard copies?

16    THE COURT:  I think electronic is fine.

17    Can you work off of electronic?

18    MR. SINGER:  That's fine.

19    THE COURT:  Okay.  We might ask you to print hard

20 copies just because -- well, there are jurors -- we could

21 possibly give the PDF and they could read it together.

22    MS. BOWMAN:  We'll work on hard copies.

23    But would Your Honor like a copy of --

24    THE COURT:  Yes.  I would like to see what it is you

25 proposed, as would, I'm sure, Defense Counsel, in case there's

Jury Deliberations                                  1031

1    any disagreement.

2             MR. SINGER:  I think this is pretty noncontroversial

3    and there won't be any disagreement.

4             THE COURT:  Okay.  Thank you.

5             MS. RANGEL:  And then while we're waiting for that

6    to be done, do you want to discuss the second note?

7             THE COURT:  Sure.

8             Again, they want clarity on sex trafficking, D,

9    fourth element, affecting interstate commerce, at page 43 of

10   the instructions, asking for, more specifically, the use of a

11   cell phone for the use of interstate commerce.

12            We could give them some Second Circuit language.

13            The problem is I'm not sure what the source of their

14   confusion is, what they mean by "more clarity."

15            We had originally, when we posted the draft proposed

16   charges, we had cited to *United States versus Garrett*, a

17   Second Circuit decision in 2022, which stated, quote, "The use

18   of cell phones and the internet are enough to establish an

19   affect on interstate commerce," citing *United States versus*

20   *Giordano;* and 442 F.3d 30 at page 39, decided by the Circuit

21   in 2006, which stated it was an unremarkable conclusion that

22   the national telephone network satisfies the interstate

23   commerce element, and also citing *United States versus Perez,*

24   414 F.3d 302 at pages 303 to 305, finding even wholly

25   interstate calls that did not require any switching or routing

Jury Deliberations                           1032

1    connections outside the state that were made using a telephone
2    network involved an interstate commerce -- I'm sorry, involved
3    in interstate commerce was sufficient to satisfy the
4    interstate nexus.
5           But I think in closings you had pointed out other
6    means by which the interstate commerce could be satisfied, so
7    it's hard to know what their question is or what the clarity
8    is that's needed.
9           MR. SINGER:  I would ask them to clarify their
10   question, Judge.
11          The instruction that you gave on page 43 going into
12   page 44 states that as a matter of law, if the Defendant used
13   a cell phone or the internet in furtherance of sex
14   trafficking, as defined above, that would satisfy this
15   element.  And so if we do not -- if it's not clear to us what
16   they're asking, what type of clarification they're asking for,
17   we should ask them to be more specific or to explain what
18   they're looking for rather than making an assumption and
19   giving them new law.
20          THE COURT:  Yes, I'm just not sure what he needs
21   clarity on.
22          MS. RANGEL:  I agree, Your Honor.  It seems --
23          MR. SINGER:  Well, the clarity we need is what
24   they're asking for.  Because I don't understand what they're
25   asking for and I think Your Honor indicated you don't know

1  what they're asking for.

2          THE COURT:  I understand, yes.  I'm not arguing with

3  you and I don't want your voice raised, please.

4          So the Government was going to be speaking.  What

5  did you say?

6          MS. RANGEL:  Yes, Your Honor.

7          I think that the note, in the Government's view, is

8  clear that they want more specificity about the use of a cell

9  phone, if it satisfies the interstate commerce element.  So I

10 think the Court providing -- I believe it was the *Garrett*

11 language would provide that, the information.

12         I mean, I don't think it would probably be

13 sufficient to point them to the charge because clearly they're

14 looking at it very closely.

15         THE COURT:  Well, I think what I'm not clear about

16 is what specificity the jurors are looking for.

17         I guess I'm more -- the note doesn't really give us

18 much.

19         I could ask him to try to articulate what it is they

20 need clarity on.

21         MS. RANGEL:  I think they're trying to -- based on

22 my review of the note, I think they're trying to understand

23 how the use of the cell phone in the commission of sex

24 trafficking, how -- that I guess what would be sufficient to

25 find that the interstate commerce element is satisfied through

Jury Deliberations                              1034

1    the use of a cell phone in the commission of sex trafficking,

2    is how I view their question.

3           But I --

4           THE COURT:  But the instructions say pretty clearly,

5    as Mr. Singer pointed out, is that as a matter of law, if he

6    used a cell phone or the internet in furtherance of sex

7    trafficking, that would satisfy this element.

8           I think I could ask him to try to clarify, you know,

9    explain further what they want clarity on.

10          And I would just propose sending back my note, as

11   Court Exhibit 8A:  Please explain what clarity you are

12   requesting on this instruction regarding the use of a cell

13   phone.

14          MS. RANGEL:  No objection from the Government.

15          THE COURT:  I think that was your original

16   suggestion, Mr. Singer, if I'm not mistaken.

17          MR. SINGER:  Yes, Judge.

18          THE COURT:  All right.

19          MR. SINGER:  And Judge, I have received a copy of

20   the transcript with one redaction in it and it's fine.

21          MR. HINE:  Shouldn't there be more than one?

22          THE COURT:  Sandy, can you make a copy of this so I

23   can write on it?  And mark it Court Exhibit 8A eight, please?

24          Thank you.

25          THE COURT:  My note back to the jury reads:  Please

Jury Deliberations                                    1035

1   explain what clarity you are seeking regarding the instruction

2   labeled "D. Fourth Element:  Affecting interstate commerce" at

3   pages 43 to 44.

4           Does anyone have anything else they think we should

5   add?

6           MR. SINGER:  Fine with the Defense, Judge.

7           MS. RANGEL:  Fine with the Government.

8           THE COURT:  All right.

9           I'm also going to ask them to write on a full sheet

10  of paper.

11          Sandy, can we label this 8A right here?

12          (Court Exhibit 8A, so marked.)

13          THE COURTROOM DEPUTY:  Okay, here it is.

14          THE COURT:  Okay.  Thank you.

15          Okay.  So we can give copies of that, too.

16          (Pause in proceedings.)

17          THE COURT:  So I think maybe giving them hard copies

18  would be easier than getting a PDF to them.

19          MS. BOWMAN:  We are getting hard copies.

20          THE COURT:  Thank you.

21          So you've agreed on the copies for Shyya already?

22          MR. HINE:  Yes, we just reached an agreement.

23          THE COURT:  Great.  Thank you.  Thank you very much.

24          (Pause in proceedings.)

25          THE COURT:  I think this is related to Court Exhibit

Jury Deliberations                                        1036

1   -- I mean, to Exhibit A.  We can talk about how to label this,

2   but the Foreperson wrote:  1. Layperson definition of

3   interstate commerce.  2.  Is any use of a cell phone for the

4   purpose of selling commercial sex considered interstate

5   commerce?

6            So I think this is relating to Court Exhibit 8 and

7   8A, so I would like to label this 8B, if that's all right with

8   you.

9            MS. RANGEL:  Yes, Your Honor.

10           THE COURT:  Does anyone have any objections?

11           MS. RANGEL:  No.

12           THE COURT:  Okay.

13           (Court Exhibit 8B, so marked.)

14           THE COURT:  And I'm happy to hear from the parties

15  on a response.

16           THE COURTROOM DEPUTY:  You've got copies of 7A?

17           THE COURT:  Do you have my response back to the

18  jurors?

19           MS. BOWMAN:  8A, yes.

20           THE COURTROOM DEPUTY:  7A.

21           THE COURT:  7A.  Please find copies.

22           MS. BOWMAN:  I don't have 7A.

23           THE COURTROOM DEPUTY:  Okay.  It's coming now.

24           THE COURT:  I'm thinking that the best response to

25  their note regarding interstate commerce, we do define it here

Andronikh M. Barna, Official Court Reporter, RPR, CRR

Jury Deliberations                                        1037

1   that the Government must prove beyond a reasonable doubt that

2   the conduct of the Defendant was in or affecting interstate

3   commerce.  Interstate commerce simply means the movement of

4   money, goods, services and individuals between any two or more

5   states.

6            I think what they need to understand is the reason

7   we have the use of the telephone, cell phone, or the internet

8   in furtherance of sex trafficking is because cell phones and

9   the internet are facilities of interstate commerce and that

10  they rely on technology that crosses state lines.

11           I'm open to suggestions as to how you might want to

12  answer the notes that the -- you know, Items 1 and 2 of

13  Court Exhibit 8B.

14           In the meantime, Ms. Jackson or Ms. Picard will take

15  back the transcripts.

16           Did anyone want to be heard?

17           Do we have more than one copy of the transcript?

18           MS. BOWMAN:  We do, Your Honor.  How many does

19  Your Honor request?

20           THE COURT:  Six, please.

21           MS. BOWMAN:  We have four.  Is that okay,

22  Your Honor?

23           THE COURT:  Four is fine.  Thank you.

24           Thank you.

25           MR. HINE:  Judge, on my read of the question, I

1   think they -- I guess I'm not quite sure where the confusion

2   comes from, but they're asking whether use of a cell phone is

3   in itself interstate commerce.  And perhaps your response

4   should clarify that the factual question that they have to

5   determine is whether Mr. Forney -- whether his conduct was in

6   or affecting interstate commerce.  And then I think you could

7   just refer them back to the instruction for whether a cell --

8   you know, to help them with the question of whether use of a

9   cell phone can satisfy that element.

10          THE COURT:  What if I directed them to the part of

11   the instruction that said if the Defendant used a cell phone

12   or the internet in furtherance of sex trafficking as defined

13   above, that would satisfy this element?

14          So the answer to Question 2 would be yes, it would

15   be affecting interstate commerce.  In response to Question 2.

16          And with regard to Question 1, since he asks for a

17   layperson definition, it would be, you know, the movement of

18   money, goods, services and individuals or facilities, such as

19   the internet or phone, that cross state lines.

20          MS. RANGEL:  Your Honor.

21          THE COURT:  I mean, if you have a -- I'm happy to

22   hear from both of you what language you want to use.

23          MS. RANGEL:  Would it be possible to hear the

24   Court's proposed language one more time?  And then the only

25   other --

Jury Deliberations                                    1039

1        MR. SINGER:  Sorry?  I can't hear.

2        MS. RANGEL:  Sorry.  I said would it be possible to

3  hear the Court's proposed language one additional time.

4        But the other thing that I want to note about

5  Court Exhibit 8B is that they underlined "any use," and so --

6  of a cell phone, and so I take that to mean they're wondering

7  if calls or text are -- could satisfy the interstate commerce

8  element.  And so I think that just making that clear that that

9  is sufficient under the law.

10       THE COURT:  Yes, he does make sure that the "any

11  use" is tied to for the purposes of selling commercial sex,

12  right?

13       So I could answer, in response to Question 2, that

14  yes, any use of a cell phone, including texts and calls, for

15  the purpose of selling commercial sex is considered to affect

16  interstate commerce.

17       MS. RANGEL:  Yes, that works for the Government.

18       THE COURT:  I mean, there's also e-mails, texts,

19  phone calls, so I would put those three in.

20       Is there any objection to that?

21       MR. HINE:  Well, I guess it's not -- I think if they

22  were confused about text or calls, they probably could have --

23  they might have asked about it.

24       I mean, I suppose my concern is that they still have

25  to determine as a -- unanimously determine as a jury whether

Jury Deliberations                                 1040

1  Mr. Forney's conduct was in or affecting interstate commerce.

2  And the instructions that were given to them that they have

3  come very close to saying that they were because it says -- it

4  already says use of a cell phone in this situation would -- in

5  furtherance of sex trafficking would satisfy this element.

6  And I guess I'm just not sure what -- whether this will

7  clarify anything beyond just -- or whether it would be better

8  to just refer it -- tell them to refer back to the instruction

9  which already contains the answer.

10           THE COURT:  I think that will be frustrating to them

11  because that's not what they're asking.

12           MS. RANGEL:  Your Honor, it seems from the

13  Government's view that they're evaluating the evidence and

14  trying to understand the legal definition of the use of a cell

15  phone as it relates to interstate commerce.  And so I think

16  the Court's proposed instruction provides them that

17  information, that as a matter law, using a cell phone either

18  through texts, calls or e-mails is sufficient to satisfy that

19  element.

20           THE COURT:  Well, it would have to be used by

21  Mr. Forney.

22           MS. RANGEL:  Actually, under the statute, if the

23  victim used the phone at his direction in sex trafficking,

24  that would also qualify or interstate commerce.

25           THE COURT:  Okay.

Jury Deliberations                                    1041

1        So if I say yes, the use of a cell phone to call,

2   e-mail or text in furtherance of sex trafficking...

3           MR. SINGER:  For the purpose of, was the question.

4           THE COURT:  All right.  So you want me to deviate

5   from the language in my instructions?

6           MR. HINE:  No.  In furtherance is --

7           MR. SINGER:  That's correct.  I'm sorry, Judge.

8           THE COURT:  As defined above satisfies the element

9   that the conduct of the Defendant was in or affecting

10  interstate commerce.

11          Is that satisfactory?

12          Does anyone have a response to my question?

13          MR. HINE:  I don't think we have an objection to

14  that, Your Honor.

15          THE COURT:  All right.  What about the Government?

16          MS. RANGEL:  I think it's fine, Your Honor.

17          THE COURT:  All right.

18          So in terms of 1, the layperson definition of

19  interstate commerce, what would you like me to say?

20          MR. HINE:  Your Honor, my reaction to that is that

21  they -- I mean, they sort of have to understand the legal

22  definition.  I'm not sure if there is a good way to sort of

23  put it in terms that they would better understand, but it --

24  the instructions do define interstate commerce already.  And I

25  know I said this for the last one, but it may just be

Jury Deliberations                           1042

1   appropriate to refer them back to the definition in the
2   instructions.
3            THE COURT:  Interstate commerce is the general term
4   for transacting or transporting products, services, or money
5   across state borders.
6            Does that work?
7            MR. HINE:  That seems fine.
8            MS. RANGEL:  I think that will confuse them because
9   it doesn't just have to do with movement.
10           THE COURT:  Right.  It also has to do with using a
11   facility that affects interstate commerce.
12           MS. RANGEL:  Exactly.
13           THE COURT:  So maybe what we should do going forward
14   with this particular charge is to, you know, amend the
15   definition.
16           When transacting products, goods, services, money,
17   information, data, you know, it includes all of those things,
18   really.
19           MS. BRANCH:  Your Honor, I think you're certainly
20   right about that, but the definition of interstate commerce as
21   it relates specifically to cell phones, the case law says that
22   there doesn't have to be any evidence that the -- whatever was
23   transmitted over the phone went through across state lines in
24   terms of a carrier.
25           THE COURT:  Okay.

Jury Deliberations                                     1043

1       MS. BRANCH:  It's just the use of the phone itself

2  because the phone itself is a facility of interstate commerce.

3       THE COURT:  So would it be sufficient if I just gave

4  them what we talked about earlier that was acceptable to both

5  sides?

6       MS. RANGEL:  I have another proposal, Your Honor.

7       THE COURT:  Okay.

8       MS. RANGEL:  This is from the jury instruction in

9  *Terranova*, which is that interstate or foreign commerce means

10 simply movement between one state and another or between the

11 United States and a foreign country, transmissions -- oh, just

12 use that language?

13      I guess we could -- sorry, I was reading the whole

14 definition of interstate commerce, but we could also just say:

15 Which includes the transmission of communications by means of

16 a telephone or internet constitutes the use of a facility in

17 interstate commerce and that regardless of whether the

18 communication actually crossed a state line, including the

19 instances where the communications are sent and received in

20 the same state.

21      THE COURT:  That is an accurate description, but I

22 think when you were closing and summarizing the evidence, you

23 talked about not just the communications or the internet

24 posting of ads, you talked about the actual traveling across

25 states.

Jury Deliberations                                    1044

1          MS. RANGEL:  Your Honor, so the interstate commerce

2    with respect to one of the defendants, there are many ways --

3    sorry, victims is there are many ways.  But with Shyya, who

4    they asked for the testimony for, the interstate commerce is

5    the use of the phone, texts or calls.  So I believe that's

6    probably why they're asking, because they're trying to

7    understand if that communication is sufficient.

8          THE COURT:  Yes, but the question is with regard to

9    the Count One involving Jonnica C, if you look at page 43.

10          MR. HINE:  Well, I guess it could be One --

11          THE COURT:  That part is Jonnica C.

12          MR. HINE:  Well, I guess it could be One or Four

13    because Four --

14          MS. RANGEL:  Yes.  So it could be One or Four just

15    because Four doesn't repeat all the language that was used in

16    One, as Mr. Hine pointed out.

17          THE COURT:  So you would like to -- that seemed a

18    little bit long.

19          But did Mr. Hine, Mr. Singer think that would be

20    appropriate?

21          MR. HINE:  I'm concerned about confusing the jury by

22    giving them language about facilities in interstate commerce

23    because that's what the -- that's one of the elements of

24    Count Five, is use of a facility of interstate commerce,

25    whereas the element of sex trafficking is in or affecting

1    interstate commerce.

2           They've also asked for a layperson definition and I

3    think tongue-tying them about facilities of interstate

4    commerce probably won't really clarify things and may actually

5    confuse them further.

6           THE COURT:  What if we, rather than using verbs like

7    "transacting" or "transporting," but just the movement of

8    products, services or money or people across state borders for

9    purposes of Count One in the context of sex trafficking?

10          MS. BRANCH:  I think again the Government would have

11   the same concern we raised earlier, which is the definition

12   does not require actual movement to be in or affecting

13   interstate commerce.  And it seems like particularly because

14   they seem to be struggling with how the cell phone fits into

15   that by giving them that instruction, it might confuse the

16   law, which is the use of a cell phone in and of itself is

17   sufficient, as Your Honor had instructed them.

18          THE COURT:  Well, there might be several reasons why

19   that's true though.  It might be because cell phones are

20   generally not made within the state in which they're used.  It

21   may be true because the communications over the cell phone

22   transcend state borders.  It might be because the

23   communications switch through states, not, you know, other

24   states.  I mean, a cell phone itself isn't necessarily per se.

25   There's reasons why the law recognizes that definition.

Jury Deliberations                                    1046

1              But I'm thinking maybe it's sufficient just to

2      say -- answer the second question.  That should help.

3              I don't know that we should try to give them a

4      definition beyond what we've already done.

5              MS. RANGEL:  No objection from the Government.

6              THE COURT:  Other than I just refer them back.

7              MS. RANGEL:  No objection from the Government.

8              Apologies, Your Honor, for interrupting to just

9      respond to the second question with the Court's proposed

10     language.

11             THE COURT:  But we do, just so you know, Ms. Branch,

12     in that, in that instruction at page 43, D, we do say

13     interstate commerce simply means the movement of many goods,

14     services and individuals.  So that's why it's maybe confusing

15     them.

16             So we'll just leave it with the second part of this

17     question that we talked about earlier that both sides seem to

18     agree to?

19             MR. HINE:  No objection.

20             MS. RANGEL:  No objection from the Government.

21             THE COURT:  Okay.  So once again for the record, it

22     will say:  Any use of a cell phone to call, e-mail or text in

23     furtherance of sex trafficking, as defined above, satisfies

24     the element that the conduct of the Defendant was in or

25     affecting interstate commerce.

1           Is that all right?

2           MS. RANGEL:  Your Honor, I think originally you said

3   "yes," comma.

4           THE COURT:  Okay.

5           But then I think they feel like I didn't answer the

6   first question.  That's why I took out the word "yes."

7           Okay.  All right, yes.

8           Now, it's 5:30 and I don't want Mr. Singer to miss

9   his show or to have to schlep his bags into the theatre.

10          What are the parties' views about dismissing them

11  for the day and asking them to come back to resume

12  deliberations on Monday?

13          MS. RANGEL:  The jury seems very engaged by sending

14  us three questions already in their first hours of

15  deliberations, so it would be the Government's position that

16  we ask them if they would like to stay.

17          And the Government is available to stay as long as

18  they'd like.

19          THE COURT:  I just don't know if Mr. Hine can stay

20  without Mr. Singer.

21          Can you do -- you're on this case as a second

22  lawyer, correct?  Or as a mentee?

23          MR. HINE:  I was appointed as a member of the CJA

24  mentoring program, so.

25          THE COURT:  Okay.  I think it would be best --

Jury Deliberations                                    1048

1         MR. HINE:  I think I would leave it to your

2   discretion, Judge.

3         THE COURT:  I just think in terms of Mr. Forney's

4   right to have counsel who is appointed by the CJA panel,

5   despite the excellence that Mr. Hine has demonstrated, not

6   just in this trial but my last one as well, I think that

7   Mr. Singer should be here.

8         MS. RANGEL:  Your Honor, respectfully, I do want

9   Mr. Singer to get to his show, but the show starts at 7:00.

10  And the jury is deliberating and they've been sitting for a

11  week and I think to be respectful of the jury's time, I don't

12  see why we couldn't at least extend it until 6:00.  I've

13  certainly schlepped my laptop many places for court

14  appearances and I think that we should ask that Mr. Singer do

15  the same so that we respect the jury's time.

16        MR. HINE:  One additional consideration, not related

17  to the theatre, is that every day that Mr. Forney comes here,

18  he's woken up at I think like 5:30 and he's expressed to me

19  that he's quite tired.  And, you know, just -- I know it's

20  been a long day for everyone, but it's been an especially long

21  day for him.

22        THE COURT:  Well, it's a long day for the marshals

23  as well, and our court reporter.

24        But you will have a weekend, sir, to recover.  I

25  hope you can rest over the weekend.  We all can.

Andronikh M. Barna, Official Court Reporter, RPR, CRR

Jury Deliberations                              1049

1        I want to hear from Mr. Singer.  Look, I don't want

2   you to miss your theatre, but I do not want to disrupt the

3   jury if they're engaged.

4        I'm happy to hear from you.

5        MR. HINE:  Again, I'll have to let Mr. Singer talk

6   about or raise any theatre-related concerns.

7        But I think the jury should certainly be given the

8   option to leave.  Like in some trials, I've seen that often

9   the first note is a question about when they're allowed to go,

10  and I think juries sometimes don't know how late they have to

11  stay or what the expectation is.  And I wouldn't want them to

12  feel rushed to reach a verdict today.  And I think that they

13  should be told that if they would like to leave for the

14  afternoon and reconvene on Monday, that that is certainly an

15  option.  And if they would like to stay later, then, you know

16  --

17       MR. SINGER:  Then we stay.

18       MR. HINE:  -- then I think we're happy to stay.

19       THE COURT:  Well, I could ask them in the note, if

20  you would like.

21       MR. SINGER:  Sure.

22       THE COURT:  "Do the jurors wish to be excused now or

23  stay until 6:00"?

24       I don't -- I think the marshals also, you know, need

25  to get Mr. Forney back at some point.  So they could leave now

Andronikh M. Barna, Official Court Reporter, RPR, CRR

Jury Deliberations                                    1050

1  or go at 6:00.  Those are the options I will propose to the

2  jurors.

3           MS. RANGEL:  Yes, Your Honor.  Thank you.

4           MR. HINE:  Sure.

5           THE COURT:  Okay.

6           All right.  I will have Ms. Jackson make a copy for

7  you.  If anyone has any objections, please let me know right

8  away.

9           (Pause in proceedings.)

10           THE COURT:  Okay.  Please take a quick look and let

11  me know right away if there is any issues with it.

12           MS. RANGEL:  Okay, yes, the parties have agreed that

13  this can go back to the jury.

14           THE COURT:  Okay.

15           Did you want me to specifically reference the

16  instruction at pages -- it's 43 and 44, correct?

17           MS. RANGEL:  They put the cite themselves, so I

18  think they'll understand.

19           THE COURT:  Okay.  All right.

20           Mr. Singer, if they want to be excused now and

21  Mr. Forney doesn't mind you leaving while I just excuse them

22  and admonish them, I won't object.

23           MR. SINGER:  I appreciate that, Judge, but I will

24  wait it out.  This is my responsibility.

25           THE COURT:  Okay.  Yes.

Jury Deliberations                                1051

1          MR. SINGER:  Ms. Branch, on the other hand, has a

2     train to catch.

3          MS. BRANCH:  Ms. Branch will miss her train if she

4     needs to.  There will be another one.

5          THE COURT:  What time is your train?

6          MS. BRANCH:  It's really fine, Your Honor.  I can

7     hop on the next one.

8          THE COURT:  Okay.  I've taken that -- I've missed

9     trains for the same reason.

10          MS. BRANCH:  I know.

11          THE COURT:  Sorry, marshals, we're getting very

12     close.  I'm grateful.  Thank you.

13          This will be Court Exhibit 8D.  The note reads:

14     Yes, we can stay until 6:00 p.m.  We are completing a verdict

15     now.  Thank you.

16          THE COURTROOM DEPUTY:  So this will be 8D or 9?

17          THE COURT:  Let's make it -- it's part of that whole

18     series, right?

19          THE COURTROOM DEPUTY:  Yes.  So 8D.  D, as in David.

20          THE LAW CLERK:  8D.  This is C.

21          (Court Exhibit 8C and 8D, so marked.)

22          MS. RANGEL:  Your Honor, did you get a new note?

23     Because I think it would be 9, right?

24          THE COURT:  Well, it's kind of in response to --

25          MS. RANGEL:  Oh, in response to.  Okay.

Andronikh M. Barna, Official Court Reporter, RPR, CRR

Jury Deliberations                                    1052

1           THE COURTROOM DEPUTY:  D, as in David.

2           THE COURT:  D, as in David.

3           MS. RANGEL:  Yes, I just wanted to understand for

4  the record.

5           Your Honor, since they're completing the verdict

6  form, do you think we have time to go to the restroom?

7           THE COURT:  I was thinking the same thing.

8           MS. RANGEL:  I guess not.

9           THE COURT:  "We have reached a verdict."

10          Okay, let's get the jurors.

11          This will be Court Exhibit No. 9:  "We have reached

12  a verdict."  Signed by the Foreperson.

13          Just let the alternates know that you will come get

14  them.  They will sit on the front row of the courtroom, the

15  alternates.  They should bring their notebooks with them.  And

16  then we will line up 1 through 12 and then have them come in.

17  Okay?

18          THE COURT:  This is Court 9?

19          MS. RANGEL:  This is Court 9, yes.

20          (Court Exhibit 9, so marked.)

21          THE COURT:  Are we ready to bring the jury in?

22          MS. RANGEL:  Yes, Your Honor.

23          THE COURT:  Before I do, would you like to have the

24  jury polled, either the Government or the Defense?

25          MR. SINGER:  Yes.

Jury Deliberations                                    1053

1          THE COURT:  All right.

2          (Jury enters; 5:51 p.m.)

3          THE COURT:  The alternates, could you sit in the

4    front row, please?  Thank you.

5          We have all jurors back in the room and all counsel

6    and Mr. Forney are present.

7          Please have a seat.

8          I received a note from the Foreprson of the jury

9    that the jury has reached a verdict.

10          For the record, who is the Foreprson?

11          Okay, sir, thank you.  You are Juror Number?

12          THE FOREPERSON:  10.

13          THE COURT:  10.  Thank you.

14          Have you reached a unanimous verdict?

15          THE FOREPERSON:  Yes, we have.

16          THE COURT:  I have before me a verdict sheet that

17    has been completed and signed by the Foreperson.

18          Now, there is a process, once I publish the verdict,

19    I'll ask each of you individually whether the verdict as

20    published reflects your own true verdict, and I will start

21    with No. 1 and go all the way to No. 12.

22          The only thing I will ask the Foreprson to do is to

23    initial all the checkmarks.

24          (Pause in proceedings.)

25          THE COURT:  I will now publish the verdict.

Andronikh M. Barna, Official Court Reporter, RPR, CRR

Jury Verdict                                                    1054

1          In the matter of United States of America versus

2   Joel David Forney, 24-CR-146, reading from the verdict sheet:

3          Count One.  Sex trafficking of Jonnica C.

4          As to Count One, how do you unanimously find the

5   Defendant Joel David Forney?  Guilty.

6          Count Two.  Mann Act transportation of Jonnica C.

7          As to Count Two, how do you unanimously find the

8   Defendant Joel David Forney?  Guilty.

9          If your verdict is guilty, answer the following

10  questions:

11         Do you unanimously find that the Government has

12  proven beyond a reasonable doubt that at the time of the

13  offense charged in Count Two, the Defendant Joel David Forney

14  did knowingly and intentionally transport Jonnica C. in

15  interstate commerce, to wit, from Wisconsin to New York, with

16  intent that such individual engage in prostitution?  Yes.

17         Do you unanimously find that the Government has

18  proven beyond a reasonable doubt that at the time of the

19  offense charged in Count Two, the Defendant Joel David Forney

20  did knowingly and intentionally transport Jonnica C. in

21  interstate commerce, to wit, from New York to Connecticut with

22  intent that such individual engage in prostitution?  Yes.

23         Count Three.  Mann Act interstate prostitution of

24  Jonnica C.

25         As to Count Three, how do you unanimously find the

Jury Verdict                                              1055

1   Defendant Joel David Forney?  Guilty.

2            If your verdict is guilty, answer the following two

3   questions:

4            Do you unanimously find that the Government has

5   proven beyond a reasonable doubt that at the time of the

6   offense charged in Count Three, the Defendant Joel David

7   Forney did knowingly and intentionally persuade, induce,

8   entice or coerce Jonnica C. to travel in interstate commerce,

9   to wit, from Wisconsin to New York to engage in prostitution?

10  Yes.

11           Do you unanimously find that the Government has

12  proven beyond a reasonable doubt that at the time of the

13  offense charged in Count Three, the Defendant Joel David

14  Forney, did knowingly and intentionally persuade, induce,

15  entice or coerce Jonnica C. to travel in interstate commerce,

16  to wit, from New York to Connecticut to engage in

17  prostitution?  Yes.

18           Count Four.  Sex trafficking of Shyya H.

19           As to Count Four, how do you unanimously find the

20  Defendant Joel David Forney?  Guilty.

21           Count Five.  Mann Act coercion and enticement of

22  Melissa N.

23           As to Count Five, how do you unanimously find the

24  Defendant Joel David Forney?  Guilty.

25           Signed, the Foreprson.

Jury Verdict                                          1056

1          Dated August 15, 2025.

2          So, starting with Juror No. 1, sir, does the verdict

3     as published reflect your own true verdict?

4          JUROR NO. 1:  Yes.

5          THE COURT:  Juror No. 2?

6          JUROR NO. 2:  Yes.

7          THE COURT:  Juror No. 3?

8          JUROR NO. 3:  Yes.

9          THE COURT:  Juror No. 4?

10         JUROR NO. 4:  Yes.

11         THE COURT:  Juror No. 5?

12         JUROR NO. 5:  Yes.

13         THE COURT:  Juror No. 6?

14         JUROR NO. 6:  Yes.

15         THE COURT:  Juror No. 7?

16         JUROR NO. 7:  Yes.

17         THE COURT:  Juror No. 8?

18         JUROR NO. 8:  Yes.

19         THE COURT:  Juror No. 9?

20         JUROR NO. 9:  Yes.

21         THE COURT:  Juror No. 10?

22         JUROR NO. 10:  Yes.

23         THE COURT:  Juror No. 11?

24         JUROR NO. 11:  Yes.

25         THE COURT:  Juror No. 12?

1          JUROR NO. 12:  Yes, Your Honor.

2          THE COURT:  All right.  I will direct the entry of

3    the verdict.

4          I want to thank the jurors for their service during

5    this past week.  Ms. Jackson has your certificates for your

6    jury service.  You will be turning in your jury cards, your

7    access cards, and she will provide your certificates.

8          On behalf of the Court and the parties, I thank you

9    all for your service.  Thank you.

10          You are dismissed for the day.  Thank you.

11          And I also want to extend my thanks the alternates

12    who sat through the trial as well.  Thank you very much.

13          You can all follow Ms. Jackson back to the jury

14    room.  Thank you.

15          (Jury exits.)

16          THE COURT:  All right.  Does anybody want to be

17    heard at this time?

18          MR. SINGER:  No, Judge.

19          We would ask for 30 days to file any post-trial

20    motions.

21          THE COURT:  Any objection?

22          MS. RANGEL:  No objection, Your Honor.

23          THE COURT:  All right.

24          So 30 days from today would bring us to September...

25          Sorry.  Today's the 15th.

Jury Verdict                                          1058

1          Let's say September 16th.

2          MR. SINGER:  That's fine, Judge.

3          THE COURT:  All right.

4          MR. SINGER:  Thank you.

5          THE COURT:  And the Government, how much time do you

6   need?

7          MS. RANGEL:  Can we also have 30 days?

8          Or two weeks?

9          THE COURT:  Three weeks.  I'll give you three weeks,

10  tops.  Okay?

11         MS. RANGEL:  Thank you.

12         THE COURT:  So three weeks from September 16th.

13         October 7th, is that a holiday for anybody that we

14  need to schedule around?

15         MS. RANGEL:  No, not for the Government.

16         THE COURT:  All right.

17         Would you like a reply, Mr. Singer?

18         MR. SINGER:  How about a week after?

19         THE COURT:  The 14th, sir?

20         MR. SINGER:  Sure.

21         THE COURT:  All right.

22         Is there anything else that you would like to bring

23  to my attention before we adjourn for the day?

24         MS. RANGEL:  No, Your Honor.  Thank you.

25         MR. SINGER:  Nothing else.

Jury Verdict                                              1059

1          THE COURT:  All right.

2          I want to thank both sets of attorneys for their

3    excellent advocacy and thank the marshals for staying late for

4    us.

5          Mr. Forney, be well, please.

6          And thank you to our court reporter for staying late

7    as well.

8          We are adjourned.  Everybody have a good weekend.

9          MS. RANGEL:  Thank you.

10         (Matter concluded.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1060

**E X H I B I T S**

Government Exhibit 533                                    843

Court Exhibits 5, 5A and 6                               1028

Court Exhibits 7 and 8                                   1028

Court Exhibit 8A                                         1035

Court Exhibit 8B                                         1036

Court Exhibit 8C and 8D                                  1051

Court Exhibit 9                                          1052